George Hofmann (10005)
Steven C. Strong (6340)
Adam H. Reiser (13339)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
ghofmann@cohnekinghorn.com
sstrong@cohnekinghorn.com
areiser@cohnekinghorn.com

Proposed Attorneys for III Exploration II LP

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re | Bankruptcy No. 16-26471 |
| III EXPLORATION II LP, | Chapter 11 |
| Debtor. | |

**MOTION FOR (I) AN INTERIM ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION, MODIFYING THE AUTOMATIC STAY, AND GRANTING RELATED RELIEF; AND (II) A FINAL ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL, PROVIDE ADEQUATE PROTECTION, AND OBTAIN POST-PETITION SECURED FINANCING, GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, MODIFYING THE AUTOMATIC STAY, AND GRANTING RELATED RELIEF**

---

III Exploration II LP (the "Debtor") respectfully submits this motion (the "Motion")

requesting, pursuant to Bankruptcy Code §§ 361, 362, 363, and 364 and Bankruptcy

Rules 2002 and 4001, entry of: (1) an interim order substantially in the form attached

hereto as Exhibit 1 (the "Interim Order") (a) authorizing the Debtor, on an interim basis,

to use cash collateral of the prepetition lenders and provide adequate protection for any

diminution in value of the prepetition lenders' liens in such collateral, (b) modifying the

{00282598.DOC / 5}

automatic stay, and (c) granting related relief; and (2) a final order substantially in the form attached hereto as <u>Exhibit 2</u> (the "Final Order") (a) granting the relief provided through the Interim Order on a final basis; and (b) authorizing the Debtor, on a final basis, to obtain postpetition secured financing and granting superpriority administrative expense status to the amounts financed.  The agreed terms for the use of cash collateral and for the postpetition financing are set forth in the Post-Petition Superpriority Credit Agreement (the "DIP Facility") attached hereto as <u>Exhibit 3</u>.[1]  In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND CASE BACKGROUND

1.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

3.       The Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 26, 2016 (the "Petition Date").

4.      The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No examiner, trustee or committee has been appointed in this case.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to the terms in the DIP Facility.  To the extent of any conflict in meaning or effect, the terms of the DIP Facility shall control.

## BACKGROUND REGARDING DEBTOR

6.      The Debtor and its general partner, Petroglyph Energy, Inc. ("Petroglyph"),
are headquartered in Boise, Idaho.  The Debtor is engaged in the exploration and
production ("E&P") of oil and natural gas deposits, primarily in the Uinta Basin in Utah.
The Debtor also has an interest in approximately 42,100 undeveloped acres in the
Raton Basin located in Colorado, and participates in joint ventures with respect to
properties in the Williston Basin in North Dakota.

7.      The Debtor is an Idaho limited partnership formed in September 2001 to
carry out E&P activities.  As a limited partnership, the Debtor operates through its
general partner, Petroglyph, which is a wholly-owned subsidiary of Intermountain
Industries, Inc. ("Intermountain").[2]  In its role as general partner, Petroglyph manages
the operations and governance of the Debtor, for which it receives a management fee
consisting of five percent of Petroglyph's costs.  Petroglyph provides field operation
services and certain financial and accounting services to the Debtor through its wholly-
owned non-debtor subsidiary, Petroglyph Operating Company, Inc. ("POCI").

## OIL AND GAS BACKGROUND

8.      The oil and gas industry is typically divided into three major sectors:
(a) upstream, (b) midstream, and (c) downstream.  E&P companies like the Debtor—
companies that search for and extract crude oil, natural gas, and other hydrocarbons
from the ground—comprise the upstream sector.  The midstream sector includes
companies engaged in gathering, transporting, and storing the hydrocarbons.  The

---

[2] The Debtor has four classes of partners: the general partner, the Class A Limited Partner, the Class B
Limited Partners, and the Class C limited Partners.  Intermountain and its shareholders own 100% of III
Exploration's Class A limited partner units and approximately 2% of the Class B limited partner units.

downstream sector is comprised of refiners, distributors, and marketers of hydrocarbon products.

9.      E&P companies own mineral interests, which generally consists of a real property interest in the minerals in place under a parcel of property and the exclusive right to explore, drill, and produce (generally, "capture") such minerals from the land. Through an oil and gas lease, owners of mineral interests sell or otherwise convey the exclusive right to capture minerals (a "Working Interest") to a third party (a "Working Interest Holder").

10.     The capture of minerals often requires an area of land that implicates the Working Interest of more than one Working Interest Holder.  Accordingly, the rights and responsibilities associated with the capture of minerals are often allocated by and between the Working Interests Holders, which is typically documented in a joint operating agreement.

11.     Working Interest Holders, through a joint operating agreement, will designate one Working Interest Holder as the operator of the relevant land (the "Operator").  The Operator is responsible for the exploration and production of oil and gas from the land on behalf of itself and the other, non-operating Working Interest Holders.  The Operator generally will pay all expenses associated with such operations. It subsequently will bill the non-operating Working Interest Holders for their *pro rata* share of the operating expenses.

## DEBTOR'S BUSINESS OPERATIONS

12.     The Debtor essentially is a real property holding company, which holds a variety of Working Interests in various oil and gas leases in Utah, Colorado and North

Dakota and generates the majority of its revenue through sales of crude oil and natural gas extracted from such properties by Operators—either its affiliate POCI or third party Operators.  The Debtor does not perform the actual drilling on its properties.  The drilling is performed and coordinated by POCI or other Operators unaffiliated with the Debtor.

13.    POCI, on the Debtor's behalf, markets the extracted crude oil and natural gas from properties it operates on behalf of the Debtor on either a month-to-month or a longer-term basis, up to 24 months, pursuant to sales contracts.  The oil sales contracts are priced based on the monthly New York Mercantile Exchange ("NYMEX") West Texas Intermediate ("WTI") price, less a deduction to move the product from the field to the refinery.  Operators of Debtor's properties other than POCI market all natural gas and oil on behalf of all working interest owners including Debtor based on oil and gas sales contracts priced at the relevant New York Mercantile Exchange ("NYMEX") index price adjusted for transportation and location.  The Debtor's customer base is highly concentrated.  For example, oil sales to five purchasers and joint-interest operators constituted more than 90% of the Debtor's total oil revenues in the twelve months ending December 2015, and natural gas sales to three purchasers and joint-interest operators constituted over 90% of the Debtor's natural gas revenue for the same period.

14.    During 2015, the Debtor generated approximately $71 million of commodity revenues.  As of December 31, 2015, the Debtor owned approximately 20 million barrels of oil equivalents of proved reserves and earned over $48 million in EBITDA for the twelve months ending December 31, 2015 (including the benefit of swaps settled in December to reduce the borrowing base).

15.     The Debtor holds interests in approximately 900 leases consisting of approximately 90,000 net acres throughout Colorado, North Dakota, and Utah.  The Debtor typically does not hold 100 percent of the Working Interests in any single well in which it has a Working Interest except for those wells operated on its behalf by POCI in which it does hold approximately 100% Working Interest.  Instead, as described above, the Debtor and other Working Interest Holders customarily enter into joint operating agreements to govern the parties' responsibilities with respect to the wells, including which party will serve as the Operator responsible for the exploration and production of oil and gas thereon.

16.     The Debtor's non-debtor affiliate, POCI, is the Operator with respect to the Debtor's properties located in the western Uinta Basin in Duchesne County of Utah (collectively, the "Operated Properties"). Generally, Debtor holds 100% of the working interests in wells operated by POCI. As of December 31, 2015, the Operated Properties were producing from approximately 233 wells and approximately 300 future drilling locations were planned.   There are nine wells drilled during 2014 in inventory ready for future completion.

17.     With respect to the Debtor's interests in the properties primarily located in the eastern Uinta and Williston Basins in Utah (collectively, the "Non-Operated Properties"), third parties not affiliated with the Debtor act as the Operators.  As of December 31, 2015, the Non-Operated properties were producing from approximately 350 wells.

## DEBTOR'S PREPETITION CAPITAL STRUCTURE

18.    Prior to the Petition Date, the Debtor obtained financing from certain

lenders (the "First Lien Lenders") pursuant to a senior secured credit facility evidenced

by that certain Credit Agreement dated February 19, 2013 among the Debtor, as

borrower, Wilmington Trust, National Association ("Wilmington Trust"), as successor

administrative agent to KeyBank National Association ("KeyBank"), and the First Lien

Lenders (as amended, the "First Lien Facility").

19.    The First Lien Facility provides the Debtor with a revolving credit facility

subject to a borrowing base that may be adjusted by Wilmington Trust at the direction of

the First Lien Lenders based upon the value of the Debtor's oil and gas reserves.

Approximately $84 million in principal amount is currently outstanding under the First

Lien Facility.  Petroglyph is a guarantor of the First Lien Facility.  POCI is not an obligor

or guarantor of the First Lien Facility.

20.    Pursuant to that certain Guarantee and Collateral Agreement dated

February 19, 2013 among the Debtor, as borrower, Petroglyph, as guarantor, and

Wilmington Trust, as successor administrative agent to KeyBank (as may be amended,

modified, and supplemented, the "First Lien Guarantee & Collateral Agreement"), the

First Lien Facility is secured by a first-priority lien in substantially all assets of the Debtor

and all personal property of Petroglyph.

21.    Prior to the Petition Date, the Debtor also obtained secured financing from

certain lenders (the "Second Lien Lenders") pursuant to a junior secured credit facility

evidenced by that certain Second Lien Term Loan Agreement dated as of February 19,

2013 among the Debtor, as borrower, KeyBank, as administrative agent, and the

Second Lien Lenders (as amended, the "Second Lien Facility").  Approximately

$25 million in principal amount is currently outstanding under the Second Lien Facility.

Petroglyph is a guarantor of the Second Lien Facility.

22.     Pursuant to that certain Guarantee and Collateral Agreement dated

February 19, 2013 among the Debtor, as borrower, Petroglyph, as guarantor, and

KeyBank, as administrative agent (as may be amended, modified, and supplemented,

the "Second Lien Guarantee & Collateral Agreement"), the Second Lien Facility is

secured by a second-priority lien in substantially all assets of the Debtor and all

personal property of Petroglyph.  The First Lien Facility and Second Lien Facility

collectively are referred to hereinafter as the "Existing Secured Facility."

23.     In addition, the Debtor is a borrower under an unsecured subordinated

promissory note with Intermountain (the "Intermountain Facility").  Under the terms of

the Intermountain Facility, the Debtor can borrow up to $160 million under a loan

agreement that is subordinated to the Existing Secured Facility.  The maturity date for

any borrowings under the Intermountain Facility is February 19, 2019.  As of December

31, 2015, approximately $132 million was outstanding on the Intermountain Facility.  All

interest is paid in kind and added to the outstanding balance.

24.     Pursuant to the Existing Secured Facility, the First Lien Lenders and the

Second Lien Lenders (collectively, the "Prepetition Lenders") have an interest in the

Debtor's "cash collateral" as defined in 11 U.S.C. § 363(a) (the "Cash Collateral").

## EVENTS LEADING TO DEBTOR'S CHAPTER 11 FILING

25.     Oil and gas companies across the United States and around the world

have been negatively impacted by the downward spiral in commodity prices.  The

difficulties faced by the Debtor are consistent with problems faced industry-wide.  E&P

companies have been challenged by low natural gas prices for years—and prices

remain below $3.00 today.  The scale of the oil price decline cannot be understated.  In

January 2016, the price of oil hit a twelve-year low, dipping below $30 a barrel, and

currently remains at approximately $45 a barrel.  The dramatically low natural gas

prices, a steep drop in the price of oil, and general market uncertainty have created an

incredibly challenging operational environment for the Debtor.  For example, for the

quarter ended December 31, 2015, the Debtor saw a decline of approximately 40% of

its EBITDA as compared to the same period in 2014.

26.     In addition to decreasing revenue as a result of this distressed

environment, lower commodity prices also resulted in a reduction to the Debtor's

borrowing capacity under the First Lien Facility.  Pursuant to the terms of the First Lien

Facility, on a quarterly basis, the administrative agent at the direction of the First Lien

Lenders may adjust the maximum borrowing base of the Debtor under the First Lien

Facility based on the value of the Debtor's oil and gas reserves.  Any reduction of the

borrowing base under the First Lien Facility gives rise to a requirement that the Debtor

repay currently outstanding loans in excess of the newly reduced borrowing base with a

120-day period.  At February 15, 2015 the borrowing base under the First Lien Facility

was $110 million with outstanding borrowings of $110 million.  Debtor reduced the

borrowings by $5 million in May 2015 to $105 million.  At June 30, 2015, the borrowing

base was $105 million, with outstanding borrowings of $105 million.  Effective July 20,

2015, the borrowing base, however, was reduced to $85 million, then further reduced to

$75 million on September 5, 2015.  Pursuant to the First Lien Facility, repayment of the

approximately $20 million deficiency was required by November 17, 2015, with an

additional $10 million deficiency due by January 2, 2016.

27.     Prior to the Petition Date, the Debtor took proactive steps to respond to

market pressure and to resolve the upcoming $30 million payment due to the lenders

under the First Lien Facility.  First, the Debtor began implementing a substantial cost-

cutting program (including, among other things, reducing capital expenditures,) that

resulted in a 22% reduction in general and administrative expenses and a 42%

reduction in lease operating expenses.

28.     The Debtor also launched a robust, comprehensive process to resolve the

shortfall under the First Lien Facility either through a sale of assets, the refinancing of

the First Lien Facility or the infusion of new equity investment from potential new equity

sponsors.  In connection with such process, the Debtor has engaged or expects to

engage Tudor Pickering Holt & Co., an investment bank focused on the energy market.

29.     While discussions with the prospective investors were underway, the

Debtor and its advisors also engaged in discussions with KeyBank, as the

administrative agent under the First Lien Facility, and its advisors regarding the

respective parties' views with respect to valuation, debt capacity, potential pro forma

capital structures, and possible forbearance and/or alternative workout arrangements.

Beginning on November 6, 2015, KeyBank, as the administrative agent under the First

Lien Facility began to exercise remedies against payments owed to the Debtor on

account of oil and gas hedging arrangements, thereby significantly reducing the

Debtor's revenue.  It ultimately became clear that the Debtor lacked the requisite time to

reach a resolution on the terms of an out-of-court restructuring or refinancing.  The

Debtor determined that seeking protection under chapter 11 was in the best interests of

the Debtor and its stakeholders in order to forestall additional potential actions by

Wilmington Trust, as the successor agent under the First Lien Facility, at the direction of

the First Lien Lenders.

30.    The Debtor will require access to postpetition financing in order to carry

on its business operations as a going concern after the Petition Date while seeking to

sell its assets subject to Court approval in this case.   The Debtor and the Prepetition

Lenders have agreed that the Debtor may use the Cash Collateral in accordance with

the budget (the "Budget") attached hereto as <u>Exhibit 4</u> and pursuant to the terms of the

proposed Interim Order.

31.    The Debtor has determined that it likely will need postpetition financing in

addition to the use of Cash Collateral, and has arranged to obtain such financing from

Wilmington Trust, as administrative agent for various lenders (the "DIP Lenders")[3] with

Wilmington serving as administrative agent for the DIP Lenders (the "DIP Agent") on the

terms set forth in the DIP Facility and Final Order.  The Debtor has sought but has been

unable to obtain financing on terms more favorable than those set forth in the DIP

Facility and Final Order.

## RELIEF REQUESTED

32.    The Debtor has prepared the Budget, which details its weekly anticipated

cash receipts, expenses, and financing needs for the period from the Petition Date

through January 6, 2017.  The Debtor requests interim relief authorizing the use of Cash

Collateral in accordance with the Budget and Interim Order through the date of the final

---

[3] The Debtor understands that the First Lien Lenders and the DIP Lenders are identical.

hearing on the Motion (expected to be within 15 days of the Petition Date).  Further, the

Debtor requests authority, on a final basis, to use Cash Collateral and to obtain

borrowings under the DIP Facility in accordance with the Budget and the specific terms

and conditions of the DIP Facility and Final Order.

33.      In particular, the Debtor requests entry of the Interim Order which, among

other things, would authorize the limited use of Cash Collateral on an interim basis in

accordance with the Budget through and including the date of the final hearing on the

Motion and provide adequate protection for any diminution in value of the Prepetition

Lenders' interest in the Cash Collateral.  Also, the Debtor requests entry of the Final

Order, which among other things, would approve the DIP Facility and the Debtor's

authority to borrow under the DIP Facility in accordance with the Budget, and provide

priming first-priority liens and superpriority administrative expense status to the extent of

such borrowings.  Additionally, on both an interim and final basis, the Debtor requests

that this court (a) modify the automatic stay to the extent necessary to implement and

effectuate the terms and provisions of the DIP Facility and of the Interim Order and Final

Order (collectively, the "Financing Orders"); and (b) rule that the fourteen-day stay

under Bankruptcy Rule 6004(h) will not apply with respect to the relief sought in this

Motion and that the Financing Orders will be effective immediately upon entry.

## MATERIAL TERMS OF THE PROPOSED DIP FACILITY

34.     In accordance with Fed. R. Bankr. P. 4001(c)(1)(B), the Debtor provides

the following summary of the material provisions[4] of the proposed DIP Facility, Interim

Order, and Final Order:

a.  <u>Obligor</u>.  The Debtor is the Borrower under the DIP Facility, and the
    Debtor's general partner, Petroglyph, will provide an unconditional
    guaranty of the Debtor's Obligations.  *See* DIP Facility § 1.02
    (Definitions, "Borrower," "Guarantors," and "Obligations").

b.  <u>Interest Rate</u>.  Borrowings under the DIP Facility will bear interest at
    the Applicable Rate, which is (i) the LIBO Rate for such date plus eight
    percent (8%) per annum, or (ii) if the LIBO Rate is unavailable for any
    reason as determined by the Administrative Agent as provided in the
    definition thereof, the Prime Rate for such date plus eight percent (8%)
    per annum.  *See* DIP Facility § 1.02 (Definitions, "Applicable Rate").

c.  <u>Maturity</u>.  The DIP Facility matures on the earliest to occur of (i) the
    date 24 weeks after the Effective Date, (ii) termination of the Transition
    Services Agreement (including any extended period thereunder) and
    the payment in full of all Costs and Management Fees required
    thereunder, (iii) the closing of the 363 Sale, (iv) the effective date of a
    Chapter 11 plan filed in the Case that is confirmed pursuant to an order
    entered by the Bankruptcy Court, and (v) the date on which all Loans
    shall become due and payable in full hereunder, whether by
    acceleration or otherwise; provided that, if any such day is not a
    Business Day, the Maturity Date shall be the Business Day
    immediately succeeding such day.  *See* DIP Facility § 1.02
    (Definitions, "Maturity Date").

d.  <u>Events of Default</u>.  The list of events of default under the DIP Facility
    and events terminating the permission to use cash collateral under the
    Financing Order includes, but is not limited to, the failure of the Debtor
    to pay principal or interest when due, the failure of the Debtor to
    comply with certain covenants and conditions in the DIP Facility, the
    failure of the Final Order to be in full force and effect, the failure of the
    Debtor or the Bankruptcy Court to meet certain deadlines in the case,
    the dismissal or conversion of the case or appointment of a trustee or
    receiver, the failure of the Debtor to comply with the Budget (within
    certain permitted Variances), and a default by the Debtor or POCI

---

[4] This summary is qualified entirely by the provisions of the DIP Facility and related documents, and any order of this Court relating to the postpetition financing proposed through the Motion.

under the Transition Services Agreement. *See* DIP Facility § 10.01; Interim Order ¶ 5; Final Order ¶ 54.

e.  <u>Liens</u>. To the extent of any diminution in value, the Prepetition Lenders are granted superpriority status (Interim Order ¶¶ 13-14) and replacement liens on all of Debtor's property (Interim Order ¶¶ 9-12) (except the Prepetition Lenders have agreed that the Interim Order will not encumber Chapter 5 avoidance actions) senior to all other liens except for liens of the DIP Lenders (Interim Order ¶ 11) and certain tax liens and other valid liens (Interim Order ¶ 18 and Final Order ¶ 36) and subject to the "Carve-Out" defined in Interim Order ¶ 19 and Final Order ¶ 37). Under the Final Order, all obligations of the Debtor under the DIP Facility will have superpriority claim status under 11 U.S.C. 364(c)(1) (subject to the "Carve-Out") and will be secured by a perfected lien on assets of the Debtor senior to all other liens except for certain tax liens and other valid liens (Final Order ¶ 36) and subject to the "Carve-Out" defined in Final Order ¶ 37). *See* DIP Facility § 7.24(b); Final Order ¶ 12-13.

f.  <u>Borrowing Limits</u>. The DIP Facility provides for borrowings up to $4,000,000. *See* DIP Facility § 1.02 (Definitions, "Commitment"); Recital E; Annex I. Borrowings that are repaid may be reborrowed. *See* DIP Facility § 2.01; Final Order at p. 2.

g.  <u>Borrowing Conditions</u>. The proceeds of the DIP Facility may be used only (i) to fund postpetition operating expenses and working capital needs of the Debtor, (ii) to funds fees and expenses (including professional fees) incurred in connection with the DIP Facility and the bankruptcy case; (iii) to pay adequate protection payments; (iv) to fund the Carve-Out, and (v) to pay certain other costs and expenses of the case—all as may be agreed to by the DIP Lenders and the Debtor in accordance with the Budget. *See* DIP Facility §§ 2.02, 2.03, 7.21; Final Order ¶¶ 7-11.

h.  <u>Swap Agreement</u>. As required by the DIP Facility and after entry of the Final Order, the Debtor intends to enter into a secured Swap Agreement with BOKF, NA d/b/a Bank of Oklahoma as a "costless collar" energy hedge facility to protect against significant declines in the market price of oil and gas, and the Final Order would grant liens, superpriority claims, and other protections to the "Lender Swap Parties" on an equal and ratable pari passu basis with the superpriority liens securing the DIP Facility. *See* DIP Facility §§ 5.03, 6.01(q), 7.02; Final Order ¶¶ 19-23.

35.    Further, the DIP Facility and/or Financing Orders contain certain

provisions specifically addressed in Fed. R. Bank. P. 4001(c)(1)(B)(i) to (xi), as follows:

a.  Rule 4001(c)(1)(B)(i).  The DIP Facility grants superpriority administrative expense status and senior liens on all assets of the estate, as explained above, subject to the Carve-Out and excluding only ad valorem tax liens and certain other valid senior liens.  *See* DIP Facility § 7.24(b) and (c); § 8.19; Final Order ¶¶ 12-15, and 36.

b.  Rule 4001(c)(1)(B)(ii).  The Interim Order provides adequate protection to the Prepetition Lenders in the form of superpriority claims and replacement liens on the Debtor's assets to the extent of any diminution in the Prepetition Lenders' interest in their collateral.  See Interim Order ¶¶ 9-18; Final Order ¶¶ 25-30, 32, and 36.  Such provisions in the Interim Order are proposed to remain in effect if the Interim Order is entered but entry of the Final Order is denied.

c.  Rule 4001(c)(1)(B)(iii).  The Interim Order and Final Order would constitute a determination that the Existing Secured Facility is valid, enforceable, secured by first-priority liens (as to the First Lien Facility) and second-priority liens (as to the Second Lien Facility), respectively, on the Debtor's assets, and not subject to avoidance under Chapter 5 of the Bankruptcy Code, subject to challenge only by certain parties in interest or the creditors committee during a limited challenge period. *See* Interim Order Recital G and ¶¶ 29-32; Final Order Recital G and ¶¶ 64-69.  Such provisions in the Interim Order are proposed to remain in effect if the Interim Order is entered but entry of the Final Order is denied.

d.  Rule 4001(c)(1)(B)(iv).  The proposed Interim Order and Final Order would modify the automatic stay to permit the Prepetition Lenders and the DIP Lenders to exercise remedies upon an event of termination, maturity, or an event of default under the DIP Facility without further order of the Court.  *See* Interim Order ¶¶ 7, 37; Final Order ¶¶ 22, 35, 59, 61.  Such provisions in the Interim Order are proposed to remain in effect if the Interim Order is entered but entry of the Final Order is denied.

e.  Rule 4001(c)(1)(B)(v).  The DIP Facility and proposed Final Order would modify the rights of parties in interest to file a plan, seek an extension of the Debtor's exclusive period to file a plan, request the use of cash collateral under Section 363(c), and request authority to obtain credit under Section 364, because all such rights could be exercised only to the extent permitted by the DIP Facility and only with

the prior consent and approval of the DIP Lenders.  *See, e.g.,* DIP Facility §§ 9.19(a), 10.01(u); Final Order, Findings ¶ P, ¶¶ 50, 54(k), 54(*l*).

f.  Rule 4001(c)(1)(B)(vi).  The DIP Facility and Financing Orders do not establish deadlines for filing a plan, approval of a disclosure statement, a hearing on confirmation, and entry of a confirmation order.

g.  Rule 4001(c)(1)(B)(vii).  The proposed Interim Order and Final Order would modify the applicability of nonbankruptcy law by providing for the perfection of liens and security interests without requiring compliance with applicable nonbankruptcy law.  S*ee* Interim Order ¶ 11; Final Order ¶ 26. Such provisions in the Interim Order are proposed to remain in effect if the Interim Order is entered but entry of the Final Order is denied.

h.  Rule 4001(c)(1)(B)(viii).  The DIP Facility and proposed Financing Orders would provide for the release and waiver by the Debtor of all claims and causes of action against the Prepetition Lenders and DIP Lenders and of all claims and causes of action relating to the Existing Secured Facility and DIP Facility.  *See* DIP Facility § 12.18; Interim Order ¶ 35 (subject to certain parties' Challenge rights); Final Order ¶ 72 (subject to certain parties' Challenge rights).

i.  Rule 4001(c)(1)(B)(ix).  The DIP Facility provides that the Debtor will indemnify, pay and hold harmless the DIP Lenders and their affiliates (and their respective directors, officers, employees, agents and advisors) against any loss, liability, cost or expense incurred in respect of the DIP financing or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).  *See* DIP Facility §12.03.

j.  Rule 4001(c)(1)(B)(x).  The DIP Facility and Final Order would prohibit the assertion of claims arising under Bankruptcy Code section 506(c) against the DIP Lenders or the commencement of other actions adverse to the DIP Lenders or their rights and remedies under the DIP Facility.  *See* DIP Facility at p. 7 (definition of required DIP Order includes waiver of 506(c) rights); Final Order ¶ 46.

k.  Rule 4001(c)(xi).  The Final Order would grant the DIP Lenders a lien on all property of the Debtor, including Chapter 5 avoidance actions.  *See* Final Order ¶ 12.

36.    In accordance with Local Bankruptcy Rule 4001-2, the Debtor sets forth

below whether the DIP Facility, Interim Order and/or Final Order contain any

extraordinary relief as listed in Rule 4001-2(a)(1)(A) through (G):

a.    <u>Rule 4001-2(a)(1)(A)</u>.  The DIP Facility, Interim Order and Final Order do not provide any cross-collateralization protection to any prepetition secured creditors.

b.    <u>Rule 4001-2(a)(1)(B)</u>.  The Interim Order and Final Order do contain provisions and findings of fact that would bind the Debtor and the estate with respect to the validity and perfection of the obligations under the Existing Secured Facility, but they do provide Challenge rights to certain other parties in interest that allow 75 days from the entry of the order for relief in the case or, in the case of a creditors' committee, if formed, 60 days from the day of its formation, to investigate such matters.  *See* Interim Order ¶¶ 29-32; Final Order ¶¶ 64-69.

c.    <u>Rule 4001-2(a)(1)(C)</u>.  The Final Order would waive whatever rights the estate may have under Section 552(b), but notice of such provision will be provided by serving notice of this Motion.  *See* Final Order ¶ 46.

d.    <u>Rule 4001-2(a)(1)(D)</u>.  The Prepetition Lenders have agreed that the Interim Order does not grant liens on claims or causes of action under Chapter 5 of the Bankruptcy Code; the Final Order, however, will grant liens on claims and causes of action under Chapter 5.  *See* Paragraph 33.e above.

e.    <u>Rule 4001-2(a)(1)(E)</u>.  The DIP Facility, Interim Order and Final Order do not contain provisions that would deem prepetition secured debt to be postpetition debt or that use postpetition loans to pay prepetition debt.

f.    <u>Rule 4001-2(a)(1)(F)</u>.  The DIP Facility and Final Order do not contain provisions that provide disparate treatment for creditors' committee professionals from that provided for the Debtor's professionals.

g.    <u>Rule 4001-2(a)(1)(G)</u>.  The Interim Order and Final Order provide senior priming liens to the Prepetition Lenders and DIP Lenders, but provide that certain ad valorem taxes and other valid senior liens (if any) will note be primed.  See Interim Order ¶ 18; Final Order ¶ 36.

## DISCUSSION

I.    **The Debtor Properly Has Exercised Its Business Judgment in Entering into the DIP Facility, Which Should be Approved Under Bankruptcy Code § 364(c) and (d).**

As described above, it is essential to the success of the Debtor's chapter 11 case that the Debtor immediately obtain access to sufficient post-petition financing.  The preservation of estate assets, the Debtor's continuing viability during this case and its ability to maximize distributions to creditors all depend heavily upon approval of the DIP Facility and the related actions requested in this Motion.

Bankruptcy Code § 364 distinguishes between (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or security.  If a debtor in possession is unable to obtain postpetition credit on an unsecured basis, pursuant to Section 364(c) the court may authorize the obtaining of credit or the incurring of debt on the basis that the debtor's repayment obligation will be entitled to superpriority administrative expense status or will be secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of these protections.  Section 364(d) provides that a court may "prime" an existing lien only if a debtor in possession "is unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

Because the Debtor proposes to obtain financing under the DIP Facility that is entitled to superpriority administrative expense status and is secured by a senior lien on

property of the Debtor that already is encumbered, approval of the DIP Facility is governed by Section 364(c) and (d).

Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod, Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  As one court has noted, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

Bankruptcy courts generally defer to the business judgment of a trustee or a debtor in possession regarding the need for and the proposed use of funds unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).  Courts generally will not second-guess a trustee's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R., at 513-14 (footnotes omitted).

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the proposed borrowing is in the best interest of the estate.  See, e.g., In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that with respect to

post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); In re Simasko Prod, Co., 47 B.R. at 448-449 (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

The statutory requirement for obtaining postpetition credit under Section § 364(c) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) … as an administrative expense." See Ames Dept. Stores, 15 B.R. at 37-39 (reasoning that a debtor must show that it has made a reasonable effort to seek other sources of financing under Section 364(a) and (b)).  The statutory requirement for obtaining postpetition credit under Section 364(d) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  See, e.g., In re Campbell Sod, Inc., 378 B.R. 647, 652 (Bankr. D. Kan. 2007) (applying "holistic" approach to conclude that financing was appropriate under Section 364(d)).

"Some courts apply a three-part test to assess debtor in possession financing requests under section 364(c), requiring a showing that (1) the debtor cannot obtain credit unencumbered or without superpriority status under section 364(b), (2) the credit transactions are necessary to preserve assets of the estate and (3) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor in possession-borrower and the proposed lender."   3 Collier on Bankruptcy ¶ 364.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases).  In this case, the

DIP Facility meets this standard and should be approved.  See id.; In re Aqua Assocs.,

123 B.R. 192, 195-196 (Bankr. E.D. Pa. 1991) (applying test to conclude that

"[o]btaining credit should be permitted not only because it is not available elsewhere, …

but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason").

To show that the credit required is not otherwise available, a debtor need only

demonstrate "by a good faith effort that the credit was not available without" the

protections of Section 364(c) and (d).  In re Snowshoe Co., 789 F.2d 1085, 1088 (4th

Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible

lender before concluding that such credit is unavailable."  Id. at 1088.  Where few

lenders are likely to be able and willing to extend the necessary credit to a debtor, "it

would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive

search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. D. N.D. Ga.

1988), aff'd sub nom Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4

(N.D. Ga 1989).

In this case, the Debtor and DIP Lenders engaged in arm's-length negotiations in

the days leading up to the Petition Date, resulting in the financing proposed in this

Motion for approval by the Court.  At no time did the Prepetition Lenders or the DIP

Lenders manifest a willingness to extend the postpetition financing without the

protections afforded under Section 364(c) and (d).  [Moreover, based on discussions

with the Debtor's investment banker and the nature of its own assets,] the Debtor

believes in its reasonable business judgment that it would be unable to obtain financing

from any capital source without the protections afforded by Section 364(c) and (d).

Accordingly, the Debtor believes that the terms and conditions of the DIP Facility are reasonable and justified under the circumstances.

The Debtor's business judgment is that the proposed postpetition financing is necessary to preserve the Debtor's assets and is in the best interests of the Debtor's estate.  It is essential that the Debtor obtain the financing necessary to continue, among other things, the orderly operation of the Debtor's business and its Chapter 11 bankruptcy case and to otherwise satisfy its working capital requirements.  If the Debtor had not filed its bankruptcy petition, the Debtor believes it would have [run out of cash necessary for continued operations within a few weeks].  Without immediate access to a new credit facility, the Debtor's business operations and its bankruptcy case likely would grind to a halt seriously jeopardizing the going concern value of the Debtor's business.

The Debtor submits that the terms of the DIP Facility are reasonable and should be approved.  The proposed DIP Facility provides that the security interests and superpriority claims granted to the DIP Lenders are subject to the Carve-Out described above.  The Carve-Out is typical of such provisions in similar Chapter 11 cases where postpetition financing is needed, and provides a reasonable and necessary method of ensuring that the Debtor's estate is adequately assisted by counsel and other professionals.  See Ames, 115 B.R. at 40.  Similarly, the Debtor believes that the fees and other charges set forth in the DIP Facility are reasonable and appropriate under the circumstances.  The proposed fees under the DIP Facility are within the parameters of market-fee structures for similar post-petition financing.  See, e.g. In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving debtor in possession financing facility that included a lender "enhancement fee").

Accordingly, the Court should approve the terms and conditions of the DIP

Facility pursuant to Bankruptcy Code § 364(c) and (d).

## II.   The Court Should Authorize the Use of Cash Collateral and the Granting of Adequate Protection Based upon Consent of the Secured Party

A debtor in possession may not use cash collateral without the consent of the

secured party or court approval.  Bankruptcy Code § 363(c)(2) and (e).  In this case, the

Debtor seeks authority to use Cash Collateral of the Prepetition Lenders on the terms

set forth in the Interim Order and Final Order.  The Court should authorize the use of

cash collateral because Prepetition Lenders consent to those terms.

As a result of the use of Cash Collateral as requested herein, the Prepetition

Lenders are entitled to receive adequate protection pursuant to sections 361, 362, 363,

and 364 of the Bankruptcy Code for any diminution in value resulting from the automatic

stay or Debtor's use, sale or lease of the Prepetition Lender's collateral (including Cash

Collateral) during this bankruptcy cases.

## III.   The Court Should Modify the Automatic Stay Consistent with the Terms of the DIP Facility.

Bankruptcy Code § 362 provides for an automatic stay upon the filing of a

bankruptcy case.  As summarized above, the proposed DIP Facility contemplates a

modification of the automatic stay (a) to permit the Debtor to grant certain liens and to

perform the Debtor's obligations under the DIP Facility, (b) to permit the exercise of

remedies by the DIP Lenders following an event of default and (c) to authorize the DIP

Lenders to retain and apply payments made pursuant to the DIP Facility, Interim Order,

and Final Order, subject to certain notices required by the Interim Order and Final

Order, as applicable.  Upon the occurrence of an event of default, the DIP Lenders are

entitled to exercise the rights and remedies as set forth in the DIP Facility.  The Debtor

submits that, in the Debtor's business judgment, such provisions are reasonable under

the present circumstances.  Accordingly, the Debtor's respectfully request that the Court

modify the automatic stay in accordance with the DIP Facility to the extent provided in

the proposed Interim Order and Final Order.

**IV.    The DIP Lenders Are Entitled to the Benefit and Protection of Bankruptcy
Code § 364(e).**

The Debtor believes that the terms and conditions of the DIP Facility are the best

possible terms obtainable under the circumstances, and were negotiated in good faith,

at arm's length, and with the assistance of counsel on all sides.  Accordingly, the DIP

Lenders should be provided with the benefit and protection of Bankruptcy Code §

364(e), such that if any of the provisions of any order granting the Motion (in whole or in

part) are later modified, vacated, stayed, or terminated by subsequent order of this or

any other court, the DIP Lenders would be fully protected with respect to any amounts

advanced before such modification, vacation, stay or termination.

**V.    Cause Exists to Waive the 14 Day Stay Otherwise Applicable
Under Bankruptcy Rule 6004**

Bankruptcy Rule 6004(h) provides that unless the Court orders otherwise, all orders

authorizing the use, sale or lease of property under Bankruptcy Code § 363 are

automatically stayed for 14 days after entry of the order.  The Debtor submits that cause

exists to permit the Court to rule that the otherwise applicable 14-day stay under Rule

6004(h) will not apply in this case.  Without immediate authority to use Cash Collateral

and obtain borrowings, the Debtor will run out of cash and be unable to continue

operating as a going concern.

## CONCLUSION

WHEREFORE, the Debtor respectfully request that the Court enter the Interim

Order after a preliminary hearing on the Motion and enter the Final Order after a final

hearing on the Motion.

Dated this 26th day of July, 2016.

COHNE KINGHORN, P.C.

_____/s/ Steven C. Strong_____
GEORGE HOFMANN
STEVEN C. STRONG
Proposed Attorneys for the Debtor

# Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re: | ) **Chapter 11** |
| | ) |
| **III EXPLORATION II LP** | ) **Case No. 16-26471** |
| | ) |
| Debtor. | ) |

**INTERIM ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL**
**PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) GRANTING**
**ADEQUATE PROTECTION TO THE PREPETITION LENDERS PURSUANT TO**
**SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE, (III) GRANTING**
**LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING AUTOMATIC STAY, AND**
**(V) SCHEDULING A FINAL HEARING**

Having considered the motion (the "Motion") of III Exploration II LP, the above-captioned debtor and debtor in possession (the "Debtor"), requesting, pursuant to Sections 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2002 and 4001, entry of: (1) an interim order (a) authorizing the Debtor, on an interim basis, to use cash collateral of the prepetition lenders and providing adequate protection for any diminution in value of the prepetition lenders' liens in such collateral, (b) modifying the automatic stay, and (c) granting related relief; and (2) a final order (the "Final Order") (a) granting the relief provided through this order (this "Interim Order") on a final basis; and (b) authorizing the Debtor, on a final basis, to obtain postpetition secured financing and granting superpriority administrative expense status to the amounts financed, any objections, evidence and arguments presented at the hearing (the "Interim Hearing") and **BASED ON THE STIPULATION OF THE PARTIES, THE COURT HEREBY FINDS AS FOLLOWS**:

## Jurisdiction

A.      This Court has jurisdiction over this case (this "Chapter 11 Case" or this "Case"), the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

## Venue

B.      Venue for this Case and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Core Proceeding

C.      This matter is a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A),(D), and (M). The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the local rules of this Court (the "Local Rules").

## Petition Date

D.      On July 26, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Utah (this "Court"). The Debtor has continued in the management and operation of its business and properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## Committee

E.      To date, the Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors equity interest holders, or other parties-in-interest in this Case.

**Notice**

F.      On _____, 2016, pursuant to Bankruptcy Rules 2002, 4001, and 9014 the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties-in-interest entitled to such notice, including: (a) the U.S. Trustee, (b) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (c) counsel to the First Lien Agent (as defined below), (d) counsel to the Second Lien Agent (as defined below), (e) counsel for the DIP Agent (as defined in the DIP Credit Agreement), (f) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (g) any other secured parties of record. Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(a), (b), (c) and (d) and the Local Rules, and no other notice needs to be provided for entry of this Interim Order.

**Pre-Petition Lenders' Claim and Liens**

G.      Without prejudice to the rights of any other party in interest (but subject to the limitations in Paragraph 29 below, including the Challenge Rights in the Challenge Period), the Debtor, on its behalf and on behalf of its estate, representatives, successors, and assigns, admits, stipulates, acknowledges, and agrees: (a) that the Agents and the Pre-Petition Lenders hold valid, enforceable and allowable claims as defined in Section 101 of the Bankruptcy Code as of the Petition Date; and (b) that this Interim Order shall constitute proof of the amount and nature of each of the Agents and the Pre-Petition Lenders' claims (as set forth below) in this Case and the Agents (on behalf of the Pre-Petition Lenders) (as defined below) may, but shall not be obligated to, amend or supplement this proof by filing a proof of claim in this Case. The Debtor further acknowledges and stipulates:

(1)      <u>First Lien Loan Documents</u>. As of the Petition Date, the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, with respect to all obligations (the

"First Lien Obligations") owing pursuant to (a) the Credit Agreement dated as of February 19, 2013 among the Debtor, the financial institutions party thereto (the "First Lien Lenders"), Citibank N.A. as Syndication Agent and KeyBank National Association as Administrative Agent, later succeeded by Wilmington Trust, National Association as Successor Administrative Agent for the First Lien Lenders (the "First Lien Agent")(as so amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"); and (b) the other documents executed in connection therewith, including, without limitation, any notes, mortgages, deeds of trust, letter of credit documents, security agreements, guaranty agreements, deposit account control agreements, hedge contracts, or any other agreements or instruments executed by the Debtor, any guarantor of the Debtor or any subsidiary of the Debtor (collectively, the "First Lien Security Documents," collectively with the First Lien Credit Agreement, the "First Lien Loan Documents"). The Debtor acknowledges that the First Lien Obligations constitute legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms, and that no portion of the First Lien Obligations or any amounts paid to the First Lien Lenders or the First Lien Agent for the benefit of the First Lien Lenders prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law. Pursuant to the First Lien Loan Documents, as of the Petition Date, the aggregate amount of not less than $_____, consisting of unpaid principal in the amount of not less than $_____, accrued but unpaid interest and fees in the amount of not less than $_____, plus all other fees, expenses, charges, and other amounts due under the First

Lien Loan Documents (collectively, the "First Lien Indebtedness") was due and owing by the Debtor to the First Lien Lenders and First Lien Agent.

(2)     First Pre-Petition Liens.  The First Lien Indebtedness is secured by valid, binding, perfected and enforceable liens and security interests (the "First Pre-Petition Liens") granted by the Debtor to the First Lien Lenders and First Lien Agent for the benefit of the First Lien Lenders, under the First Lien Loan Documents, upon and in property of the Debtor as described in the First Lien Security Documents whether then owned or thereafter acquired or arising, and all proceeds and products thereof  (collectively, the "First Lien Collateral").

(3)     Validity and Priority of First Pre-Petition Liens.  The First Pre-Petition Liens constitute valid, binding, enforceable and perfected liens encumbering the First Lien Collateral, including Cash Collateral (as defined below), and are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind (except insofar as such liens are subordinate to (a) any liens existing on the Petition Date that are valid, properly perfected, unavoidable, and senior to the First Pre-Petition Liens, (b) the Adequate Protection Replacement Liens (as defined below), (c) any DIP liens expressly consented to by the First Lien Agent (on behalf of the First Lien Lenders), or (d) the Carve-Out (as defined below)).  The First Lien Agent (on its behalf and on behalf of the First Lien Lenders) holds properly perfected security interests and First Pre-Petition Liens in and on the First Lien Collateral by the filing of UCC-1 financing statements, mortgages, deeds of trust and other required documents against the Debtor and such First Lien Collateral with the applicable federal, state, and county offices for perfection of such security interests and First Pre-Petition Liens or otherwise.

(4)      Second Lien Loan Documents.  As of the Petition Date, the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, with respect to all obligations (the "Second Lien Obligations," collectively with the First Lien Obligations, the "Pre-Petition Obligations") owing pursuant to (a) the Second Lien Term Loan Agreement dated as of February 19, 2013 among the Debtor, the financial institutions party thereto (the "Second Lien Lenders" collectively with the First Lien Lenders, the "Pre-Petition Lenders"), Citibank N.A. as Syndication Agent and KeyBank National Association as Administrative Agent (the "Second Lien Agent," collectively with the First Lien Agent, the "Agents") (as so amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement" collectively with the First Lien Credit Agreement, the "Pre-Petition Credit Agreements"); and (b) the other documents executed in connection therewith, including, without limitation, any notes, mortgages, deeds of trust, letter of credit documents, security agreements, guaranty agreements, deposit account control agreements, hedge contracts, or any other agreements or instruments executed by the Debtor, any guarantor of the Debtor or any subsidiary of the Debtor (collectively, the "Second Lien Security Documents," collectively with (i) the First Lien Security Documents, the "Pre-Petition Security Documents" and (ii) the Second Lien Credit Agreement, the "Second Lien Loan Documents").    The Debtor acknowledges that the Second Lien Obligations constitute legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms, and that no portion of the Second Lien Obligations or any amounts paid to the Second Lien Lenders prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.    Pursuant to the Second Lien Loan Documents

(collectively with the First Lien Loan Documents, the "Pre-Petition Loan Documents"), as of the Petition Date, the aggregate amount of not less than $_____, consisting of unpaid principal in the amount of not less than $_____, accrued but unpaid interest and fees in the amount of not less than $_____, plus all other fees, expenses, charges, and other amounts due under the Second Lien Loan Documents(collectively, the "Second Lien Indebtedness," collectively with the First Lien Indebtedness, the "Pre-Petition Indebtedness") was due and owing by the Debtor to the Second Lien Lenders and Second Lien Agent.

(5)    For purposes of this Interim Order, Pre-Petition Indebtedness shall mean and include, without duplication, any and all amounts owing or outstanding under the Pre-Petition Loan Documents, interest on, fees and other costs, expenses and charges owing in respect of such amounts (including, without limitation, any reasonable attorneys' fees, accountants' fees, financial advisors' fees, or other fees and expenses) that are chargeable or reimbursable pursuant to the Pre-Petition Loan Documents, and any and all obligations liabilities, contingent or otherwise, owed in respect of the letters of credit or other Pre-Petition Obligations outstanding thereunder.

(6)    Second Pre-Petition Liens.  The Second Lien Indebtedness is secured by valid, binding, perfected and enforceable liens and security interests (the "Second Pre-Petition Liens," collectively with the First Pre-Petition Liens, the "Pre-Petition Liens") granted by the Debtor to the Second Lien Lenders and Second Lien Agent for the benefit of the Second Lien Lenders, under the Second Lien Loan Documents, upon and in property of the Debtor as described in the Second Lien Security Documents whether then owned or thereafter acquired or arising, and all proceeds and products thereof  (collectively, the "Second Lien Collateral," collectively with the First Lien Collateral, the "Pre-Petition Collateral").

(7)     For the avoidance of doubt, Pre-Petition Collateral shall mean and include (a) collateral in or upon which a lien or other security interest has been granted in favor or for the benefit of the Agents or the Pre-Petition Lenders in connection with, pursuant to or under the Pre-Petition Loan Documents; and (b) any Pre-Petition Collateral provided under any of the Pre-Petition Loan Documents, including that collateral described in this subparagraph and/or subparagraphs 2 and 6, that existed as of the Petition Date and all pre-petition and post-petition proceeds, products, offspring, rents, and profits of such Pre-Petition Collateral.

(8)     <u>Validity and Priority of Second Pre-Petition Liens</u>. The Second Pre-Petition Liens constitute valid, binding, enforceable and perfected second priority liens encumbering the Second Lien Collateral, including Cash Collateral (as defined below), and are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind (except insofar as such liens are subordinate to (a) any liens existing on the Petition Date that are valid, properly perfected, unavoidable, and senior to the Second Pre-Petition Liens, including, without limitation, the First Pre-Petition Liens, but not limited to the First Pre-Petition Liens, (b) any DIP liens expressly consented to by the Second Lien Agent (on behalf of the Second Lien Lenders), (c) the Carve-Out, or (d) the Adequate Protection Replacement Liens (as defined below). The Second Lien Agent (on its behalf and on behalf of the Second Lien Lenders) holds properly perfected security interests and Second Pre-Petition Liens in and on the Second Lien Collateral by the filing of UCC-1 financing statements, mortgages, deeds of trust, and other required documents against the Debtor and such Second Lien Collateral with the proper federal, state, and county offices for perfection of such security interests and Second Pre-Petition Liens or otherwise.

(9)     Pursuant to the Pre-Petition Loan Documents, the Agents and the Pre-Petition Lenders made certain loans, advances, and other financial accommodations and provided letters of credit to the Debtor to fund, among other things, the Debtor's operations.

(10)     The Agents and the Pre-Petition Lenders assert, and the Debtor does not dispute, that the amounts owed as of the Petition Date under the First Lien Loan Documents and the Second Lien Loan Documents and described herein, are correct and are secured by perfected liens and security interests in the First Lien Collateral and the Second Lien Collateral, respectively.  The Agents and the Pre-Petition Lenders assert, and the Debtor does not dispute, that the Agents and the Pre-Petition Lenders hold enforceable, perfected liens and security interests in the Pre-Petition Collateral, which includes the Cash Collateral.

(11)     The claims, liens and security interests of the First Lien Agent and the First Lien Lenders have priority over the claims, liens and security interests of the Second Lien Agent and the Second Lien Lenders to the extent provided in the Intercreditor Agreement dated as of February 19, 2013 and entered into among the Debtor, Petroglyph Energy, Inc., as guarantor, KeyBank National Association, in its capacity as administrative agent for the holders of the First Lien Obligations (including its successors and assigns from time to time), and KeyBank National Association, in its capacity as administrative agent for the holders of the Second Lien Obligations (including its successors and assigns from time to time) (the "Intercreditor Agreement").

(12)     The Pre-Petition Lenders are not providing any DIP loans or DIP financing to the Debtor on an interim basis.  It is anticipated that the Debtor will seek approval of DIP loans at a final hearing on the Motion.  Subject to the terms and conditions of the DIP Credit Agreement,

the First Lien Lenders have committed to fund a $4 million DIP Facility (as defined in the DIP
Credit Agreement).

## Binding Agreement and Good Faith

H.      The terms and conditions set forth in this Interim Order are fair, just and
reasonable under the circumstances, are ordinary and appropriate, reflect the Debtor's exercise of
its prudent business judgment consistent with its fiduciary duties, and are supported by
reasonably equivalent value and fair consideration.   Any agreements and arrangements
authorized in this Interim Order have been negotiated at arms' length with all parties represented
by experienced counsel and the Agents and Pre-Petition Lenders are hereby found to be entities
that have acted in "good faith" in connection with the negotiations and entry of this Interim
Order, and each is entitled to the protections provided under Section 363(m) of the Bankruptcy
Code, and are enforceable in accordance with their terms.

## Cash Collateral

I.      For purposes of this Interim Order, cash collateral consists of all of the Debtor's
property that constitutes cash collateral in which the Agents and the Pre-Petition Lenders have an
interest as provided in Section 363(a) of the Bankruptcy Code.  Accordingly, "Cash Collateral"
shall mean all cash, cash equivalents, negotiable instruments, refunds, documents of title,
securities, deposit accounts or other cash equivalents, in which the Agents and the  Pre-Petition
Lenders have an interest as provided in Section 363(a) of the Bankruptcy Code.  "Cash
Collateral" shall also consist of all of the Debtor's property that constitutes cash collateral in
which the Debtor has an interest as provided in Section 363(a) of the Bankruptcy Code and shall
include, without limitation:

(1)      All cash proceeds from the collection, sale, lease or other disposition, use
or conversion of any property upon which the Agents and the Pre-Petition Lenders hold
liens or replacement liens, whether as a part of the Pre-Petition Collateral or pursuant to

the Bankruptcy Code, and order of this Court, applicable law or otherwise and whether such property has been converted to cash or existed as of the Petition Date;

(2)      all of the respective deposits and refund claims of the Debtor upon which the Agents and the Pre-Petition Lenders have liens or replacement liens, whether as part of the Pre-Petition Collateral or pursuant to the Bankruptcy Code, and order of this Court or applicable law or otherwise and the Debtor's cash on hand as of the Petition Date; and

(3)      all accounts, accounts receivable, and cash proceeds arising on and after the Petition Date generated by the Pre-Petition Collateral.

J.      Without limiting the foregoing, as of the Petition Date, all cash and cash equivalents received by the Debtor, including collections and proceeds of any Pre-Petition Collateral or services provided by the Debtor, which shall at any time come into the possession, custody, or control of the Debtor, or to which the Debtor is now or shall become entitled at any time held in any banking, checking, or other deposit account with any financial institution constitute the Cash Collateral of the Agents and the Pre-Petition Lenders.

## Cause Shown

K.      The Debtor has an immediate and critical need to use the Pre-Petition Lenders' Cash Collateral to continue the Debtor's ordinary course business operations and to maintain the value of the Debtor's bankruptcy estate.  The Agents and the Pre-Petition Lenders have agreed to permit the Debtor to use the Pre-Petition Collateral including Cash Collateral, on an interim basis, on the terms and conditions provided for herein, including the granting of adequate protection hereunder, solely in accordance with the Interim Budget (as defined below).  The adequate protection provided herein to the Agents and the Pre-Petition Lenders and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary to obtain the consent or non-objection of such parties.

L.      Subject to the Final Order, each of the Agents and Pre-Petition Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  The "equities

of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to them with respect to the proceeds, product, offspring or profits with respect to any of the Pre-Petition Collateral.

M.    Neither the Agents nor the Pre-Petition Lenders consent to the Debtor's use of Cash Collateral or the Interim Budget (as defined below) except in accordance with the terms and conditions contained in this Interim Order commencing on the Petition Date and expiring at 5:00 p.m. (prevailing Mountain Time) on the date of the Final Hearing  (as defined below) (the "Interim Period").   The Interim Period may be extended from time to time as provided in Paragraph 4 below.

N.    The Debtor has requested that the Agents and the Pre-Petition Lenders permit the use of Cash Collateral to provide funds to be used solely for such purposes set forth in the Interim Budget (as defined in Paragraph 2 below) to avoid immediate and irreparable harm to the Debtor's bankruptcy estate, which will occur if this Interim Order is not immediately approved.

O.    Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein.  The Debtor's interim use of Cash Collateral is necessary to preserve the bankruptcy estate, and will avoid immediate and irreparable harm to the Debtor, its bankruptcy estate and assets, before the expiration of the Interim Period.

P.    Good, adequate, and sufficient cause has been shown to justify the immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b) and (c).

Q.    Pursuant to Section 363(c)(2) and (e) of the Bankruptcy Code, the relief requested in the Motion is hereby **APPROVED AND GRANTED** as described herein.

## **ORDER**

Accordingly, it is hereby **ORDERED** as follows:

1.      The Motion is hereby **GRANTED** in accordance with the terms and conditions set forth in this Interim Order and with the consent of the Agents and the Pre-Petition Lenders, to the form and entry of this Interim Order.  Any objections and reservations of rights to the relief requested in the Motion that have not been previously resolved or withdrawn are hereby **OVERRULED AND DENIED** on their merits, or to the extent applicable, deferred to the final hearing (the "<u>Final Hearing</u>").  This Interim Order shall be a valid, binding obligation on all parties-in-interest and fully effective immediately upon its entry.

<u>**Budget and Expenditures**</u>

2.      The Debtor shall be permitted to use Cash Collateral solely to pay the expenses to the extent accrued and as incurred and described in the expenditures contained in the interim budget attached as **<u>Exhibit A</u>** (the "<u>Interim Budget</u>") as the same may be extended in accordance herewith, <u>provided, however,</u> (a) the Debtor's total expenditures shall not exceed 5% of the amount of the Interim Budget for each week, (b) the Debtor's aggregate expenditures for the previous four calendar weeks shall not exceed 5% of aggregate Interim Budget expenditures for such four week period ((a), and (b), collectively, the "<u>Variance</u>"); and (c) access to the Cash Collateral shall be made only in conformance with the expense line items in the Interim Budget (subject to only the Variance).

<u>**Restriction on Use of Cash Collateral Proceeds**</u>

3.      Notwithstanding anything herein to the contrary and except as permitted by Paragraph 29 below, for so long as the Debtor is authorized to use the Pre-Petition Lenders' Cash Collateral, no proceeds from the Cash Collateral (including any retainer held by any professional persons whose employment has been approved by the Bankruptcy Court in this Case (the "<u>Professionals</u>")) or any other Pre-Petition Collateral, may be used by the Debtor, official committee of unsecured creditors, equity interest holders or other official committee appointed in

this Case or in any Successor Case (as defined below) (any such official committee, a "Committee") or any trustee or other estate representative appointed in this Case or in this Case if it is converted to a case under chapter 7 of the Bankruptcy Code (a "Successor Case"), or any other person, party, or entity (or to pay any fees and disbursements of any Professional incurred in connection therewith) (a) to investigate or prosecute any litigation or other action in connection with the value of the Pre-Petition Collateral at any time; (b) to request authorization to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) of the Bankruptcy Code; or (c) to investigate, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the Agents, any of the Pre-Petition Lenders or their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, without limitation,

    i.    any Challenges (as defined below) and any avoidance actions or other actions arising under Chapter 5 of the Bankruptcy Code or any equivalent or similar action arising under state law;

    ii.    any action with respect to the validity, enforceability, priority, and extent of the Pre-Petition Indebtedness, or the validity, extent, or priority of the Pre-Petition Liens, or the Adequate Protection Replacement Liens (as defined below);

    iii.    any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Indebtedness, the Pre-Petition Liens, the Adequate Protection Replacement Liens, or the Agents' and Pre-Petition Lenders' Adequate Protection; and

    iv.    any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the Agents and the Pre-Petition Lenders hereunder or under the Pre-Petition Loan Documents, as applicable.

**Termination Date**

4.      The term of this Interim Order and the Debtor's authority to use Cash Collateral hereunder shall expire at 5:00 p.m. (prevailing Mountain Time) on the date of the Final Hearing (the "Termination Date").   The Debtor and the First Lien Agent (on behalf of the First Lien Lenders) may extend the Termination Date, without further notice to creditors or order of this Court, provided that a stipulation extending this Interim Order (an "Extension Stipulation") signed by the Debtor's counsel and counsel for the First Lien Agent (on behalf of the First Lien Lenders) is filed together with a copy of a new budget (a "New Budget") approved by the First Lien Agent (on behalf of the First Lien Lenders).  The Debtor shall provide the First Lien Agent (on behalf of the First Lien Lenders) with written notice upon the occurrence of a Termination Event.

**Termination Events**

5.      The Debtor's right to use Cash Collateral under this Interim Order shall immediately and automatically terminate (unless otherwise indicated and subject to the Debtor's right to challenge such termination as provided in Paragraphs 6 and 7)  upon occurrence of any of the following events (each a "Termination Event"):

      (a)      5:00 p.m. (prevailing Mountain Time) on _____, 2016 or such later date as may be agreed to by the Debtor and the First Lien Agent (on behalf of the First Lien Lenders);

      (b)      failure of the Debtor to adhere to the terms of this Interim Order or the Interim Budget (including the Variance);

      (c)      upon the written notice to the Debtor after Debtor's failure to make any payment to the First Lien Lenders when due in accordance with the terms of this Interim Order and the Debtor's failure to cure such missed payment within 2 days of receipt of such written notice;

      (d)      entry of an order without prior consent of the First Lien Agent (on behalf of the First Lien Lenders), (i) converting this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (ii) dismissing this Chapter 11

Case; (iii) appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or appointing an examiner with expanded powers (powers beyond those set forth in Section 1106(a)(3) and (a)(4)) in this Case; (iv) reversing, vacating or otherwise amending, supplementing or modifying this Interim Order; or (v) granting relief from the automatic stay to any creditor (other than the First Lien Agent on behalf of any of the First Lien Lenders) holding or asserting a lien in collateral of the Agents or the Pre-Petition Lenders or reclamation claim;

(e)     upon the Debtor's commencement of, or an order entered relating to any proceeding or action, except as set forth in Paragraph 29 hereof, for (i) the invalidation, subordination or other challenge of the Superpriority Claims (as defined below) or Adequate Protection Replacement Liens (as defined below); (ii) relief under Section 506 of the Bankruptcy Code with respect to the Pre-Petition Collateral other than per the Challenge Rights (as defined below); or (iii) any other relief which could reasonably be expected to result in a material impairment of the rights or interests of the Pre-Petition Lenders;

(f)     upon the Debtor's filing of any application for entry of an order approving use of Cash Collateral other than the application related to this Interim Order;

(g)     upon the Debtor's commencement, or any order entered relating to any proceeding or action seeking an order approving the sale of substantially all or a material portion of the Debtor's assets, whether done pursuant to one transaction or a series of transactions (i) without the prior written consent of the First Lien Agent (on behalf of the First Lien Lenders); and (ii) without expressly providing for the First Lien Agent's (on behalf of the First Lien Lenders) right to credit bid up to the full amount of the First Lien Indebtedness;

(h)     upon the Debtor's creation, incurrence, or allowance to exist of any postpetition liens or security interests having a value greater than $_____ in the aggregate on the Pre-Petition Collateral or Adequate Protection Collateral other than those granted pursuant to this Interim Order without the prior written consent of the First Lien Agent (on behalf of the Pre-Petition Lenders);

(i)     (x) entry of an order reversing, staying for a period in excess of three business days, vacating or otherwise amending, supplementing, or modifying this Interim Order in a manner adverse to the Pre-Petition Lenders, without the written consent of the First Lien Agent (on behalf of the First Lien Lenders) or (y) the filing by the Debtor of a motion to reserve, stay, vacate, or otherwise amend, supplement, or modify this Interim Order without the written consent of the First Lien Agent (on behalf of the First Lien Lenders);

(j)     the filing of any chapter 11 plan or any agreement  (a "<u>Plan</u>") without the First Lien Agent's prior written consent (on behalf of the First Lien Lenders) that provides for a restructuring of the Debtor that does not contain a provision for termination of the commitments under the First Lien Loan Documents and the indefeasible payment in full in cash of the First Lien Indebtedness under the First Lien Credit Agreement on or before the effective date of such Plan;

(k)     the filing by the Debtor of a motion in this Chapter 11 Case without the First Lien Agent's prior written consent (on behalf of the First Lien Lenders) (i) to obtain financing under Section 364 of the Bankruptcy Code from any person or entity other than the First Lien Lenders;  (ii) to grant any lien or offering any collateral; or (iii) to recover any portion of the First Lien Collateral; and

(l)     the Debtor's failure to timely provide any of the documents required by Paragraphs 22-24 of this Interim Order, or upon three (3) business days' written notice to the Debtor that the Debtor has failed to comply with any other term of this Interim Order.

## <u>Termination Remedies</u>

6.      If the Debtor's right to use Cash Collateral has not been previously terminated pursuant to the provisions of this Interim Order, such right may be extended only upon the First Lien Agent's written consent (on behalf of the First Lien Lenders) or further order of this Court. The First Lien Agent (on behalf of the First Lien Lenders) shall have no obligation to agree to such extension under any circumstances and may elect or not elect to agree to such extension as it determines in its sole and absolute discretion, provided that the Debtor shall have the right to seek authority from this Court to use Cash Collateral on an expedited basis in the event that the First Lien Agent (on behalf of the First Lien Lenders) does not consent to such extension.

## <u>Enforcement Notice</u>

7.      Upon (a) the occurrence and continuation of a Termination Event and (b) subject to three (3) business days' written notice (which may be delivered by electronic mail) (an "<u>Enforcement Notice</u>") to the Debtor, its counsel, the U.S. Trustee, and counsel for any official committee (if appointed), the Agents (on behalf of the Pre-Petition Lenders) shall be entitled to

enforce and foreclose in accordance with applicable state law upon any Pre-Petition Liens and Adequate Protection Replacement Liens granted to the Agents and the Pre-Petition Lenders pursuant to this Interim Order and the Pre-Petition Loan Documents and to exercise all rights and remedies provided therein without requiring prior authorization of this Court to exercise such rights and remedies.  In such instance, the automatic stay of Section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated with respect to the Agents (on behalf of the Pre-Petition Lenders) as to the Pre-Petition Collateral without the necessity of any further action by this Court in the event that the Debtor, the U.S. Trustee, and any official committee (if appointed) have not obtained an Order from this Court to the contrary within three (3) business days after receiving an Enforcement Notice.   The Debtor and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any injunctive relief and the sole issue at any hearing to reimpose or continue the automatic stay shall be limited to whether a Termination Event occurred.   Termination of the Debtor's right to use Cash Collateral or termination of the automatic stay pursuant to the provisions of this paragraph shall in no way affect the validity, enforceability, or priority of Adequate Protection Replacement Liens, the Superpriority Claims, or other protections afforded to the Agents and the Pre-Petition Lenders pursuant to the provisions of this Interim Order.

**Delivery of Cash Collateral**

8.     Upon the termination of the automatic stay pursuant to Paragraph 7 above or an order of this Court so directing, the Debtor shall deliver or cause the delivery of the Cash Collateral and the proceeds of the First Lien Collateral to the First Lien Agent (on behalf of the First Lien Lenders) to apply such proceeds in accordance with the provisions of the First Lien Loan Documents and the Intercreditor Agreement.

**Adequate Protection**

9.      For the use of Cash Collateral, each of the Agents and Pre-Petition Lenders is entitled, pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral on account of the Debtor's use, sale, or lease of the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, the subordination of the Pre-Petition Liens to the Carve-Out (as defined in Paragraph 19), and the imposition of the automatic stay per Section 362 of the Bankruptcy Code, and any other decrease in value of such interests on account of Sections 362 or 363 of the Bankruptcy Code or otherwise (the "Diminution in Value").  In consideration for the use of Cash Collateral and as adequate protection for, and to secure payment for the aggregate Diminution in Value, the Agents and the Pre-Petition Lenders shall be and are granted (effective upon the Petition Date and without the necessity of the execution or filing by the Debtor, the Agents, or any of the Pre-Petition Lenders of any mortgage, deed of trust, security agreement, pledge agreement, financing statement, or otherwise), the following: (a)  Adequate Protection Replacement Liens (as defined below), and (b) Superpriority Claims (as defined below) (collectively, "Adequate Protection") as set forth herein.

**Adequate Protection Replacement Liens**

10.     Subject to the Carve-Out, and to the extent of any Diminution in Value, the Agents and the Pre-Petition Lenders are hereby granted, pursuant to Sections 361 and 363 of the Bankruptcy Code, valid, automatically perfected and enforceable additional first priority adequate protection replacement liens (the "Adequate Protection Replacement Liens") upon all of the Debtor's right, title and interest in, to, and under (a) the Pre-Petition Collateral; (b) all of the Debtor's property which, in the absence of bankruptcy, would have been subject to the respective Pre-Petition Liens including, without limitation, the Debtor's post-petition accounts

receivable and post-petition gross receipts resulting from the Debtor's ordinary course business operations to the extent of the Debtor's use of Cash Collateral; (c) all of the Debtor's now-owned and after-acquired real and personal property, assets and rights, of any kind or nature, wherever located, including, without limitation, contracts, property, plant, equipment, general intangibles, documents, instruments, interests in leaseholds, patents, copyrights, trademarks, trade names, and all other intellectual property, capital stock of subsidiaries, cash and cash collateral of the Debtor (whether maintained with the Agents, the Pre-Petition Lenders or other financial institutions), any investment of such cash and cash collateral, inventory, and the proceeds thereof (whether recorded by judgment, settlement or otherwise, but not including any cause of action brought against the Agents or the Pre-Petition Lenders); and (d) any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits (collectively, the "Adequate Protection Collateral").

11.    The Adequate Protection Replacement Liens shall at all times be senior to any security interest, assignment, or lien of any creditor or other party-in-interest in this Case (other than with respect to any DIP liens expressly approved by the First Lien Agent (on behalf of the First Lien Lenders)).   The Adequate Protection Replacement Liens granted shall not be subordinated to, or made *pari passu* with, any other lien, claim or security interest (other than with respect to any DIP liens expressly approved by the First Lien Agent (on behalf of the First Lien Lenders)), however and whenever arising, in this Case or any Successor Case.   The Adequate Protection Replacement Liens shall be, and hereby are, deemed duly perfected and recorded under all applicable federal, state and other laws as of the commencement of this Case, and no notice, filing, mortgage or deed of trust recordation, possession, further order or other act shall be required to effect such perfection.   The Adequate Protection Replacement Liens shall

survive and shall not be adversely modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of debt by the Debtor (under Section 364 of the Bankruptcy Code or otherwise unless so approved by the First Lien Agent (on behalf of the First Lien Lenders) and subject to the Carve-Out), (b) the entry of an order confirming any plan or plans of reorganization in this Case, or (c) the entry of an order converting this Chapter 11 Case to Chapter 7 or dismissing this Chapter 11 Case or by any act or omission whatsoever.

12.     The Adequate Protection Replacement Liens for the benefit of the Second Lien Agent and the Second Lien Lenders shall only be subordinate to the Adequate Protection Replacement Liens for the benefit of the First Lien Agent and the First Lien Lenders on the same basis as the Second Pre-Petition Liens are subordinate to the First Pre-Petition Liens under the Intercreditor Agreement.[1]

## Superpriority Claims

13.     Subject to the Carve-Out and as further adequate protection for the Debtor's use of the Cash Collateral, and to protect against Diminution in Value, the Agents and the Pre-Petition Lenders are hereby further granted allowed administrative superpriority expense claims (the "Superpriority Claims"), as provided and to the full extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114, but subject to the

---

[1] Any decisions made by the Pre-Petition Lenders relating to this Interim Order, as same may be extended from time to time, shall be subject to the terms and provisions of the Intercreditor Agreement regarding required lenders or similar provisions. Further, as to any rights or remedies of the Pre-Petition Lenders, same shall be subject to the terms and provisions of the Intercreditor Agreement regarding the First Lien Agent and similar provisions.

Carve-Out   and any other provision of the Bankruptcy Code, and payable from and having recourse to all pre- and post-property of the Debtor and all proceeds thereof.

14.     The Superpriority Claims for the benefit of the Second Lien Agent and the Second Lien Lenders shall only be subordinate to the Superpriority Claims for the benefit of the First Lien Agent and the First Lien Lenders on the same basis as the Second Pre-Petition Liens are subordinate to the First Pre-Petition Liens under the Intercreditor Agreement.

## First Lien Agent's and First Lien Lenders' Professional Fees and Expenses

15.     As additional adequate protection for the Debtor's use of Cash Collateral, the Debtor is authorized and directed, within twenty (20) days of submission of invoices therefor (copies of which invoices shall be delivered to the Debtor, United States Trustee and counsel for the Committee, if any), to pay all fees and expenses for the professionals of the First Lien Agent and the First Lien Lenders, including, without limitation, the reasonable fees and expenses of their respective outside counsel in connection with matters relating to the Case.  None of the fees or expenses of professionals payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

## Right to Seek Additional Adequate Protection

16.     The Agents (on behalf of the Pre-Petition Lenders) may request Court approval for additional or alternative adequate protection.  The Adequate Protection Replacement Liens and the Superpriority Claims (a) shall not be subject to Sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of a Final Order, Section 506(c) of the Bankruptcy Code or the "equities of the case" exception of Section 552(b) of the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the

Debtor and its estate under Section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtor, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed in this Case or any Successor Case and any "custodian" (as defined in the Bankruptcy Code), and/or upon the dismissal of this Case or any Successor Case.

17.     Nothing contained in this Interim Order or otherwise shall constitute nor be deemed to constitute, directly or indirectly, by implication or otherwise, a waiver by the Agents or the Pre-Petition Lenders of their right to assert that the Debtor is obligated under the Pre-Petition Loan Documents to pay (i) the default interest rates specified therein, (ii) interest on interest, and/or (iii) other fees, costs and other charges specified therein.

## Ad Valorem Taxes and Other Valid Liens

18.     Notwithstanding anything contained herein, all Adequate Protection Replacement Liens and the Superpriority Claims are subject to the payment of any outstanding *ad valorem* property taxes and nothing contained herein shall impact the validity and priority of liens granted to *ad valorem* taxing authorities under applicable statutes.  Notwithstanding anything contained herein, all Adequate Protection Replacement Liens and the Superpriority Claims are subject to other liens, if any, that have priority over the Pre-Petition Liens of the Agents and the Pre-Petition Lenders.  For avoidance of doubt, the Adequate Protection Replacement Liens and the Superpriority Claims shall not extend to cash held by the Debtor in trust for the benefit of a third party.

## Carve-Out

19.     Subject to the terms and conditions contained in this paragraph, the Adequate Protection Replacement Liens and the Superpriority Claims shall be subject and subordinate to payment of a carve-out (the "Carve-Out").  As used in this Interim Order, the term "Carve-Out"

shall mean (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; and (b) the aggregate amount of any fees and expenses of any Professional included in the Interim Budget or any New Budget, which are actually incurred, but unpaid as of the termination of the Debtor's right to use Cash Collateral under this Interim Order, but only to the extent incurred and unpaid, such fees and expenses have been previously or subsequently are approved by this Court and only to the extent such incurred and unpaid fees and expenses exceed any retainer held by any such Professional at the time of such termination, in an aggregate amount not to exceed $_____; and (c) after a Termination Event, the payment of the reasonable fees and expenses of the Professionals (as accrued and regardless of whether approved and unpaid or pending approval by this Court) that are incurred and are ultimately allowed by this Court pursuant to Bankruptcy Code §§ 330 and 331, in an aggregate amount not to exceed $200,000. The Carve-Out may only be used for the payment of fees and expenses of Professionals to the extent allowed by order of this Court. Prior to a Termination Event, subject to the entry of an appropriate order of this Court (in form and substance reasonably acceptable to the Pre-Petition Lenders), the Debtor shall be permitted to use Cash Collateral to pay compensation and reimbursement of budgeted expenses allowed and payable to Professionals under Section 330 and 331 of the Bankruptcy Code in accordance with the Interim Budget, and the portion of the Carve-Out set forth in clause (c) above shall not be reduced by the amount of any compensation or reimbursement of costs and expenses accrued, incurred, awarded or paid before the occurrence of the Termination Date. Notwithstanding the foregoing, from and after 5:00 p.m. (prevailing Mountain Time) on the Termination Date, any amounts paid to Professionals by any means will reduce the Carve-Out on a dollar-for-dollar

basis.  Nothing herein shall be construed to impair the ability of any party-in-interest to object to any fees, expenses, reimbursement, or compensation sought by the Professionals.

## Carve-Out Limitation

20.    Neither the Carve-Out nor Cash Collateral may be used to challenge the amount, validity, perfection, priority of enforceability of or assert any defense, counterclaim or offset to the Pre-Petition Loan Documents or claims, security interests and liens of the Agents and the Pre-Petition Lenders with respect thereto or otherwise to litigate (including, without limitation, commencing adversary proceedings, motions, contested matters, arbitrations, mediations, or other similar proceedings) against the Agents or any of the Pre-Petition Lenders.

21.    Notwithstanding the foregoing, the Carve-Out shall include an aggregate amount not to exceed $20,000 of Cash Collateral for any Committee, if any is appointed, or its Professionals to investigate the claims, liens and security interests of the Agents and the Pre-Petition Lenders.

## Reporting Requirements

22.    As additional adequate protection for its use of the Cash Collateral, the Debtor will comply with all reporting requirements under the First Lien Loan Documents.  Additionally, the Debtor will provide the First Lien Agent (on behalf of the First Lien Lenders) with reporting information regarding, among other things, prospective asset sales, business plans, updated cash flow forecasts and budgets.  Such information shall be of a nature, quality, and frequency to enable the First Lien Lenders to monitor their interests in the First Lien Collateral and Cash Collateral.  The Debtor shall also have weekly (or less frequently as may be agreed between the Debtor and the First Lien Agent (on behalf of the First Lien Lenders)) calls with the First Lien Agent and the First Lien Lenders and their advisors, during regular business hours and with

reasonable advance notice, on topics related to the Debtor's operations, cash position, the Agents' and First Lien Lenders' rights under this Interim Order or the Final Order, and the Case.

23.     Following entry of this Interim Order, before the close of business on Wednesday of  each week before the Termination Date, the Debtor shall deliver to the First Lien Agent (on behalf of the First Lien Lenders) and its counsel, a written (i) report summarizing the Debtor's actual cash flow ending on Friday of the prior week, as compared to the cash flow for such week as set forth in the Budget (the "Cash Flow Report"), each such report to be in a form and with such level of detail as shall be reasonably satisfactory to the First Lien Lenders; and (ii) report setting forth the Debtor's working capital position (including a summary of priority payables) ending on Friday of the prior week, such report to include all supporting ledgers, analysis and other information, each such report to be in form and with such level of detail as shall be reasonably satisfactory to the First Lien Lenders.  The Debtor shall immediately make available to the First Lien Agent (on behalf of the First Lien Lenders) or any of its agents (including professionals) supporting documentation for all receipts and expenditures, including, but not limited to, bank statements, contracts, invoices, copies of checks, and general ledgers.

24.     In addition, the Debtor will provide the First Lien Agent (on behalf of the First Lien Lenders) with the following information:

> (a)     A copy of any plan to be filed in the Case as soon as reasonably practicable after it becomes available, together with a reconciliation to any prior plan;
>
> (b)     Presentations by the Debtor or its advisors to the First Lien Lenders at times and places as the First Lien Agent (on behalf of the First Lien Lenders) may reasonably request in writing (including via email);
>
> (c)     Promptly, but in any event by the twenty-fifth (25th) day of each calendar month, a report as of the last day of the preceding calendar month, in form and detail reasonable acceptable to the First Lien Lenders, of (i) an accounts payable aging and an accounts receivable agent and (ii) all written demands or claims related to or asserting any liens in respect of the

Debtor's property or assets (including lien imposed by law, such as landlord's, vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers', mechanics' liens, and other similar liens); and

(d)     Promptly, but in any event by the twenty-fifth (25th) day of each calendar month or by the forty-fifth (45th) day after each fiscal quarter end, beginning with the year-to-date period ended _____, 2016, a monthly and year-to-date income statement, balance sheet, and monthly and year-to-date detail of capital expenditures and workovers, which in each case, may be unaudited and presented without footnotes.

25.     Failure to timely provide any of the reports required Paragraphs 22-24 of this Interim Order shall be a Termination Event as defined in Paragraph 5.

**<u>Access to Premises</u>**

26.     The Debtor shall (and shall continue to so) provide the First Lien Agent (on behalf of the First Lien Lenders) and any professional retained by the First Lien Agent (on behalf of the First Lien Lenders), with reasonable access during normal business hours to   (a) the Debtor's premises, management and financial advisors, (b) any and all books, records, engineering reports, documents and information relevant to the Debtor's business operations, and (c) and other information or report regarding the Debtor or this Chapter 11 Case that the First Lien Agent (on behalf of the First Lien Lenders) may from time to time reasonably request.

**<u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>**

27.     Nothing in this Interim Order or otherwise shall be construed to obligate the Agents or any Pre-Petition Lender in any way to pay compensation to, or to reimburse expenses of any Professional, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.   Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtor, or any Committee or any other official or unofficial committee in this Case, or of any other person or entity, or shall affect the right of the

Agents (on behalf of the Pre-Petition Lenders) to object to the allowance and payment of such

fees and expenses.

## Waiver of 506(c) Claims

28.     Subject to the entry of the Final Order, as a further condition to the Debtor's use

of Cash Collateral pursuant to this Interim Order and the Agents' and the Pre-Petition Lenders'

consent to the payment of the Carve-Out to the extent provided herein, no costs or expenses of

administration of the Case or any Successor Case shall be charged against or recovered from or

against the Agents or any of the Pre-Petition Lenders, the Pre-Petition Collateral and the Cash

Collateral, or the property subject to the Adequate Protection Replacement Liens, in each case

pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the First Lien Agent's

prior written consent (on behalf of the First Lien Lenders), and no such consent shall be implied

from any other action, inaction, or acquiescence of the Agents or any of the Pre-Petition Lenders.

## Challenge Rights

29.     The Debtor's stipulations contained in Paragraph G and elsewhere of this Interim

Order (the "Debtor's Stipulations") shall be binding upon the Debtor upon entry of this Interim

Order.  Specifically, but without limiting the scope or effect of the Debtor's Stipulations, the

Agents and Pre-Petition Lenders shall have valid, binding, enforceable, and perfected security

interests and liens in all of the Debtor's assets as set forth in Paragraph G of this Interim Order

except and only to the extent an action to challenge the stipulations set forth in Paragraph G of

this Interim Order (collectively, the "Challenges" and, each individually, a "Challenge"),

including but not limited to: (a) a contested matter, adversary proceeding, or other action or

"claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the

admissions, stipulations, findings, or releases included in the Debtor's stipulations herein; or

(b) a contested matter, adversary proceeding, or other action against the First Lien Agent, the

Second Lien Agent, any individual Pre-Petition Lender, or the Pre-Petition Lenders, in connection with or related to the Pre-Petition Indebtedness, the Pre-Petition Collateral, or the actions or inactions of the Agents or any of the Pre-Petition Lenders arising out of or related to the Pre-Petition Indebtedness, or the Pre-Petition Liens, or otherwise, including, without limitation, any claim against any or all of the Pre-Petition Lenders or the Agents in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Pre-Petition Indebtedness or the Pre-Petition Liens (including, but not limited to, those under Sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Agents or the Pre-Petition Lenders) has been timely and properly commenced in a contested matter, adversary proceeding, or other appropriate action within the applicable Challenge Period (defined herein) and a final, non-appealable order in favor of the party timely commencing such Challenge in any such timely-filed contested matter, adversary proceeding, or other appropriate action has been entered by the Court.  A party-in-interest other than the Debtor must exercise its rights (the "Challenge Rights") as set forth in this paragraph by the applicable time periods (as applicable, the "Challenge Period"):

(a)      General Challenge Period.   The Debtor's Stipulations shall be binding upon all parties-in-interest in this case unless, within seventy five (75) days following the Petition Date (the "General Challenge Period"), or as extended with the Agents' prior written consent (on behalf of the First Lien Lenders), a party-in-interest other than any Committee or any trustee appointed in this Case (a "Chapter 11 Trustee") or a chapter 7 trustee appointed in any Successor Case (a "Chapter 7 Trustee" and, with a Chapter 11 Trustee, either one, a "Trustee") commences a Challenge (a "General Challenge") and subsequently obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.  The General Challenge Period shall not apply to any Committee or any Trustee.

(b)      Committee and Trustee Challenge Period.   The Debtor's Stipulations shall be binding upon any Committee, any Trustee and all other parties-in-interest, unless within the earlier of (1) sixty (60) days following its appointment or (2) seventy five (75) days following the Petition Date (the "Committee and Trustee Challenge Period"), or as such period may be extended in accordance with the Agents'

prior written consent (on behalf of the Pre-Petition Lenders), any Committee or Trustee commences a Challenge (a "Committee or Trustee Challenge") and subsequently obtains a final, non-appealable order in favor of such Committee or Trustee sustaining such Committee or Trustee Challenge in any such timely-filed contested matter, adversary proceeding, or other appropriate action; provided, however, that if a Trustee is appointed within seventy-five (75) days following the Petition Date, the Stipulations Effective Date (as defined below) with respect to such Trustee only shall be the later of (1) the seventy-fifth (75th) day following the Petition Date or (2) the date that is twenty (20) days after the date on which such Trustee is appointed.

30.    The Debtor's Stipulations shall be binding on all parties-in-interest in this Case and in any Successor Case on the date that is the later of (a) if no General Challenge or Committee or Trustee Challenge, as the case may be, was timely raised, the next calendar day after expiration of the General Challenge Period and the Committee and Trustee Challenge Period, (b) if a General Challenge or Committee or Trustee Challenge, as the case may be, was timely raised, this Court fully and finally adjudicates such General Challenge or Committee or Trustee Challenge, as the case may be, and does not sustain such Challenge, the next calendar day thereafter, which date in either case shall be referred to as the "Stipulations Effective Date."

31.    Except as otherwise expressly provided herein, from and after the Stipulations Effective Date and for all purposes in this Case and any Successor Case:

(a)    all payments made to or for the benefit of the Agents or the Pre-Petition Lenders pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance,

(b)    any and all such Challenges by any party-in-interest, whether raised or not raised, shall be deemed to be forever released, waived, and barred;

(c)    the Pre-Petition Indebtedness shall be deemed to be fully allowed claims under the Bankruptcy Code; and

(d)    the Debtor's Stipulations, including the release provisions therein, shall be binding on all parties-in-interest, including any Committee and any Trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted in any such adversary proceeding, contested matter or other action or proceeding, the Debtor's Stipulations shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest, except to the extent that such stipulations were expressly

challenged with particularity in such adversary proceeding, contested matter, or other action.

32.    The General Challenge Period and the Committee and Trustee Challenge Period may only be extended with the Agents' prior written consent (on behalf of the Pre-Petition Lenders) in the Agents' (on behalf of the Pre-Petition Lenders) sole and absolute discretion. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing to any party-in-interest, including any Committee or Trustee, to bring any Challenge on behalf of the Debtor's estate.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court before the Stipulations Effective Date granting standing to bring any Challenge on behalf of the Debtor's estate shall not be a defense to failing to timely commence a Challenge as required under this Interim Order.

## Insurance Policies

33.    The Debtor shall maintain, with financially sound and reputable insurance companies, insurance with respect to all of the Pre-Petition Collateral for all the purposes in accordance with the requirements of the Pre-Petition Security Documents (covering such risks and in amounts as shall be satisfactory to the Pre-Petition Lenders).  Without any further action or notice, the Agents and the Pre-Petition Lenders shall be deemed to be named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtor.

## Intercreditor Agreement

34.    Pursuant to section 510(a) of the Bankruptcy Code, the Intercreditor Agreement shall be enforceable in this Case to the same extent that it is enforceable under applicable nonbankruptcy law.  Nothing within this Interim Order shall alter or affect the rights and obligations of the Agents or the Pre-Petition Lenders pursuant to the Intercreditor Agreement. For the avoidance of doubt, in the event any provision of this Interim Order conflicts with the

terms of the Intercreditor Agreement with respect to the rights and obligations the Agents and the

Pre-Petition Lenders among each other, the Intercreditor Agreement shall control.

## Release of Claims

35.     Subject to the rights of a party in interest to file a Challenge in accordance with

Paragraph 29, the Debtor and its estate shall be deemed to have forever waived, discharged, and

released the Agents and each of the Pre-Petition Lenders and their respective members,

managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers,

directors, employees and other representatives (all of the foregoing, collectively, the "Pre-

Petition Releasees") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims,

causes of action (including, without limitation, causes of action in the nature of "lender

liability"), defenses, setoff, recoupment, or other offset rights against any and all of the Pre-

Petition Releasees, whether arising at law or in equity, relating to and/or otherwise in connection

with the Pre-Petition Indebtedness, the Pre-Petition Liens, or the debtor-creditor relationship

between the Agents and any of the Pre-Petition Lenders, on the one hand, and the Debtor, on the

other hand, including, without limitation, (a) any recharacterization, subordination, avoidance, or

other claim arising under or pursuant to Section 105, Chapter 5 or otherwise of the Bankruptcy

Code or under any other similar provisions of applicable state law, federal law, or municipal law

and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the

Pre-Petition Indebtedness or any payments made on account of the Pre-Petition Indebtedness, or

the amount, validity, enforceability, priority, or non-avoidability of the Pre-Petition Liens

securing the Pre-Petition Indebtedness.

## Proofs of Claim

36.     The Agents and the Pre-Petition Lenders will not be required to file proofs of

claim in the Case or Successor Case for any claim allowed herein.  The Debtor's Stipulations

shall be deemed to constitute timely filed proofs of claim for the Agents and the Pre-Petition

Lenders.  Notwithstanding any order entered by this Court in relation to the establishment of a

proof of claim deadline or bar date in the Case or Successor Case to the contrary, the Agents (on

behalf of the Pre-Petition Lenders) are each hereby authorized and entitled, in their sole

discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of

claim and/or aggregate proofs of claim in the Case or Successor Case for any claim allowed

herein.

## **Modification of Stay**

37.     The automatic stay provided under Section 362 of the Bankruptcy Code is hereby

vacated and modified to the extent necessary to permit (a) the Debtor, the Agents and the Pre-

Petition Lenders to commit all acts and take all actions necessary to implement this Interim

Order and (b) all acts, actions, and transfers contemplated by this Interim Order.

38.     The Debtor irrevocably waives any right to seek any amendment, modification, or

extension of this Interim Order without the Agents' prior written consent (on behalf of the Pre-

Petition Lenders), and no such consent shall be implied by any other action, inaction, or

acquiescence of the Agents or the Pre-Petition Lenders.

## **Dismissal**

39.     If any order dismissing the Case under Section 1112 of the Bankruptcy Code or

otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and

349 of the Bankruptcy Code), that (a) the Agents' and the Pre-Petition Lenders' Adequate

Protection provided in this Interim Order shall continue in full force and effect and shall

maintain their priorities as provided in this Interim Order until the Pre-Petition Indebtedness has

been fully satisfied (and that all the Agents' and the Pre-Petition Lenders' Adequate Protection

shall, notwithstanding such dismissal, remain binding on all parties-in-interest), and  (b) this

Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Agents' and the Pre-Petition Lenders' Adequate Protection.

## Survival of Interim Order

40.     The provisions of this Interim Order, any actions taken pursuant hereto or thereto, the Agents' and the Pre-Petition Lenders' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the Agents and any or all of the Pre-Petition Lenders, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in this Case, converting this Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Case, withdrawing of the reference or this Case or any Successor Case or providing for abstention from handling or retaining of jurisdiction of this Case or any Successor Case in this Court or by any other act or omission.   The terms and provisions of this Interim Order, including all of the Agents' and the Pre-Petition Lenders' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the Agents and any or all of the Pre-Petition Lenders, shall continue in full force and effect notwithstanding the entry of any such order, and such Agents' and Pre-Petition Lenders' Adequate Protection shall continue in this Case and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order.

## Binding Effect

41.     Subject to Paragraph 29, the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in this Case, including, without limitation, the Agents and the Pre-Petition Lenders, any Committee, and the Debtor and their respective successors and assigns (including any Trustee, any examiner appointed pursuant to Section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as

a legal representative of the Debtor or the Debtor's estate or with respect to the property of the estate of the Debtor), whether in the Case, in any Successor Case, or upon dismissal of any such Case or Successor Case; provided, however, that the Agents and Pre-Petition Lenders shall have no obligation to permit the use of Cash Collateral or to extend any financing to any Trustee or other responsible person appointed for the estate of the Debtor in any Case or Successor Case.

## No Third Party Rights

42.     Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.  In determining to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the Agents and the Pre-Petition Lenders shall not (a) be deemed to be in control of the operations of the Debtor or (b) owe any fiduciary duty to the Debtor, its respective creditors, shareholders, or estate.

43.     No Marshaling.  Subject to entry of the Final Order, the Agents and the Pre-Petition Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Pre-Petition Collateral.

44.     Bankruptcy Code Section 552(b).  The Agents and the Pre-Petition Lenders shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and, subject to entry of the Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Agents or the Pre-Petition Lenders with respect to the proceeds, products, offspring or profits of any of the Pre-Petition Collateral.

## Controlling Person

45.     Neither the Agents nor the Pre-Petition Lenders shall (a) have liability to any third party, nor be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation

or management of the Debtor (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal of state statute), or owe any fiduciary duty to the Debtor, their creditors or their bankruptcy estate, and (b) have a relationship with the Debtor which shall be deemed to constitute a joint venture or partnership with the Debtor.

## **Enforceability**

46.     This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

47.     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

## **Final Hearing**

48.     A Final Hearing to consider entry of the Final Order is scheduled for _____ 2016, at _____a.m./p.m. (prevailing Mountain Time) at the United States Bankruptcy Court for the District of Utah.

49.     Final Hearing Notice.  On or before _____, 2016, the Debtor shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (a) notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice") and (b) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with

this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.

## Objection Deadline

50.     The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2016, at 5:00 p.m. (prevailing Mountain Time) (the "Objection Deadline"), which objections shall: (a) conform to the Bankruptcy Rules and the Local Rules; and (b) be served upon the following parties so as to be actually received no later than _____, at 5:00 p.m. (prevailing Mountain Time): counsel for the Debtor; counsel for the First Lien Agent; counsel for the Second Lien Agent; counsel for the DIP Agent (as defined in the DIP Credit Agreement); the United States Trustee for the District of Utah; counsel for any Committee; and any party requesting notice pursuant to Bankruptcy Rule 2002.

## Retention of Jurisdiction

51.     The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

### ###

# Exhibit 2

{00282598.DOC / 5}

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **III EXPLORATION II LP** | ) | **Case No. 16-26471** |
| | ) | |
| Debtor. | ) | |

**FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II)
AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE, (III) AUTHORIZING THE DEBTOR TO ENTER
INTO NEW LENDER PARTY SWAP AGREEMENTS, PLEDGE COLLATERAL, AND
HONOR OBLIGATIONS THEREUNDER, (IV) GRANTING ADEQUATE
PROTECTION TO THE PRE-PETITION LENDERS PURSUANT TO SECTIONS 361,
362, 363 AND 364 OF THE BANKRUPTCY CODE, (V) GRANTING LIENS AND
SUPERPRIORITY CLAIMS AND (VI) MODIFYING AUTOMATIC STAY**

The Court has considered the motion (the "Motion") of III Exploration II LP, the above-captioned debtor and debtor in possession (the "Debtor"), requesting entry of a final order (this "Final Order") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Utah (the "Local Rules"). Among other things, the Motion requests the entry of a final order that:

        (i)     authorizes the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) to obtain, and Petroglyph Energy, Inc., the guarantor (the "DIP Guarantor") under the DIP Loan Documents (as defined below), to unconditionally guarantee the Debtor's obligations with respect to

**FINAL ORDER APPROVING MOTION FOR POSTPETITION FINANCING AND AUTHORIZATION
TO USE CASH COLLATERAL**
523453 000002 17512808.12
{00289090.DOCX /}

PAGE 1

senior secured priming and superpriority post-petition financing, which would consist of a revolving credit loan facility for up to $4,000,00.00 (the "DIP Facility") pursuant to the terms of (x) this Final Order, (y) that certain Post-Petition Superpriority Credit Agreement, dated as of August ___, 2016 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement"),[1] by and among the Debtor, the DIP Guarantor, Wilmington Trust, National Association as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (the "DIP Lenders," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) or Lender Party Swap Obligations (as defined below) are owed, the "DIP Secured Parties," each a "DIP Secured Party"), in substantially the form attached to the Motion, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "DIP Loan Documents"), to: (A) finance operating expenses, specified capital expenditures, restructuring costs, professional fees, and general corporate purposes of the Debtor, (B) grant, as of the Petition Date (as defined below) and in accordance with the relative priorities set forth herein, certain adequate protection to the Pre-Petition Secured Parties (as defined below) as described below, (C) pay certain transaction fees and other costs and expenses of administration of the Case (as defined below), and (D) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Loan Documents and this Final Order;

---

[1] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement. A copy of the DIP Credit Agreement is attached as **Exhibit B**.

(ii)    approves the terms of, and authorizes the Debtor to execute and deliver, and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Final Order;

(iii)    grants adequate protection of the liens and security interests granted in favor of the Pre-Petition Agents and the Pre-Petition Lenders (as defined below), which liens are being primed by the liens securing the repayment of the DIP Facility, in accordance with this Final Order;

(iv)    authorizes the Debtor to grant security interests, liens, and superpriority claims (including superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent for the benefit of each of the DIP Lenders in each case payable from, and having recourse to, all pre-petition property, including, but not limited to, all Pre-Petition Collateral, and post-petition property of the Debtor's estate and all proceeds thereof; except, that the DIP Liens (as defined below) are subject only to the Carve-Out (as defined below);

(v)    authorizes the Debtor to use "cash collateral," as such term is defined in the Interim Order (as defined below) (the "Cash Collateral"), including, without limitation, Cash Collateral in which the Pre-Petition Lenders and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order, this Final Order or otherwise, and provides

the Pre-Petition Secured Parties' Adequate Protection (as defined below) to the Pre-Petition Secured Parties as set forth herein;

(vi)     authorizes (a) the Debtor to (1) enter into and perform under new hedging arrangements (the "Lender Party Swap Agreements"), governed by a master agreement substantially in the form attached hereto as **Exhibit C**, with certain of the DIP Lenders (collectively, the "Lender Swap Parties") in the ordinary course of business, (2) honor, pay, or otherwise satisfy all obligations, liabilities, and indebtedness of the Debtor arising under the Lender Party Swap Agreements (the "Lender Party Swap Obligations") as they come due, (3) pledge and transfer collateral in the form of DIP Liens to secure Lender Party Swap Obligations, and (4) grant DIP Superpriority Claims (as defined below) to the Lender Swap Parties on account of the Lender Party Swap Obligations; (b) the DIP Agent to exercise all rights and remedies with respect to the DIP Collateral (as defined below) for the benefit of the Lender Swap Parties in accordance with the terms of the DIP Loan Documents following the occurrence and during the continuation of an Event of Default or a Termination Event under, and as defined in, the Lender Party Swap Agreements; and (c) the Lender Swap Parties to set off, net, and apply any payment amounts that such Lender Swap Parties would otherwise be obligated to pay to the Debtor under the Lender Party Swap Agreements in accordance with the DIP Loan Documents and the Lender Party Swap Agreements;

(vii)     vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, the Lender Party Swap Agreements and this Final Order;

(viii)   authorizes the Debtor to borrow under the DIP Facility in an aggregate outstanding principal amount not to exceed [$_____], and directs the DIP Guarantor to unconditionally guarantee such obligations; and

(ix)   waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

Due and appropriate notice of the Motion, the DIP Credit Agreement, the Lender Party Swap Agreements and the evidence submitted or proffered at the interim hearing (the "Interim Hearing") on the Motion before this Court having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014 and all applicable Local Rules; and the Interim Hearing having been conducted by this Court on [_____, 2016], and this Court having entered the interim order (the "Interim Order") granting the relief requested in the Motion related to Cash Collateral use on an interim basis on [_____, 2016]; and the Court having considered the Motion, the evidence submitted by the Debtor at the final hearing held on [_____, 2016] (the "Final Hearing") to consider entry of this Final Order granting the relief requested in the Motion on a final basis, authorizing the borrowings under the DIP Loan Documents and the Lender Party Swap Agreements on a final basis and granting other relief as more fully set forth in this Final Order; and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d) and 9014 and all applicable Local Rules; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its creditors, its estate and all parties-in-interest, and is essential for the continued operation of the Debtor's business; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent

with Article III of the United States Constitution; and it appearing that venue of this proceeding

and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due

deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]**

### Jurisdiction

A.      This Court has jurisdiction over this case ("<u>Case</u>" or "<u>Chapter 11 Case</u>"), the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

### Venue

B.      Venue for the Case and proceedings on the Motion is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

### Core Proceeding

C.      This matter is a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A),(D),

and (M).  The statutory and other predicates for the relief sought herein are sections 105, 361,

362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and

9014 and the Local Rules.

### Petition Date

D.      On July 26, 2016 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

District of Utah (this "<u>Court</u>").  The Debtor has continued in the management and operation of

its business and properties as a debtor in possession pursuant to Sections 1107 and 1108 of the

Bankruptcy Code.

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

**Committee**

E.      To date, the Office of the United States Trustee (the "U.S. Trustee") has not

appointed an official committee of unsecured creditors equity interest holders, or other parties-

in-interest in this Case.

**Notice**

F.      The Final Hearing was held pursuant to the authorization of Bankruptcy Rule

4001.  Notice of the Final Hearing and the relief requested in the Motion has been provided by

the Debtor, whether by facsimile, electronic mail, overnight courier or hand delivery, to all

creditors and parties-in-interest entitled to such notice, including: (a) the U.S. Trustee, (b) those

creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (c) counsel

to the First Lien Agent(as defined below), (d) counsel to the Second Lien Agent (as defined

below), (e) counsel to the DIP Agent, (f) any party that has requested notice pursuant to

Bankruptcy Rule 2002, and (g) any other secured parties of record.  Under the circumstances,

such notice of the Motion, the relief requested therein and the Final Hearing complies with

Bankruptcy Rule 4001(a), (b), (c) and (d) and the Local Rules, and no other notice needs to be

provided for entry of this Final Order.

**Pre-Petition Lenders' Claim and Liens**

G.      Without prejudice to the rights of any other party in interest (but subject to the

limitations in Paragraph 64 below, including the Challenge Rights in the Challenge Period), the

Debtor, on its behalf and on behalf of its estate, representatives, successors, and assigns, admits,

stipulates, acknowledges, and agrees: (a) that the Pre-Petition Agents and the Pre-Petition

Lenders hold valid, enforceable and allowable claims as defined in Section 101 of the

Bankruptcy Code as of the Petition Date; and (b) that this Final Order shall constitute proof of

the amount and nature of each of the Pre-Petition Agents' and the Pre-Petition Lenders' claims (as set forth below) in this Case and the Pre-Petition Agents (on behalf of the Pre-Petition Lenders (as defined below)) may, but shall not be obligated to, amend or supplement this proof by filing proofs of claim in this Case.  The Debtor further acknowledges and stipulates:

(1)  <u>First Lien Loan Documents</u>.  As of the Petition Date, the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, with respect to all obligations (the "<u>First Lien Obligations</u>") owing pursuant to (a) the Credit Agreement dated as of February 19, 2013 among the Debtor, the financial institutions party thereto (the "<u>First Lien Lenders</u>"), Citibank N.A. as Syndication Agent and KeyBank National Association as Administrative Agent,  later succeeded by Wilmington Trust, National Association as  Successor Administrative Agent  for the First Lien Lenders (the "<u>First Lien Agent</u>")(as so amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>"); and (b) the other documents executed in connection therewith, including, without limitation, any notes, mortgages, deeds of trust, letter of credit documents, security agreements, guaranty agreements, deposit account control agreements, hedge contracts, or any other agreements or instruments executed by the Debtor, any guarantor of the Debtor or any subsidiary of the Debtor (collectively, the "<u>First Lien Security Documents</u>," collectively with the First Lien Credit Agreement, the "<u>First Lien Loan Documents</u>").  The Debtor acknowledges that the First Lien Obligations constitute legal, valid and binding obligations of the Debtor, enforceable in accordance with their terms, and that no portion of the First Lien Obligations or any amounts paid to the First Lien Lenders or the First Lien Agent for the benefit of the First Lien Lenders prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the

Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law. Pursuant to the First Lien Loan Documents, as of the Petition Date, the aggregate amount of not less than $_____, consisting of unpaid principal in the amount of not less than $_____, accrued but unpaid interest and fees in the amount of not less than $_____, plus all other fees, expenses, charges, and other amounts due under the First Lien Loan Documents (collectively, the "First Lien Indebtedness") was due and owing by the Debtor to the First Lien Lenders and First Lien Agent.

(2)     First Pre-Petition Liens. The First Lien Indebtedness is secured by valid, binding, perfected and enforceable liens and security interests (the "First Pre-Petition Liens") granted by the Debtor to the First Lien Lenders and First Lien Agent for the benefit of the First Lien Lenders, under the First Lien Loan Documents, upon and in property of the Debtor as described in the First Lien Security Documents whether then owned or thereafter acquired or arising, and all proceeds and products thereof (collectively, the "First Lien Collateral").

(3)     Validity and Priority of First Pre-Petition Liens. The First Pre-Petition Liens constitute valid, binding, enforceable and perfected liens encumbering the First Lien Collateral, including Cash Collateral, and are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind (except insofar as such liens are subordinate to (a) any liens existing on the Petition Date that are valid, properly perfected, unavoidable, and senior to the First Pre-Petition Liens, (b) the Pre-Petition Secured Parties' Adequate Protection Replacement Liens (as defined below), (c) any DIP Liens expressly consented to by the First Lien Agent (on behalf of the First Lien Lenders), or (d) the Carve-Out). The First Lien Agent (on its behalf and on behalf of the First Lien Lenders) holds properly perfected security interests and First Pre-

Petition Liens in and on the First Lien Collateral by the filing of UCC-1 financing statements, mortgages, deeds of trust and other required documents against the Debtor and such First Lien Collateral with the applicable federal, state, and county offices for perfection of such security interests and First Pre-Petition Liens or otherwise.

(4)    Second Lien Loan Documents.  As of the Petition Date, the Debtor was indebted and liable, without defense, counterclaim, or offset of any kind, with respect to all obligations (the "Second Lien Obligations" collectively with the First Lien Obligations, the "Pre-Petition Credit Obligations") owing pursuant to (a) the Second Lien Term Loan Agreement dated as of February 19, 2013 among the Debtor, the financial institutions party thereto (the "Second Lien Lenders" collectively with the First Lien Lenders, the "Pre-Petition Lenders"), Citibank N.A. as Syndication Agent and KeyBank National Association as Administrative Agent (the "Second Lien Agent," collectively with the First Lien Agent, the  "Pre-Petition Agents," and, collectively with the Pre-Petition Lenders, the "Pre-Petition Secured Parties," each a "Pre-Petition Secured Party") (as so amended and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement" collectively with the First Lien Credit Agreement, the "Pre-Petition Credit Agreements"); and (b) the other documents executed in connection therewith, including, without limitation, any notes, mortgages, deeds of trust, letter of credit documents, security agreements, guaranty agreements, deposit account control agreements, hedge contracts, or any other agreements or instruments executed by the Debtor, any guarantor of the Debtor or any subsidiary of the Debtor (collectively, the "Second Lien Security Documents," collectively with (i) the First Lien Security Documents, the "Pre-Petition Security Documents" and (ii) the Second Lien Credit Agreement, the "Second Lien Loan Documents").  The Debtor acknowledges that the Second Lien Obligations constitute legal,

valid and binding obligations of the Debtor, enforceable in accordance with their terms, and that

no portion of the Second Lien Obligations or any amounts paid to the Second Lien Lenders prior

to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack,

offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any

kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Pursuant to the Second

Lien Loan Documents (collectively with the First Lien Loan Documents, the "Pre-Petition Loan

Documents"), as of the Petition Date, the aggregate amount of not less than $_____,

consisting of unpaid principal in the amount of not less than $_____, accrued but unpaid

interest and fees in the amount of not less than $_____, plus all other fees, expenses,

charges, and  other amounts due under the Second Lien Loan Documents (collectively, the

"Second Lien Indebtedness," collectively with the First Lien Indebtedness, the "Pre-Petition

Indebtedness") was due and owing by the Debtor to the Second Lien Lenders and Second Lien

Agent.

(5)     For purposes of this Final Order, Pre-Petition Indebtedness shall mean and

include, without duplication, any and all amounts owing or outstanding under the Pre-Petition

Loan Documents, interest on, fees and other costs, expenses and charges owing in respect of

such amounts (including, without limitation, any reasonable attorneys' fees, accountants' fees,

financial advisors' fees, or other fees and expenses) that are chargeable or reimbursable pursuant

to the Pre-Petition Loan Documents, and any and all obligations liabilities, contingent or

otherwise, owed in respect of the letters of credit or other Pre-Petition Obligations outstanding

thereunder.

(6)     Second Pre-Petition Liens.  The Second Lien Indebtedness is secured by valid,

binding, perfected and enforceable liens and security interests (the "Second Pre-Petition Liens,"

collectively with the First Pre-Petition Liens, the "Pre-Petition Liens") granted by the Debtor to the Second Lien Lenders and Second Lien Agent for the benefit of the Second Lien Lenders, under the Second Lien Loan Documents, upon and in property of the Debtor as described in the Second Lien Security Documents whether then owned or thereafter acquired or arising, and all proceeds and products thereof (collectively, the "Second Lien Collateral," collectively with the First Lien Collateral, the "Pre-Petition Collateral").

(7)     For the avoidance of doubt, Pre-Petition Collateral shall mean and include (a) collateral in or upon which a lien or other security interest has been granted in favor or for the benefit of the Pre-Petition Agents or the Pre-Petition Lenders in connection with, pursuant to or under the Pre-Petition Loan Documents; and (b) any Pre-Petition Collateral provided under any of the Pre-Petition Loan Documents, including that collateral described in this subparagraph and/or subparagraphs 2 and 6, that existed as of the Petition Date and all pre-petition and post-petition proceeds, products, offspring, rents, and profits of such Pre-Petition Collateral.

(8)     Validity and Priority of Second Pre-Petition Liens. The Second Pre-Petition Liens constitute valid, binding, enforceable and perfected second priority liens encumbering the Second Lien Collateral, including Cash Collateral, and are not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or Claim (as such term is defined in the Bankruptcy Code) of any kind (except insofar as such liens are subordinate to (a) any liens existing on the Petition Date that are valid, properly perfected, unavoidable, and senior to the Second Pre-Petition Liens, including, without limitation, the First Pre-Petition Liens, but not limited to the First Pre-Petition Liens, (b) any liens expressly consented to by the Second Lien Agent (on behalf of the Second Lien Lenders), (c) the Carve-Out, or (d) the Pre-Petition Secured Parties' Adequate Protection Replacement Liens (as defined

below)).  The Second Lien Agent (on its behalf and on behalf of the Second Lien Lenders) holds

properly perfected security interests and Second Pre-Petition Liens in and on the Second Lien

Collateral by the filing of UCC-1 financing statements, mortgages, deeds of trust, and other

required documents against the Debtor and such Second Lien Collateral with the proper federal,

state, and county offices for perfection of such security interests and Second Pre-Petition Liens

or otherwise.

(9)     Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Agents and the

Pre-Petition Lenders made certain loans, advances, and other financial accommodations and

provided letters of credit to the Debtor to fund, among other things, the Debtor's operations.

(10)     The Pre-Petition Agents and the Pre-Petition Lenders assert, and the Debtor does

not dispute, that the amounts owed as of the Petition Date under the First Lien Loan Documents

and the Second Lien Loan Documents and described herein, are correct and are secured by

perfected liens and security interests in the First Lien Collateral and the Second Lien Collateral,

respectively.  The Pre-Petition Agents and the Pre-Petition Lenders assert, and the Debtor does

not dispute, that the Pre-Petition Agents and the Pre-Petition Lenders hold enforceable, perfected

liens and security interests in the Pre-Petition Collateral, which includes the Cash Collateral.

(11)     The claims, liens and security interests of the First Lien Agent and the First Lien

Lenders have priority over the claims, liens and security interests of the Second Lien Agent and

the Second Lien Lenders to the extent provided in the Intercreditor Agreement dated as of

February 19, 2013 and entered into among the Debtor, Petroglyph Energy, Inc., as guarantor,

KeyBank National Association, in its capacity as administrative agent for the holders of the First

Lien Obligations (including its successors and assigns from time to time), and KeyBank National

Association, in its capacity as administrative agent for the holders of the Second Lien

Obligations (including its successors and assigns from time to time) (the "Intercreditor Agreement").[3]

## Findings Regarding the DIP Facility

H.    Good cause has been shown for the entry of this Final Order, and immediate and irreparable harm will be caused to the Debtor and its estate if immediate financing is not obtained and permission to use Cash Collateral is not granted, in accordance with the terms of this Final Order and the DIP Loan Documents.

I.    Need for Post-petition Financing. The Debtor has an immediate and critical need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operation needs, to complete the Debtor's sale process and to otherwise preserve the enterprise value of the Debtor's estate. The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to otherwise preserve the enterprise value of the Debtor and its estate.

J.    No Credit Available on More Favorable Terms. As set forth in the Motion and the evidence presented, the Debtor has determined, at the time hereof, that no acceptable financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Final Order is available. The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit on terms acceptable to the Debtor allowable only

---

[3] Any decisions made by the Pre-Petition Lenders relating to this Final Order, as same may be extended from time to time, shall be subject to the terms and provisions of the Intercreditor Agreement regarding required lenders or similar provisions. Further, as to any rights or remedies of the Pre-Petition Lenders, same shall be subject to the terms and provisions of the Intercreditor Agreement regarding the First Lien Agent and similar provisions.

under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtor is unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Superpriority Claims (each as defined below), (b) allowing the DIP Secured Parties to provide the loans and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents (all of the foregoing described in clauses (a) and (b) above, including, without limitation, the DIP Liens and the DIP Superpriority Claims, collectively, the "DIP Protections"), and (c) providing the Pre-Petition Secured Parties the adequate protection more fully described below.

K.    Financing. The DIP Secured Parties, and, as applicable, the Pre-Petition Secured Parties, are willing to provide financing to the Debtor and/or consent to the use of Cash Collateral by the Debtor, as applicable, subject to (a) the entry of this Final Order, (b) the terms and conditions of the DIP Loan Documents, and (c) findings by the Court that such post-petition financing and use of Cash Collateral is essential to the Debtor's estate, that the terms of such financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Liens, the Pre-Petition Adequate Protection Replacement Liens, the DIP Superpriority Claims, and the other protections granted pursuant to this Final Order and the DIP Loan Documents with respect to such financing and use of Cash Collateral will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code or this Final Order.

L.    Without limiting the foregoing, any advances made to the Debtor and Cash Collateral use by the Debtor under the DIP Loan Documents and this Final Order shall be

entitled to the protections provided by section 364(e) of the Bankruptcy Code. The DIP Agent, the other DIP Secured Parties and the Pre-Petition Secured Parties have each acted in good faith in, as applicable, negotiating, consenting to, and agreeing to provide the post-petition financing arrangements and/or use of Cash Collateral on a final basis as contemplated by this Final Order and the DIP Loan Documents, and the reliance by the DIP Agent, the other DIP Secured Parties and the Pre-Petition Secured Parties on the assurances referred to above is in good faith.

M.     Adequate Protection for Pre-Petition Secured Parties. The Pre-Petition Secured Parties have negotiated in good faith regarding the Debtor's use of the Pre-Petition Collateral (including the Cash Collateral) to fund the administration of the Debtor's estate and continued operation of its business. The Pre-Petition Secured Parties have agreed to permit the Debtor to use the Pre-Petition Collateral, including the Cash Collateral, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for the priming of the Pre-Petition Liens pursuant to section 364(d) of the Bankruptcy Code. The Pre-Petition Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court at the Final Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtor's prudent exercise of its business judgment, and constitute reasonably equivalent value and fair consideration for the consent of the Pre-Petition Secured Parties.

N.     Each of the Pre-Petition Agents, Pre-Petition Lenders, DIP Agent and the DIP Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy

Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply.

## Findings Regarding Swap/Hedging Agreements

O.      Good cause has been shown for (a) the Debtor to (1) enter into and perform under the Lender Party Swap Agreements with the Lender Swap Parties in the ordinary course of business, (2) honor, pay, or otherwise satisfy all Lender Party Swap Obligations as they come due, (3) pledge and transfer collateral in the form of DIP Liens to secure Lender Party Swap Obligations, and (4) grant DIP Superpriority Claims to the Lender Swap Parties on account of the Lender Party Swap Obligations; (b) the DIP Agent to exercise all rights and remedies with respect to the DIP Collateral (as defined below) for the benefit of the Lender Swap Parties in accordance with the terms of the DIP Loan Documents following the occurrence and during the continuation of an Event of Default or a Termination Event under, and as defined in, the Lender Party Swap Agreements; and (c) the Lender Swap Parties to set off, net, and apply any payment amounts that such Lender Swap Parties would otherwise be obligated to pay to the Debtor under the Lender Party Swap Agreements in accordance with the DIP Loan Documents and the Lender Party Swap Agreements.

## Sale Milestones

P.      The DIP Credit Agreement requires the Debtor to actively and diligently work with Tudor Pickering & Holt ("TPH") regarding the 363 Sale, including timely response to any requests by, and prompt implementation of  any recommendations made by, TPH with respect thereto, and to achieve the following milestones, unless the DIP Agent and the Required Lenders in their respective discretion shall otherwise consent in writing (the "Sale Milestones"):

| Action | Deadline |
|---|---|
| Borrower shall have delivered to the Administrative Agent and Lenders a copy of the draft Confidential Sales Memorandum which will be disseminated to potential purchasers. | August 15, 2016 |
| The Bankruptcy Court shall have entered the Sale Procedures Order. | August 23, 2016 |
| TPH shall have commenced actively marketing of the Borrower's Property to third parties. | August 15, 2016 |
| Final bid deadline with respect to the 363 Sale | October 24, 2016 |
| The 363 Purchase and Sale Agreement shall have been executed. | November 7, 2016 |
| The Bankruptcy Court shall have entered the Sale Order approving the 363 Sale. | December 13, 2016 |
| The 363 Sale shall close pursuant to the terms of the 363 Purchase and Sale Agreement of sales pursuant to terms of the Purchase and Sale Agreement(s). | Three Business Days after the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale |

## Business Judgment, Binding Agreement and Good Faith

Q.  The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtor in accordance with the DIP Loan Documents and this Final Order.

R.  The terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Final Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, and the Debtor's agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtor's

exercise of prudent business judgment consistent with its fiduciary duties. Such terms and conditions are supported by reasonably equivalent value and fair consideration.

S.      The DIP Facility, the DIP Loan Documents, the Pre-Petition Secured Parties' Adequate Protection (as defined below) and any agreements and arrangements authorized in this Final Order were negotiated in good faith and at arm's length among the Debtor, the DIP Agent, the other DIP Secured Parties and the Pre-Petition Secured Parties, respectively, with the assistance and counsel of their respective advisors, and all of the DIP Obligations and Pre-Petition Secured Parties' Adequate Protection (as defined below) shall be deemed to have been extended by the DIP Agent, the DIP Secured Parties and their affiliates and consented to by the requisite Pre-Petition Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, the Interim Order, or this Final Order, and the DIP Liens, the DIP Superpriority Claims, the other DIP Protections and the Pre-Petition Secured Parties' Adequate Protection (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, the Interim Order, and this Final Order in the event this Final Order, the Interim Order, or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

T.      <u>Relief Essential; Best Interest</u>. For the reasons stated above, the Debtor has requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules. Absent granting the relief set forth in this Final Order, the Debtor's estate and its ability to preserve the enterprise value of the Debtor and its estate will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash

Collateral in accordance with this Final Order and the DIP Loan Documents is therefore in the best interests of the Debtor's estate and consistent with its fiduciary duties.

U.      **NOW, THEREFORE**, on the Debtor's Motion and the record before this Court with respect to the Motion, and with the consent of the Pre-Petition Secured Parties and the DIP Secured Parties to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

Accordingly, it is hereby **ORDERED** as follows:

1.      The Motion is hereby **GRANTED** in accordance with the terms and conditions set forth in this Final Order and with the consent of the DIP Secured Parties and the Pre-Petition Secured Parties, to the form and entry of this Final Order. Any objections and reservations of rights to the relief requested in the Motion that have not been previously resolved or withdrawn are hereby **OVERRULED AND DENIED** on their merits. This Final Order shall be a valid, binding obligation on all parties-in-interest and fully effective immediately upon its entry.

### DIP Loan Documents and DIP Protections

2.      <u>Approval of DIP Loan Documents</u>. The Debtor is expressly and immediately authorized and directed to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Final Order, to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Final Order and the DIP Loan Documents.

3.      The Debtor is hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Final Order, including, without limitation, all closing fees, administrative fees, commitment fees, and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Final Order, which amounts shall not be subject to further approval of this Court (but this Court shall resolve any disputes as to the reasonableness of any such fees and expenses) and no such recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

4.      Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor enforceable against such Debtor in accordance with their terms. Each officer of the Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of such officer's respective authority to act in the name of and on behalf of the Debtor.

## DIP Obligations

5.      For purposes of this Final Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the Debtor under the DIP Credit Agreement and other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement) and shall include, without limitation, the principal of, interest on, fees, costs, expenses, and other charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan

Documents and/or this Final Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.

6.     <u>Authorization to Incur DIP Obligations</u>. To enable the Debtor to continue to operate its business and preserve and maximize the value of its estate, during the period from the entry of the Interim Order through and including the date of entry of this Final Order (the "<u>Interim Period</u>"), and subject to the terms and conditions of the Interim Order, the Debtor was hereby authorized to use Cash Collateral.  Upon entry of this Final Order, the Debtor is, subject to the terms of the DIP Loan Documents, including, without limitation, the Budget Covenants (as defined below), and this Final Order, entitled to borrow all amounts under the DIP Loan Documents to fund the Debtor's working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the DIP Loan Documents, this Final Order, and any other orders of this Court. All DIP Obligations shall be unconditionally guaranteed by the DIP Guarantor, as further provided in the DIP Loan Documents.

## Budget and Expenditures

7.     The Debtor shall be permitted to use Cash Collateral and borrowings under the DIP Credit Agreement solely to pay the expenses to the extent accrued and as incurred and described in the expenditures contained in the budget attached as **Exhibit A** and in subsequent budgets as approved by the Majority Lenders (as defined in the DIP Credit Agreement) (**Exhibit A** and each subsequently approved budget, the "<u>Approved Budget</u>") as the same may be extended in accordance herewith, in an amount not to exceed those amounts set forth in the Approved Budget; <u>provided, however,</u> (a) the Debtor's total expenditures shall not exceed 5% of the amount of the Approved Budget for each week, (b) the Debtor's aggregate expenditures for the previous four calendar weeks shall not exceed 5% of aggregate Approved Budget

expenditures for such four week period (excluding in each case (x) any Contingent Budget Items approved by Majority Lenders and (y) any variance caused by any Budget expenditure budgeted for a week prior to such previous calendar week (or prior to such previous four calendar week period), not paid in such week (or prior four week period), and paid in such previous week (or previous four week period)) ((a) and (b), collectively, the "Variance"); and (c) access to the Cash Collateral shall be made only in conformance with the expense line items in the Approved Budget (subject to only the Variance).

8.      Budget Covenants.  The Debtor shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral (as defined below) proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (and in the case of the costs and expenses of the DIP Secured Parties, the First Lien Agent and the First Lien Lenders, in accordance with the DIP Loan Documents and this Final Order), subject to the Variance, which shall be tested weekly on a rolling cumulative basis (*i.e.*, the sum of all actual amounts expended for the current week and the three previous weeks in the Approved Budget cannot exceed the sum of all budgeted disbursements for such cumulative period).  The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

## Interest, Fees, Costs and Expenses.

9.      The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Final Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court. The Debtor shall pay on demand all fees, costs, expenses (including reasonable out-of-pocket legal and other professional fees and expenses of the DIP

Agent) and other charges payable under the terms of the DIP Loan Documents. All such fees, costs, expenses and disbursements, whether incurred, paid or required to be paid pre-petition or post-petition, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Secured Parties and/or their professionals as of the Petition Date for payment of such fees, costs, expenses and disbursements may be applied for payment) as contemplated in this Final Order and the DIP Loan Documents, which amounts shall not be subject to further approval of this Court (but this Court shall resolve any disputes as to the reasonableness of any such fees and expenses) and no such recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

## Use of DIP Facility and Proceeds of DIP Collateral

10.    The Debtor shall apply the proceeds of all DIP Collateral (as defined below) solely in accordance with this Final Order and the applicable provisions of the DIP Loan Documents. For the avoidance of doubt, the Debtor shall, in accordance with the applicable provisions of the DIP Loan Documents, and subject to the Carve-Out, pay, or cause to be paid, all proceeds of any sale of all or a portion of the DIP Collateral (as defined below) outside the ordinary course of business *first* to the DIP Agent for application in accordance with the DIP Loan Documents and this Final Order until the DIP Obligations and the Lender Party Swap Obligations are Paid in Full, *second,* to a segregated account (the "Wind-Down Account"), solely in an amount necessary to fund the wind-down of the Debtor's estate and the closure of the Chapter 11 Case, in accordance with a wind-down budget prepared by the Debtor and acceptable to the DIP Agent and the DIP Secured Parties, in their respective sole discretion; and *third,* to the First Lien Agent for application in accordance with the DIP Loan Documents and this Final Order until the First Lien Obligations are Paid in Full (as defined below).

Notwithstanding the foregoing, the Debtor shall be permitted to pay all outstanding obligations pursuant to the Approved Budget on the effective date of any sale. Without limiting the foregoing, the Debtor shall not be permitted to make any payments on account of any pre-petition debt or obligation prior to the effective date of a confirmed chapter 11 plan with respect to the Debtor in the Case, except (a) with respect to the Pre-Petition Credit Obligations as set forth in this Final Order; (b) as provided in the entered orders approving the motions filed by the Debtor on the Petition Date (the "First Day Orders"), which First Day Orders shall be in form and substance acceptable to the DIP Agent and the DIP Secured Parties; (c) as provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent and the DIP Secured Parties prior to such motion, order, or request for such relief being filed, including, without limitation, any motions, orders, or requests for relief in connection with any structured dismissal of the Case; or (d) as otherwise provided in the DIP Loan Documents.

11.    Conditions Precedent. The DIP Secured Parties shall have no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral (as defined below) proceeds, including Cash Collateral, as applicable, unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral (as defined below) or proceeds thereof under the DIP Loan Documents and this Final Order have been satisfied in full or waived by the requisite DIP Secured Parties in accordance with the DIP Loan Documents and this Final Order.  Upon the Debtor's satisfaction of all the conditions precedent under the DIP Credit Agreement, the DIP Secured Parties shall extend credit under the DIP Facility.

**DIP Liens**

12.      As security for the DIP Obligations, the following security interests and liens, which are immediately and without any further action by any Person, valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable and, upon the entry of this Final Order hereby are, granted by the Debtor to the DIP Secured Parties, on all property of the Debtor, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Secured Parties or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts (including the Concentration Account (as defined in the DIP Credit Agreement), the Wind-Down Account, and all right, title, and interest of the Debtor and the DIP Guarantor in and to such accounts, and the proceeds and products thereof), documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims as described on attached **Exhibit __**, rights under section 506(c) of the Bankruptcy Code, all other Collateral (as defined in the DIP Loan Documents), and, with the exception of actions arising under Chapter 5 of the Bankruptcy Code, all other "property of the estate" (as defined in section 541(a)(1) of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created (other than any "Building" (as defined in the applicable Flood Insurance Regulation) or

"Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Regulation) with

a fair market value in excess of [$50,000] individually or $100,000 in the aggregate), and all

rents, products, substitutions, accessions, profits, replacements, and cash and non-cash

proceeds of all of the foregoing, as provided below (all of the foregoing collateral collectively

referred to as the "DIP Collateral," and all such Liens granted to the DIP Secured Parties

pursuant to the Interim Order, this Final Order, and the DIP Loan Documents, the "DIP

Liens"):

(i)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral;

(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable junior Lien upon all DIP Collateral that is subject solely to the DIP Liens, other than liens which are expressly stated to be primed by the liens to be granted to the DIP Agent described in clause (iii) below; and

(iii)   pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to the Pre-Petition Adequate Protection Replacement Liens (as defined below) and senior and priming to (x) the Pre-Petition Liens and (y) any Liens that are junior to the Pre-Petition Liens and the Pre-Petition Adequate Protection Replacement Liens (as defined below), after giving effect to any intercreditor or subordination agreements (the liens referenced in clauses (x) and (y), collectively, the "Primed Liens"); provided, however, that the liens described in this subsection (iii) shall be junior solely to the Carve-Out, the DIP Liens, and the liens enumerated in Paragraph 36 below.

13.     DIP Lien Priority. Notwithstanding anything to the contrary contained in this

Final Order or the DIP Loan Documents (except as provided for in Paragraph 36 below), for

the avoidance of doubt, the DIP Liens granted to the DIP Secured Parties are and shall be in

each and every case be first priority senior liens that (a) to the extent provided in this Final

Order and the DIP Loan Documents, shall be subject to the Carve-Out, and (b) except as

provided in the immediately preceding sub-clause (a), are senior to all pre-petition and post-petition liens of any other person or entity (including, without limitation, the Primed Liens and the Pre-Petition Adequate Protection Replacement Liens (as defined below)). The DIP Liens and the DIP Superpriority Claims (as defined below): (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtor, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of the Case.

14.    Enforceable Obligations. The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtor, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and its creditors and other parties-in-interest, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, the Interim Order, or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, set off, recoupment,

offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

15.    <u>Superpriority Administrative Claim Status</u>. In addition to the DIP Liens granted pursuant to this Final Order, effective immediately upon entry of this Final Order, all of the DIP Obligations and the Lender Party Swap Obligations do and, pursuant to this Final Order shall, constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in favor of the DIP Secured Parties, which shall have priority, subject only to the payment of the Carve-Out in accordance with this Final Order, over all administrative expense claims, adequate protection and other diminution claims, unsecured claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "<u>DIP Superpriority Claims</u>"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtor and shall be payable from and have recourse to all unencumbered property of the Debtor and all proceeds thereof. Other than as expressly provided in the DIP Credit Agreement and/or this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code and professional fees described in

Paragraph 31 hereof, or otherwise, that have been or may be incurred in this Case, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents, the Lender Party Swap Agreements, and/or this Final Order.

**Authorization to Use Cash Collateral and Proceeds of the DIP Facility**

16.     Subject to the terms and conditions of this Final Order and the DIP Loan Documents, including, without limitation, the Budget Covenants, (a) the Debtor is authorized to use proceeds of credit extended under the DIP Facility from and after the Effective Date (as defined in the DIP Credit Agreement), and (b) the Debtor is authorized to use Cash Collateral; provided, however, that the Debtor shall be prohibited from at any time using proceeds of DIP Collateral (including Cash Collateral) and/or advances under the DIP Facility, in each case, except in accordance with the terms and conditions of this Final Order and the DIP Loan Documents. To fund the Debtor's working capital and other general corporate needs, in accordance with the terms of this Final Order, the DIP Loan Documents, and the Approved Budget, the Debtor may request advances and other financial accommodations under the DIP Facility. The DIP Secured Parties may terminate the Debtor's right to use proceeds of extensions of credit under the DIP Facility, DIP Collateral, Pre-Petition Collateral, and Cash Collateral without further notice, motion, or application to, order of, or hearing before, the Court, in accordance with this Final Order, immediately upon notice to such effect by the DIP Agent to the Debtor after the occurrence and during the continuance of any Termination Event (as defined in Paragraph 54).

17.    Upon the occurrence and during the continuance of a Termination Event, the DIP Agent (on behalf of the DIP Secured Parties) and the First Lien Agent (on behalf of the Pre-Petition Secured Parties) may terminate the consensual Cash Collateral use arrangement contained herein without further notice, motion, or application to, order of, or hearing before, the Court; provided, that the rights of the DIP Secured Parties and the Pre-Petition Secured Parties under this Final Order or otherwise shall not be affected by the waiver of any Termination Event by any other party.

## Restriction on Use of Proceeds

18.    Notwithstanding anything herein to the contrary and except as permitted by Paragraph 31 below, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professional persons whose employment has been approved by the Bankruptcy Court in this Case (the "Professionals")) or any other Pre-Petition Collateral, or any portion of the Carve-Out may be used by the Debtor, official committee of unsecured creditors, equity interest holders or other official committee appointed in this Case or in any Successor Case (any such official committee, a "Committee") or any trustee or other estate representative appointed in this Case or a Successor Case, or any other person, party, or entity (or to pay any fees and disbursements of any Professional incurred in connection therewith) (a) to investigate or prosecute any litigation or other action in connection with the value of the Pre-Petition Collateral or the DIP Collateral at any time; (b) to request authorization to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) of the Bankruptcy Code; or (c) to investigate, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter or adversary proceeding seeking any order,

judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Pre-Petition Secured Parties or their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, without limitation,

(i)      any Challenges (as defined below) and any avoidance actions or other actions arising under Chapter 5 of the Bankruptcy Code or any equivalent or similar action arising under state law;

(ii)     any action with respect to the validity, enforceability, priority, or extent of the DIP Obligations and/or the Pre-Petition Credit Obligations, or the validity, extent, or priority of the DIP Liens, the Pre-Petition Liens, or the Pre-Petition Adequate Protection Replacement Liens;

(iii)    any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Indebtedness, the DIP Liens, the other DIP Protections, the Pre-Petition Liens, the Pre-Petition Adequate Protection Replacement Liens, or the Pre-Petition Secured Parties' Adequate Protection;

(iv)    except to contest the occurrence or continuance of any Termination Event, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties' (and, after the Payment in Full (as defined below) of the DIP Obligations, the Pre-Petition Secured Parties') assertion, enforcement, or realization on the Cash Collateral in accordance with the Pre-Petition Loan Documents or this Final Order);

(v)     any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Pre-Petition Secured Parties hereunder or under the DIP Loan Documents or the Pre-Petition Loan Documents, as applicable;

(vi)    pay any fees or similar amounts to any person (other than the First Lien Agent, the First Lien Lenders and the DIP Secured Parties) who has proposed or may propose to purchase interests in the Debtor without the prior written consent of the DIP Secured Parties and the Pre-Petition Secured Parties; and/or

(vii)    use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the Pre-Petition Secured Parties and the DIP Secured Parties, as applicable.

**Swap/Hedging Agreements**

19.    The Debtor is authorized to: (a) enter into and perform under the Lender Party Swap Agreements in the ordinary course of business; (b) honor, pay, or otherwise satisfy all Lender Party Swap Obligations as they come due; (c) pledge and transfer DIP Collateral in the form of DIP Liens to secure the Lender Party Swap Obligations; and (d) grant DIP Superpriority Claims to the Lender Swap Parties on account of the Lender Party Swap Obligations.

20.    As security and assurance of the Lender Party Swap Obligations, and in exchange for providing benefits to the Debtor in accordance with this Final Order:

(a)    the DIP Agent, for the benefit of the Lender Swap Parties, is hereby granted, effective as of the entry of this Final Order and without the necessity of the execution by the Debtor or the filing of security agreements, pledge agreements, mortgages, financing statements, or otherwise, enforceable DIP Liens, as permitted by this Final Order with respect to the Lender Party Swap Obligations;

(b)    the Lender Party Swap Obligations shall constitute DIP Superpriority Claims against the Debtor; and

(c)    the Lender Swap Parties may set off, net, and apply any payment, settlement payment, termination values, termination payments, and any other amounts that such Lender Swap Party would be entitled to receive from the Debtor or otherwise be obligated to pay to the Debtor under any Lender Party Swap Agreement in accordance with the terms of each of such Lender Party Swap Agreement and the DIP Loan Documents, including but not limited to set off, netting, and application of the foregoing against any and all obligations of the Debtor under the Lender Party Swap Agreement and the DIP Loan Documents in accordance with the terms of such Lender Swap Party Agreement and the DIP Loan Documents to reduce permanently the DIP Obligations; provided, that upon the occurrence and during the continuation of an Event of Default or a Termination Event, any Lender Swap Party may terminate, liquidate, or unwind its Lender Swap Agreements and set off and net transactions

thereunder upon notice by such Lender Swap Party to the Debtor in accordance with the applicable Lender Party Swap Agreement; provided, however, any set off or netting against obligations under the DIP Loan Documents in connection with the termination, liquidation, or unwind of a Lender Swap Party Agreement will only be permitted after three (3) business days prior written notice from the DIP Agent or Lender Swap Party to the Debtor (unless the Debtor otherwise agrees in writing).

21.     If any or all of the provisions of this Final Order are stayed, modified in a manner adverse to a Lender Party Swap Agreement counterparty, or vacated or if this Final Order otherwise terminates, such stay, modification, vacation, or termination will not affect (a) the validity of any indebtedness, obligation, or liability incurred by the Debtor to each of the Lender Swap Parties before the receipt of written notice by the Lender Swap Parties of the effective date of such stay, modification, vacation, or termination; (b) the validity or enforceability of the security interests, administrative claims, and netting and termination rights authorized or created hereby or pursuant to the Lender Party Swap Agreements, or any related documents; and (c) the rights of the Lender Swap Parties to exercise remedies as set forth in the Lender Party Swap Agreements, and each Lender Swap Party shall be entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code.

22.     The automatic stay provided in Section 362 of the Bankruptcy Code is hereby modified to the extent necessary to:

(a)     permit immediate and unconditional exercise and enforcement of rights and remedies by (i) in respect of the DIP Collateral, the DIP Agent on behalf of any Lender Swap Party (including, but not limited to, the foreclosure on the DIP Liens in order to collect from the Debtor amounts that may be owed to the Lender Swap Parties under the Lender Party Swap Agreements) and (ii) the Lender Swap Parties, upon the occurrence of an Event of Default or a Termination Event under the Lender Party Swap Agreements (including, but not limited to, the suspension, termination, liquidation, or acceleration thereof and set off, netting, and application of any payment, settlement payment, termination values, termination payments, and any other amounts that such Lender Swap Party would be entitled to receive from or otherwise be obligated to pay to

the Debtor under any Lender Party Swap Agreement), and the Lender Swap Parties' rights thereunder shall not be modified, stayed, avoided, or otherwise limited by order of this Court or any court proceeding under the Bankruptcy Code. The Debtor waives the right and shall not seek relief, including under section 105(a) or section 549 of the Bankruptcy Code, to the extent that any such relief would in any way restrict or impair the rights of the DIP Agent or the Lender Swap Parties under the Lender Party Swap Agreements or this Final Order, including, without limitation, the right of the Lender Swap Parties to set off, net, and apply any payment amounts that such Lender Swap Parties would otherwise be obligated to pay to the Debtor under the Lender Party Swap Agreements against amounts owed by the Debtor under the DIP Loan Documents and other obligations in accordance with each of the Lender Party Swap Agreements and the DIP Loan Documents; provided, however, that such waiver shall not preclude the Debtor from contesting whether an Event of Default or Termination Event has occurred under any Lender Party Swap Agreement; provided, however, that any exercise or enforcement of rights or remedies with respect to the DIP Collateral or any set off or netting against obligations under the DIP Loan Documents will only be permitted after three (3) business days prior written notice from the DIP Agent or Lender Swap Party to the Debtor (unless the Debtor otherwise agrees in writing);

(b)    permit the DIP Agent, on behalf of the Lender Swap Parties, to take all actions to validate and perfect the liens and security interests granted hereunder and under the DIP Loan Documents, including by filing or recording financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction. For the avoidance of doubt, whether or not the DIP Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted under this Final Order, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination, as of the entry of this Final Order; and

(c)    provide that a Lender Swap Party's rights, powers, privileges, and remedies under the applicable Lender Party Swap Agreement may not be modified, stayed, avoided, or otherwise limited by further order of this Court or any court proceeding under the Bankruptcy Code.

23.    Notwithstanding any provision of the DIP Loan Documents or the Lender Party Swap Agreements to the contrary, any counterparty to the Debtor under a Lender Party Swap Agreement that is a DIP Lender as of the date that such counterparty enters into any transaction

under such Lender Party Swap Agreement shall be a Lender Swap Party for purposes of this

Final Order and enjoy the DIP Superiority Claims, DIP Liens, automatic stay relief, and other

protections afforded by this Final Order in respect of each such transaction (without giving

effect to any amendment, extension, increase or other modification, including, without

limitation, "blending," that occurs on or after the date on which such counterparty ceases to be

a DIP Lender) until the earliest of (a) the termination of such transaction and the satisfaction of

all obligations arising thereunder in full in cash, and (b) other arrangements satisfactory to such

Lender Swap Party having been made, in each case regardless of whether such counterparty

ceases to be a DIP Lender while such transaction remains outstanding.

### Pre-Petition Secured Parties' Adequate Protection

24.     For the Debtor's use of Cash Collateral, each of the Pre-Petition Secured Parties

is entitled, pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, to adequate

protection of its interests in the Pre-Petition Collateral on account of the Debtor's use, sale, or

lease of the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date,

the subordination of the Pre-Petition Liens to the Carve-Out (as defined in Paragraph 37), and

the imposition of the automatic stay per Section 362 of the Bankruptcy Code, and any other

decrease in value of such interests on account of Sections 362 or 363 of the Bankruptcy Code

or otherwise (the "Diminution in Value").   In consideration for the Debtor's use of Cash

Collateral and as adequate protection for, and to secure payment for the aggregate Diminution

in Value, the Pre-Petition Secured Parties shall be and are granted (effective upon the Petition

Date and without the necessity of the execution or filing by the Debtor, the Pre-Petition

Agents, or any of the Pre-Petition Lenders of any mortgage, deed of trust, security agreement,

pledge agreement, financing statement, or otherwise), the following: (a)  Pre-Petition Adequate

Protection Replacement Liens (as defined below), and (b) Pre-Petition Adequate Protection

Superpriority Claims (as defined below) (collectively, the "<u>Pre-Petition Secured Parties'</u>

<u>Adequate Protection</u>") as set forth herein.

### Pre-Petition Adequate Protection Replacement Liens

25.      Subject to the Carve-Out, and to the extent of any Diminution in Value, the Pre-

Petition Agents and the Pre-Petition Lenders are hereby granted, pursuant to Sections 361 and

363 of the Bankruptcy Code, valid, automatically perfected and enforceable additional first

priority adequate protection replacement liens (the "<u>Pre-Petition Adequate Protection</u>

<u>Replacement Liens</u>") upon all of the Debtor's right, title and interest in, to, and under (a) the

Pre-Petition Collateral; (b) all of the Debtor's property which, in the absence of bankruptcy,

would have been subject to the respective Pre-Petition Liens including, without limitation, the

Debtor's post-petition accounts receivable and post-petition gross receipts resulting from the

Debtor's ordinary course business operations to the extent of the Debtor's use of Cash

Collateral; (c) all of the Debtor's now-owned and after-acquired real and personal property,

assets and rights, of any kind or nature, wherever located, including, without limitation,

contracts, property, plant, equipment, general intangibles, documents, instruments, interests in

leaseholds, patents, copyrights, trademarks, trade names, and all other intellectual property,

capital stock of subsidiaries, cash and cash collateral of the Debtor (whether maintained with

the Pre-Petition Agents, the Pre-Petition Lenders or other financial institutions), any

investment of such cash and cash collateral, inventory, accounts receivable, any cause of

action, and the proceeds thereof (whether recorded by judgment, settlement or otherwise, but

not including any cause of action brought against the Pre-Petition Agents or the Pre-Petition

Lenders); and (d) any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits (collectively, the "Adequate Protection Collateral").

26.    The Pre-Petition Adequate Protection Replacement Liens shall at all times be senior to any security interest, assignment, or lien of any creditor or other party-in-interest in this Case or in any Successor Case (other than as provided herein).  The Pre-Petition Adequate Protection Replacement Liens granted shall not be subordinated to, or made *pari passu* with, any other lien, claim or security interest (other than as provided herein), however and whenever arising, in this Case or any Successor Case.  The  Pre-Petition Adequate Protection Replacement Liens shall be, and hereby are, deemed duly perfected and recorded under all applicable federal, state and other laws as of the commencement of this Case, and no notice, filing, mortgage or deed of trust recordation, possession, further order or other act shall be required to effect such perfection.  The Pre-Petition Adequate Protection Replacement Liens shall survive and shall not be adversely modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of debt by the Debtor (under Section 364 of the Bankruptcy Code or otherwise unless provided herein or so approved by the First Lien Agent (on behalf of the First Lien Lenders)), (b) the entry of an order confirming any plan or plans of reorganization in this Case, or (c) the entry of an order converting this Chapter 11 Case to Chapter 7 or dismissing this Chapter 11 Case or by any act or omission whatsoever.

27.    The Pre-Petition Adequate Protection Replacement Liens for the benefit of the Second Lien Agent and the Second Lien Lenders shall be subordinate to the Pre-Petition Adequate Protection Replacement Liens for the benefit of the First Lien Agent and the First

Lien Lenders on the same basis as the Second Pre-Petition Liens are subordinate to the First

Pre-Petition Liens under the Intercreditor Agreement.[4]

### Pre-Petition Adequate Protection Superpriority Claims

28.      As further adequate protection for the Debtor's use of the Cash Collateral, and

to protect against Diminution in Value, the Pre-Petition Secured Parties are hereby further

granted allowed administrative superpriority expense claims (the "Pre-Petition Adequate

Superpriority Claims"), as provided and to the full extent allowed by Sections 503(b) and

507(b) of the Bankruptcy Code, with priority over all administrative expense claims and

unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any

kind or nature whatsoever, including, without limitation, administrative expenses of the kind

specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c),

507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 and any

other provision of the Bankruptcy Code, and payable from and having recourse to all pre-

petition and post-petition property of the Debtor and all proceeds thereof.

29.      For purposes of this Final Order, the terms ''Paid in Full,'' "Repaid in Full,''

"Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP

Obligations and/or Pre-Petition Credit Obligations, (a) the indefeasible payment in full in cash

and satisfaction of such obligations and (b) the termination of all credit commitments under the

DIP Loan Documents, the Lender Party Swap Agreements and/or the Prepetition Loan

Documents, as applicable.

---

[4] Any decisions made by the Pre-Petition Lenders relating to this Final Order, as same may be extended from time to time, shall be subject to the terms and provisions of the Intercreditor Agreement regarding required lenders or similar provisions. Further, as to any rights or remedies of the Pre-Petition Lenders, same shall be subject to the terms and provisions of the Intercreditor Agreement regarding the First Lien Agent and similar provisions.

30.     The Pre-Petition Adequate Protection Superpriority Claims for the benefit of the

Second Lien Agent and the Second Lien Lenders shall be subordinate to the Pre-Petition

Adequate Protection Superpriority Claims for the benefit of the First Lien Agent and the First

Lien Lenders on the same basis as the Second Pre-Petition Liens are subordinate to the First

Pre-Petition Liens under the Intercreditor Agreement.

### Professional Fees and Expenses of the First Lien Lenders, First Lien Agent and DIP Secured Parties

31.     As additional adequate protection for the Debtor's use of Cash Collateral and in

consideration of the DIP Facility and the Lender Party Swap Agreements provided by the DIP

Secured Parties, as applicable, the Debtor is authorized and directed, within twenty (20) days

of submission of invoices therefor (copies of which invoices shall be delivered to the Debtor,

United States Trustee and counsel for the Committee, if any), to pay all fees and expenses for

the professionals of the First Lien Agent, the First Lien Lenders and the DIP Secured Parties,

including, without limitation, the reasonable fees and expenses of their respective outside

counsel and the allocated internal costs of their respective in-house counsel, in connection with

matters relating to the Case.  None of the fees or expenses of professionals payable pursuant to

this paragraph shall be subject to separate approval by this Court (but this Court shall resolve

any dispute as to the reasonableness of any such fees and expenses), and no recipient of any

such payment shall be required to file any interim or final fee application with respect thereto.

### Right to Seek Additional Adequate Protection

32.     The Pre-Petition Agents (on behalf of the Pre-Petition Lenders) may request

Court approval for additional or alternative adequate protection.  The Pre-Petition Adequate

Protection Replacement Liens, the Pre-Petition Adequate Protection Superpriority Claims, the

DIP Liens, and the DIP Superpriority Claims (a) shall not be subject to Sections 506, 510, 549,

550, or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552(b) of

the Bankruptcy Code, (b) shall not be subordinate to, or *pari passu* with, (x) any lien that is

avoided and preserved for the benefit of the Debtor and its estate under Section 551 of the

Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the

Debtor, and (c) shall be valid and enforceable against any trustee or any other estate

representative appointed in this Case or any Successor Case and any "custodian" (as defined in

the Bankruptcy Code), and/or upon the dismissal of this Case or any Successor Case.

33.    Nothing contained in this Final Order or otherwise shall constitute nor be

deemed to constitute, directly or indirectly, by implication or otherwise, a waiver by the Pre-

Petition Secured Parties of their right to assert that the Debtor is obligated under the Pre-

Petition Loan Documents to pay (i) the default interest rates specified therein, (ii) interest on

interest, and/or (iii) other fees, costs and other charges specified therein.

## Consent to Priming and Adequate Protection

34.    The Pre-Petition Secured Parties consent to the Pre-Petition Secured Parties'

Adequate Protection and the priming provided for herein; provided, however, such consent of

the Pre-Petition Secured Parties to the priming of the Pre-Petition Liens, the use of Cash

Collateral, and the sufficiency of the Pre-Petition Secured Parties' Adequate Protection

provided for herein is expressly conditioned upon the entry of this Final Order, and such

consent shall not be deemed to extend to any other Cash Collateral usage or other replacement

financing or debtor-in-possession financing other than the DIP Facility provided under the DIP

Loan Documents and the Lender Party Swap Agreements; and provided, further, that such

consent shall be of no force and effect in the event this Final Order is not entered or is entered

and subsequently reversed, modified, stayed, or amended (unless such reversal, modification,

stay, or amendment is acceptable to the Pre-Petition Agents (on behalf of the Pre-Petition Secured Parties) in their respective sole discretion) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

### Automatic Post-Petition Lien Perfection

35.     This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Pre-Petition Adequate Protection Replacement Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Pre-Petition Adequate Protection Replacement Liens or to entitle the DIP Liens and the Pre-Petition Adequate Protection Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Secured Parties and the Pre-Petition Secured Parties (in the latter case, solely with respect to the Pre-Petition Adequate Protection Replacement Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date. The Debtor shall execute and deliver to the DIP Secured Parties and/or the Pre-Petition Secured Parties, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated priority of, the DIP Liens and the Pre-Petition Adequate Protection Replacement Liens, as applicable, granted pursuant hereto. Without

limiting the foregoing, each of the DIP Secured Parties and the Pre-Petition Secured Parties may in its discretion, file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.  To the extent that a Pre-Petition Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee under any of the Debtor's insurance policies, or is a secured party under any of the Pre-Petition Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtor's insurance policies, and the secured party under each such Pre-Petition Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Pre-Petition Secured Parties.

### Ad Valorem Taxes and Other Valid Liens

36.    Notwithstanding anything contained herein, all Pre-Petition Adequate Protection Replacement Liens and the Pre-Petition Adequate Protection Superpriority Claims are subject to the payment of any outstanding *ad valorem* taxes on any of the DIP Collateral and nothing contained herein shall impact the validity and priority of liens granted to *ad valorem* taxing authorities under applicable statutes.  Notwithstanding anything contained herein, the Pre-Petition Adequate Protection Replacement Liens and the Pre-Petition Adequate

Protection Superpriority Claims are subject to other liens, if any, that have priority over the Pre-Petition Liens of the Pre-Petition Secured Parties.  For avoidance of doubt, the Pre-Petition Adequate Protection Replacement Liens and the Pre-Petition Adequate Protection Superpriority Claims shall not extend to cash held by the Debtor in trust for the benefit of a third party.

## Carve-Out

37.    Subject to the terms and conditions contained in this paragraph, each of the DIP Liens, the DIP Superpriority Claims, the Pre-Petition Liens, the Pre-Petition Adequate Protection Replacement Liens and the Pre-Petition Adequate Protection Superpriority Claims shall be subject and subordinate to payment of a carve-out (the "Carve-Out").  As used in this Final Order, the term "Carve-Out" shall mean (a) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court; (b) the aggregate amount of any fees and expenses of any Professional included in the Approved Budget, which are actually incurred, but unpaid as of the termination of the Debtor's right to use Cash Collateral under the Interim Order, but only to the extent incurred and unpaid, such fees and expenses have been previously or subsequently are approved by this Court and only to the extent such incurred and unpaid fees and expenses exceed any retainer held by any such Professional at the time of such termination in an aggregate amount not to exceed $____; and (c) after a Termination Event, the payment of the reasonable fees and expenses of the Professionals (as accrued and regardless of whether approved and unpaid or pending approval by this Court) that are incurred and are ultimately allowed by this Court pursuant to Bankruptcy Code §§ 328, 330 and 331, in an aggregate amount not to exceed $200,000.  The Carve-Out granted pursuant to this Final Order represents a confirmation of the Carve-Out

granted pursuant to the Interim Order.  Accordingly, the aggregate available amount under both

Carve-Outs, collectively, is limited to $200,000.  The Carve-Out may only be used for the

payment of fees and expenses of Professionals to the extent allowed by order of this Court.

Prior to a Termination Event, subject to the entry of an appropriate order of this Court (in form

and substance reasonably acceptable to the DIP Secured Parties and the Pre-Petition Lenders),

the Debtor shall be permitted to use Cash Collateral to pay compensation and reimbursement

of budgeted expenses allowed and payable to Professionals under Sections 328, 330 and 331 of

the Bankruptcy Code in accordance with the Approved Budget, and the portion of the Carve-

Out set forth in clause (c) above shall not be reduced by the amount of any compensation or

reimbursement of costs and expenses accrued, incurred, awarded or paid before the occurrence

of the Termination Date (as defined below).  Notwithstanding the foregoing, from and after

5:00 p.m. (prevailing Mountain Time) on the Termination Date, any amounts paid to

Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis.  Nothing

herein shall be construed to impair the ability of any party-in-interest to object to any fees,

expenses, reimbursement, or compensation sought by the Professionals.

## Carve-Out Limitation

38.    Neither the Carve-Out nor Cash Collateral may be used to challenge the

amount, validity, perfection, priority of enforceability of or assert any defense, counterclaim or

offset to the Pre-Petition Loan Documents or claims, security interests and liens of the Pre-

Petition Secured Parties with respect thereto otherwise to litigate (including, without limitation,

commencing adversary proceedings, motions, contested matters, arbitrations, mediations, or

other similar proceedings) against any of the Pre-Petition Secured Parties.

39.     Notwithstanding the foregoing, the Carve-Out shall include an aggregate amount not to exceed $20,000 of Cash Collateral for any Committee, if any is appointed, or its Professionals to investigate the claims, liens and security interests of the Pre-Petition Secured Parties.

## Reporting Requirements

40.     As additional adequate protection for the Debtor's use of Cash Collateral and in consideration of the DIP Facility provided by the DIP Secured Parties, as applicable, the Debtor will comply with all reporting requirements under the DIP Loan Documents. Additionally, the Debtor will provide the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders) with reporting information regarding, among other things, prospective asset sales, business plans, updated cash flow forecasts and budgets.  Such information shall be of a nature, quality, and frequency to enable the DIP Secured Parties and the First Lien Lenders to monitor their interests in the DIP Collateral and the Pre-Petition Collateral and Cash Collateral, as applicable.  The Debtor shall also have weekly (or less frequently as may be agreed between the Debtor, the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders)) calls with the DIP Secured Parties, the First Lien Agent and the First Lien Lenders and their advisors, during regular business hours and with reasonable advance notice, on topics related to the Debtor's operations, cash position, the DIP Secured Parties,' the Pre-Petition Agents' and First Lien Lenders' rights under the Interim Order or this Final Order, and the Case.

41.     Following entry of this Final Order, before the close of business on the first Wednesday of each week before the Termination Date, the Debtor shall deliver to the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders) and their

counsel, a written (i) report summarizing the Debtor's and each DIP Guarantor's actual cash flow ending on Friday of the prior week, as compared to the cash flow for such week as set forth in the Approved Budget (the "Cash Flow Report"), each such report to be in a form and with such level of detail as shall be reasonably satisfactory to the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders); and (ii) report setting forth the Debtor's and each DIP Guarantor's working capital position (including a summary of priority payables) ending on Friday of the prior week, such report to include all supporting ledgers, analysis and other information (including a transaction report from the Concentration Account, the POCI Impress Account and the POCI Management Fee Account), each such report to be in form and with such level of detail as shall be reasonably satisfactory to the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders).  The Debtor shall immediately make available to the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders) or any of their agents (including professionals) supporting documentation for all receipts and expenditures, including, but not limited to, bank statements, contracts, invoices, copies of checks, and general ledgers.

42.     In addition, the Debtor will provide the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders) with the following information:

(a)     A copy of any plan to be filed in this Case as soon as reasonably practicable after it becomes available, together with a reconciliation to any prior plan;

(b)     Presentations by the Debtor or its advisors to the DIP Secured Parties or the First Lien Lenders at times and places as the DIP Secured Parties or the First Lien Agent (on behalf of the First Lien Lenders) may reasonably request in writing (including via email);

(c)     Promptly, but in any event by the twenty-fifth (25th) day of each calendar month, a report as of the last day of the preceding calendar month, in form and detail reasonable acceptable to the DIP Secured Parties and the First

Lien Lenders, of (i) an accounts payable aging and an accounts receivable agent and (ii) all written demands or claims related to or asserting any liens in respect of the Debtor's property or assets (including lien imposed by law, such as landlord's, vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers', mechanics' liens, and other similar liens); and

(d)     Promptly, but in any event by the twenty-fifth (25th) day of each calendar month or by the forty-fifth (45th) day after each fiscal quarter end, beginning with the year-to-date period ended [ ] 2016, a monthly and year-to-date income statement, balance sheet, and monthly and year-to-date detail of capital expenditures and workovers, which in each case, may be unaudited and presented without footnotes.

43.     Failure to timely provide any of the reports required by Paragraphs 40-42 of this Final Order shall be a Termination Event as defined in Paragraph 54.

## Access to Premises

44.     The Debtor shall (and shall continue to so) provide the First Lien Agent (on behalf of the First Lien Lenders) and the DIP Secured Parties and any professional retained by the First Lien Agent (on behalf of the First Lien Lenders) or the DIP Secured Parties, with reasonable access during normal business hours to (a) the Debtor's premises, management and financial advisors, (b) any and all books, records, engineering reports, documents and information relevant to the Debtor's business operations, and (c) and other information or report regarding the Debtor or this Chapter 11 Case that the First Lien Agent (on behalf of the First Lien Lenders) or the DIP Secured Parties may from time to time reasonably request.

## No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees

45.     Nothing in this Final Order or otherwise shall be construed (a) to obligate any DIP Secured Party or any Pre-Petition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtor's Professionals or Committee's Professionals, or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement or

(b) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtor's

Professionals or Committee's Professionals are higher in fact than the amount of the Carve-

Out. The respective Pre-Petition Secured Parties' liens and claims shall be subject to the Carve-

Out as set forth in this Final Order. Notwithstanding any provision in this Paragraph to the

contrary, no portion of the Carve-Out, Cash Collateral, Pre-Petition Collateral, DIP Collateral

or proceeds of the DIP Facility shall be utilized for the payment of professional fees and

disbursements to the extent restricted under the Carve-Out. Nothing herein shall be construed

as consent to the allowance of any professional fees or expenses of the Debtor, any Committee,

or of any other person or entity, or shall affect the right of any DIP Secured Party or any Pre-

Petition Secured Party to object to the allowance and payment of such fees and expenses.

### Waiver of 506(c) Claims

46.     As a further condition of the DIP Facility and any obligation of the DIP Secured

Parties to make credit extensions pursuant to the DIP Loan Documents and the Lender Party

Swap Agreements (and their consent to the payment of the Carve-Out to the extent provided

herein) and as a further condition to the Debtor's use of Cash Collateral pursuant to this Final

Order, no costs or expenses of administration of the Case or any Successor Case shall be

charged against or recovered from or against any or all of the DIP Secured Parties and/or the

Pre-Petition Secured Parties, the Pre-Petition Collateral, the DIP Collateral, the Cash Collateral

or the property subject to the Adequate Protection Replacement Liens, in each case pursuant to

section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the

DIP Secured Parties and the Pre-Petition Agents (on behalf of the Pre-Petition Secured

Parties), and no such consent shall be implied from any other action, inaction, or acquiescence

of any or all of the DIP Secured Parties or the Pre-Petition Secured Parties.

## After-Acquired Property

47.     Except as otherwise expressly provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtor on or after the Petition Date is not, and shall not be, subject to any lien of any person or entity resulting from any security agreement entered into by the Debtor prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtor that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

## Protection of DIP Secured Parties' Rights

48.     Unless the requisite DIP Secured Parties under the DIP Loan Documents and the Lender Party Swap Agreements shall have provided their prior written consent or all DIP Obligations and Lender Party Swap Obligations have been Paid in Full, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following: (a) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections granted pursuant to this Final Order to the DIP Secured Parties, unless such order provides that all DIP Obligations and the Lender Party Swap Obligations are Paid in Full as part of the proposed credit facility; or (b) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Final Order.

49.     The Debtor (and/or its legal and financial advisors in the case of clauses (b) through (d) below) will (a) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (b) reasonably cooperate, consult with, and provide to the DIP Secured Parties and the Pre-Petition Secured Parties all such information as required or allowed under the DIP Loan Documents or the provisions of this Final Order, (c) permit representatives of the DIP Agent and the Pre-Petition Agent such rights to visit and inspect any of the Debtor's respective properties, to examine and make abstracts or copies from its books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtor's business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, and independent public accountants as and to the extent required by the DIP Loan Documents (with the Pre-Petition Agents being granted the same access and cooperation rights as the DIP Agent for purposes of this subsection (c)), and (d) permit the DIP Secured Parties and the Pre-Petition Secured Parties and their respective representatives to consult with the Debtor's management and advisors on matters concerning the Debtor's businesses, financial condition, operations and assets.

**Proceeds of Subsequent Financing**

50.     Without limiting the provisions and protections of Paragraph 48 above, if at any time prior to the Payment in Full of all the DIP Obligations and the Lender Party Swap Obligations (including subsequent to the confirmation of any Chapter 11 plan with respect to the Debtor), the Debtor's estate, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the DIP

Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent until Payment in Full of the DIP Obligations and the Lender Party Swap Obligations.

51.     <u>Cash Collection</u>. From and after the date of the entry of this Final Order, all cash and Property (as defined in the DIP Credit Agreement) received by the Debtor, including collections and proceeds of any DIP Collateral and Pre-Petition Collateral or services provided by the Debtor and all Cash Collateral which shall at any time come into the possession, custody, or control of the Debtor, or to which the Debtor is now or shall become entitled at any time, shall be promptly deposited in the POCI Impress Account (as defined in the DIP Credit Agreement) (or in such other accounts as are designated by the DIP Agent from time to time).

52.     <u>Disposition of DIP Collateral</u>. Unless the DIP Obligations, the Lender Party Swap Obligations and the Pre-Petition Credit Obligations are Paid in Full upon the closing of a sale or other disposition, the Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents and the Pre-Petition Secured Parties (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Pre-Petition Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Pre-Petition Loan Documents, as applicable, and this Final Order.

## **Termination Date**

53.     The term of this Final Order and the Debtor's authority to use Cash Collateral hereunder shall expire at 5:00 p.m. (prevailing Mountain Time) on _____, 2016 (the "<u>Termination Date</u>").  The Debtor, the DIP Secured Parties and the First Lien Agent (on behalf

of the First Lien Lenders) may extend the Termination Date, without further notice to creditors or order of this Court, provided that a stipulation extending the Termination Date (an "Extension Stipulation") signed by the Debtor's counsel, counsel for the DIP Agent and counsel for the First Lien Agent (on behalf of the First Lien Lenders) is filed together with a copy of a new Approved Budget approved by the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders).  The Debtor shall provide the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders) with written notice upon the occurrence of a Termination Event.

### Termination Events

54.     The following shall constitute a termination event under this Final Order and the DIP Loan Documents unless waived in writing by each of the required DIP Secured Parties and Pre-Petition Secured Parties (each, a "Termination Event"):

a.     failure of the Debtor to adhere to the terms of this Final Order or the Approved Budget (including the Variance);

b.     the occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "DIP Default Termination Event");

c.     the occurrence of an "Event of Default" under any Lender Party Swap Agreement, as set forth therein;

d.     upon the written notice to the Debtor after Debtor's failure to make any payment to the DIP Secured Parties or the First Lien Lenders when due in accordance with the terms of this Final Order and the Debtor's failure to cure such missed payment within 2 days of receipt of such written notice;

e.     entry of an order without prior consent of the DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders), (i) converting this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (ii) dismissing this Chapter 11 Case; (iii) appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or appointing an examiner with expanded powers (powers beyond those set forth in Section 1106(a)(3) and

(a)(4)) in this Case; (iv) reversing, vacating or otherwise amending, supplementing or modifying this Final Order; or (v) granting relief from the automatic stay to any creditor (other than the First Lien Agent on behalf of any of the First Lien Lenders) or the DIP Secured Parties) holding or asserting a lien in collateral of the Pre-Petition Secured Parties, DIP Secured Parties or reclamation claim;

f.      upon the Debtor's commencement of, or an order entered relating to any proceeding or action, except as set forth in Paragraph 64 hereof, for (i) the invalidation, subordination or other challenge of any Pre-Petition Adequate Protection Superpriority Claim or Pre-Petition Adequate Protection Replacement Lien; (ii) relief under Section 506 of the Bankruptcy Code with respect to the Pre-Petition Collateral other than per the Challenge Rights (as defined below); or (iii) any other relief which could reasonably be expected to result in a material impairment of the rights or interests of the Pre-Petition Lenders or the DIP Secured Parties;

g.      upon the Debtor's filing of any application for entry of an order approving use of Cash Collateral other than the application related to this Final Order;

h.      upon the Debtor's commencement, or any order entered relating to any proceeding or action seeking an order approving the sale of substantially all or a material portion of the Debtor's assets, whether done pursuant to one transaction or a series of transactions (i) without the prior written consent of the requisite DIP Secured Parties and the First Lien Agent (on behalf of the First Lien Lenders); and (ii) without expressly providing for the First Lien Agent's (on behalf of the First Lien Lenders) right to credit bid up to the full amount of the First Lien Indebtedness;

i.      upon the Debtor's creation, incurrence, or allowance to exist of any postpetition liens or security interests having a value greater than $_____ in the aggregate on the Prepetition Collateral or Adequate Protection Collateral other than those granted pursuant to this Final Order without the prior written consent of the Pre-Petition Agents (on behalf of the Pre-Petition Lenders);

j.      (x) entry of an order reversing, staying for a period in excess of three (3) business days, vacating or otherwise amending, supplementing, or modifying this Final Order in a manner adverse to the Pre-Petition Lenders or the DIP Secured Parties, without the written consent of the First Lien Agent (on behalf of the First Lien Lenders) or the DIP Secured Parties or (y) the filing by the Debtor of a motion to reserve, stay, vacate, or otherwise amend,

supplement, or modify this Final Order without the written consent of the First Lien Agent (on behalf of the First Lien Lenders) and the DIP Secured Parties;

k.  the filing of any chapter 11 plan or any agreement without the written consent of the First Lien Agent (on behalf of the First Lien Lenders) and the DIP Secured Parties that provides for a restructuring of the Debtor that does not contain a provision for termination of the commitments under the DIP Facility, the Lender Party Swap Agreements and the First Lien Loan Documents and the indefeasible Payment in Full in cash of the DIP Obligations, the Lender Party Swap Obligations and the First Lien Indebtedness on or before the effective date of such plan;

l.  the filing by the Debtor of a motion in this Chapter 11 Case without the written consent of the First Lien Agent (on behalf of the First Lien Lenders) and the DIP Secured Parties (i) to obtain financing under Section 364 of the Bankruptcy Code from any person or entity other than the First Lien Lenders or the DIP Secured Parties; (ii) to grant any lien or offering any collateral; or (iii) to recover any portion of the First Lien Collateral or the DIP Collateral;

m.  the Debtor's failure to timely provide any of the documents required by Paragraphs 40-42 of this Final Order, or upon three (3) business days' written notice to the Debtor that the Debtor has failed to comply with any other term of this Final Order; or

n.  the Debtor's failure to timely and strictly comply with any of the Sale Milestones.

## **Termination Remedies**

55.  Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Secured Parties to exercise the following remedies immediately upon the occurrence and during the continuance of any Termination Event (as set forth above): (a) terminate the Commitments (as defined in the DIP Credit Agreement); (b) declare the principal amount then outstanding of, and the accrued interest on, the DIP Obligations and all other amounts payable by the Debtor under the DIP Loan Documents or the Lender Party Swap

Agreements to be forthwith due and payable, whereupon such amounts shall be immediately due and payable without presentment, demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Debtor; (c) terminate the DIP Facility and any DIP Loan Document and the Lender Party Swap Agreements as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations, the DIP Liens securing the DIP Obligations or the DIP Protections; (d) declare a termination, reduction, or restriction on the ability of the Debtor to use any Cash Collateral (except as permitted in Paragraph 56 below), including Cash Collateral derived solely from the proceeds of DIP Collateral (any such declaration to be made in writing to the Debtor, the    Pre-Petition Agents (on behalf of the Pre-Petition Lenders), the respective lead counsel to any Committee, and the United States Trustee shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date"); (e) reduce any claim to judgment; (f) take any other action permitted by law; and/or (g) take any action permitted to be taken by the DIP Loan Documents during the continuance of any Termination Event.

56.    Five (5) Business Days following a Termination Declaration Date (and subject to the Debtor's right to challenge such Termination Declaration), the DIP Secured Parties shall be deemed to have relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtor's premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral pursuant to the DIP Loan Documents and as permitted by applicable nonbankruptcy law. During the five (5) Business Day period after a Termination Declaration Date, the Debtor, the DIP Secured Parties, the Pre-Petition

Secured Parties and any Committee shall be entitled to an emergency hearing before the Court

for the sole purpose of contesting whether a Termination Event has occurred and section 105 of

the Bankruptcy Code may not be invoked by the Debtor, any Committee, or any other party-in-

interest in an effort to restrict or preclude any DIP Secured Party from exercising any rights or

remedies set forth in this Final Order or the DIP Loan Documents pending such emergency

hearing. Unless during such period the Court enters an order determining that a Termination

Event has not occurred and/or is not continuing, the automatic stay, as to the DIP Secured

Parties and the DIP Collateral, shall automatically terminate at the end of such five (5)

Business Day period, without further notice or order. During such five (5) Business Day

period, the Debtor may not use Cash Collateral or any amounts under the DIP Facility except

to pay payroll and other expenses critical to keep the business of the Debtor operating in

accordance with and otherwise due under the Approved Budget.

57.     All proceeds realized in connection with the exercise of the rights and remedies

of the DIP Secured Parties or the Pre-Petition Secured Parties shall be turned over to the DIP

Agent for application to the other DIP Obligations and Lender Party Swap Obligations under,

and in accordance with, the provisions of the DIP Loan Documents until Payment in Full of the

DIP Obligations and the Lender Party Swap Obligations; provided, that in the event of the

liquidation of the Debtor's estate after the occurrence and during the continuance of a

Termination Event, the Carve-Out shall be funded into a segregated account exclusively (a)

first, from proceeds of any unencumbered assets of the Debtor, and (b) then from Cash

Collateral received by the DIP Agent subsequent to the date of termination of the DIP

Obligations and prior to the distribution of any such Cash Collateral to any other parties-in-

interest.

58.     Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties contained in this Final Order or the DIP Loan Documents or the Lender Party Swap Agreements, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) Business Days' written notice to the Debtor and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Secured Parties (a) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Secured Parties (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtor for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (b) shall be entitled to all of the Debtor's rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtor, which are owned by or subject to a Lien of any third party and which are used by Debtor in its business, in either the case of subparagraph (a) or (b) of this paragraph without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Secured Parties shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtor that first arise after the written notice referenced above and that accrue during the period of such occupancy or use by the DIP Secured Parties calculated on a *per diem* basis. Nothing herein shall require the Debtor or any of the DIP Secured Parties to assume any lease or license under Bankruptcy Code section 365(a) or otherwise become subject thereto as a precondition to the rights afforded to the DIP Secured Parties in this paragraph.

59.     The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of this Final Order and the DIP Loan Documents as necessary to (a) permit the Debtor to grant the Pre-Petition Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Pre-Petition Secured Parties and the DIP Secured Parties under the DIP Loan Documents, the DIP Facility, the Interim Order, and this Final Order, (b) authorize the DIP Secured Parties and the Pre-Petition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Interim Order, and this Final Order, and (c) otherwise to the extent necessary to implement and effectuate the provisions of this Final Order.

### Preservation of Rights Granted Under this Final Order

60.     <u>No Non-Consensual Modification of Final Order</u>. The Debtor irrevocably waives any right to seek any amendment or modification of this Final Order without the prior written consent of the DIP Secured Parties and the Pre-Petition Agents (on behalf of the Pre-Petition Lenders), and no such consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties or the Pre-Petition Secured Parties. In the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby. Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of

this Court or any other court, the DIP Secured Parties and the Pre-Petition Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (a) the validity, priority, or enforceability of any DIP Protections and the Pre-Petition Secured Parties' Adequate Protection granted or incurred prior to the actual receipt of written notice by the DIP Secured Parties or the Pre-Petition Secured Parties, as the case may be, of the effective date of such reversal, modification, vacatur, or stay or (b) the validity, enforceability and non-avoidability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations, the Lender Party Swap Obligations and the Pre-Petition Secured Parties' Adequate Protection. Notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or Lender Party Swap Obligations or Pre-Petition Secured Parties' Adequate Protection incurred or granted by the Debtor prior to the actual receipt of written notice by the DIP Secured Parties or the Pre-Petition Secured Parties, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties and the Pre-Petition Secured Parties shall be entitled to all of the DIP Protections and Pre-Petition Secured Parties' Adequate Protection, as the case may be, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order, and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and all DIP Obligations, Lender Party Swap Obligations and Pre-Petition Secured Parties' Adequate Protection.

### Modification of Stay

61.     The automatic stay provided under Section 362 of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit (a) the Debtor, the DIP Secured Parties and the Pre-Petition Secured Parties to commit all acts and take all actions necessary to implement this Final Order and (b) all acts, actions, and transfers contemplated by this Final Order.

62.     The Debtor irrevocably waives any right to seek any amendment, modification, or extension of this Final Order without the prior written consent of the Pre-Petition Agents (on behalf of the Pre-Petition Lenders) and the DIP Secured Parties, and no such consent shall be implied by any other action, inaction, or acquiescence of the Pre-Petition Secured Parties or the DIP Secured Parties.

### Dismissal

63.     If any order dismissing the Case under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code), that (a) the DIP Protections and the Pre-Petition Secured Parties' Adequate Protection provided in this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations have been Paid in Full, the Pre-Petition Credit Obligations have been Paid in Full (and that all DIP Protections and the Pre-Petition Secured Parties' Adequate Protection shall, notwithstanding such dismissal, remain binding on all parties-in-interest), and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Pre-Petition Secured Parties' Adequate Protection.

## **Challenge Rights**

64.      The Pre-Petition Secured Parties shall have valid, binding, enforceable, and perfected security interests and liens in all of the Debtor's assets as set forth in Paragraph G of this Final Order except and only to the extent an action to challenge the stipulations set forth in Paragraph G of this Final Order (collectively, the "Challenges" and, each individually, a "Challenge"), including but not limited to: (a) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtor's stipulations herein; or (b) a contested matter, adversary proceeding, or other action against the First Lien Agent, the Second Lien Agent, any individual Pre-Petition Lender, or the Pre-Petition Lenders, in connection with or related to the Pre-Petition Indebtedness, the Pre-Petition Collateral, or the actions or inactions of the Pre-Petition Agents or any of the Pre-Petition Lenders arising out of or related to the Pre-Petition Indebtedness, or the Pre-Petition Liens, or otherwise, including, without limitation, any claim against any or all of the Pre-Petition Lenders or the Pre-Petition Agents in the nature of a "lender liability" cause of action, set off, counterclaim, or defense to the Pre-Petition Indebtedness or the Pre-Petition Liens (including, but not limited to, those under Sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Pre-Petition Agents or the Pre-Petition Lenders) has been timely and properly commenced in a contested matter, adversary proceeding, or other appropriate action within the applicable Challenge Period (defined herein) and a final, non-appealable order in favor of the party timely commencing such Challenge in any such timely-filed contested matter, adversary proceeding, or other appropriate action has been entered by the Court.   A

party-in-interest other than the Debtor must exercise its rights (the "Challenge Rights") as set

forth in this paragraph by the applicable time periods (as applicable, the "Challenge Period"):

(a)    General Challenge Period.   The Debtor's stipulations shall be
binding upon all parties-in-interest in this case unless, within seventy five (75) days
following the Petition Date (the "General Challenge Period"), or as extended with the
Pre-Petition Agents' prior written consent (on behalf of the Pre-Petition Lenders), a
party-in-interest other than any Committee or any trustee appointed in this Case (a
"Chapter 11 Trustee") or a chapter 7 trustee appointed in any Successor Case
(a "Chapter 7 Trustee" and, with a Chapter 11 Trustee, either one, a "Trustee")
commences a Challenge (a "General Challenge") and subsequently obtains a final, non-
appealable order in favor of such party-in-interest sustaining any such Challenge in any
such timely-filed contested matter, adversary proceeding, or other action.  The General
Challenge Period shall not apply to any Committee or any Trustee.

(b)    Committee and Trustee Challenge Period.   The Debtor's
stipulations shall be binding upon any Committee, any Trustee and all other parties-in-
interest, unless within the earlier of (1) sixty (60) days following its appointment or
(2) seventy five (75) days following the Petition Date (the "Committee and Trustee
Challenge Period"), or as such period may be extended in accordance with the Pre-
Petition Agents' prior written consent (on behalf of the Pre-Petition Lenders), any
Committee or Trustee commences a Challenge (a "Committee or Trustee Challenge")
and subsequently obtains a final, non-appealable order in favor of such Committee or
Trustee sustaining such Committee or Trustee Challenge in any such timely-filed
contested matter, adversary proceeding, or other appropriate action; provided, however,
that if a Trustee is appointed within seventy-five (75) days following the Petition Date,
the Stipulations Effective Date (as defined below) with respect to such Trustee only
shall be the later of (1) the seventy-fifth (75th) day following the Petition Date or (2) the
date that is twenty (20) days after the date on which such Trustee is appointed.

65.    The Debtor's stipulations shall be binding on the date that is the next calendar

day after the termination of the Challenge Period, in the event that (a) no Challenge (as defined

below) is raised during the Challenge Period or (b) with respect only to those parties who

properly file a timely Challenge, such Challenge is fully and finally adjudicated which, date in

each case shall be referred to as the "Challenge Period Termination Date."

66.    Except as otherwise expressly provided herein, from and after the Challenge

Period Termination Date and for all purposes in this Case and any Successor Case:

(a)     all payments made to or for the benefit of the Pre-Petition Lenders pursuant to, or otherwise authorized by, the Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance,

(b)     any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred;

(c)     the Pre-Petition Indebtedness shall be deemed to be a fully allowed claim under the Bankruptcy Code; and

(d)     the Debtor's stipulations, including the release provisions therein, shall be binding on all parties-in-interest, including any Committee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted in any such adversary proceeding, contested matter or other action or proceeding, the Debtor's stipulations shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such stipulations were expressly challenged with particularity in such adversary proceeding, contested matter, or other action.

67.     The Debtor's stipulations shall be binding on all parties-in-interest in this Case and in any Successor Case on the date that is the later of (a) if no General Challenge or Committee or Trustee Challenge, as the case may be, was timely raised, the next calendar day after expiration of the General Challenge Period and the Committee and Trustee Challenge Period, (b) if a General Challenge or Committee or Trustee Challenge, as the case may be, was timely raised, this Court fully and finally adjudicates such General Challenge or Committee or Trustee Challenge, as the case may be, and does not sustain such Challenge, the next calendar day thereafter, which date in either case shall be referred to as the "Stipulations Effective Date."

68.     Except as otherwise expressly provided herein, from and after the Stipulations Effective Date and for all purposes in this Case and any Successor Case:

(a)     all payments made to or for the benefit of the Pre-Petition Agents or the Pre-Petition Lenders pursuant to, or otherwise authorized by, this Final Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or

avoidance,

(b)      any and all such Challenges by any party-in-interest, whether raised or not raised, shall be deemed to be forever released, waived, and barred;

(c)      the Pre-Petition Indebtedness shall be deemed to be a fully allowed claim under the Bankruptcy Code; and

(d)      the Debtor's stipulations, including the release provisions therein, shall be binding on all parties-in-interest, including any Committee and any Trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted in any such adversary proceeding, contested matter or other action or proceeding, the Debtor's stipulations shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest, except to the extent that such stipulations were expressly challenged with particularity in such adversary proceeding, contested matter, or other action.

69.      The General Challenge Period and the Committee and Trustee Challenge Period may only be extended with the Pre-Petition Agents' prior written consent (on behalf of the Pre-Petition Lenders) in the Pre-Petition Agents' (on behalf of the Pre-Petition Lenders) sole and absolute discretion.  Notwithstanding any provision to the contrary herein, nothing in this Final Order shall be construed to grant standing to any party-in-interest, including any Committee or Trustee, to bring any Challenge on behalf of the Debtor's estate.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court before the Stipulations Effective Date granting standing to bring any Challenge on behalf of the Debtor's estate shall not be a defense to failing to timely commence a Challenge as required under this Final Order.

## Insurance Policies

70.      The Debtor shall maintain, with financially sound and reputable insurance companies, insurance with respect to all of the DIP Collateral and all of the Pre-Petition Collateral for all the purposes in accordance with the requirements of the DIP Loan Documents (covering such risks and in amounts as shall be satisfactory to the DIP Secured Parties) and the Pre-Petition Security Documents (covering such risks and in amounts as shall be satisfactory to

the Pre-Petition Lenders), respectively.  Without any further action or notice, the DIP Secured Parties and the Pre-Petition Secured Parties shall be deemed to be, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtor.

## Intercreditor Agreement

71.    Pursuant to section 510(a) of the Bankruptcy Code, the Intercreditor Agreement shall be enforceable in this Case to the same extent that it is enforceable under applicable nonbankruptcy law.  Nothing within this Final Order shall alter or affect the rights and obligations of the Pre-Petition Agents or the Pre-Petition Lenders pursuant to the Intercreditor Agreement. For the avoidance of doubt, in the event any provision of this Final Order conflicts with the terms of the Intercreditor Agreement with respect to the rights and obligations of the Pre-Petition Agents and the Pre-Petition Lenders among each other, the Intercreditor Agreement shall control.

## Release of Claims

72.    Subject to the rights of a party-in-interest to file a Challenge in accordance with Paragraph 64, the Debtor and its estate shall be deemed to have forever waived, discharged, and released the Pre-Petition Secured Parties and their respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives (all of the foregoing, collectively, the "Pre-Petition Releasees") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, set off, recoupment, or other offset rights against any and all of the Pre-Petition Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Pre-Petition Indebtedness, the Pre-Petition Liens, or the debtor-creditor relationship

between the Pre-Petition Secured Parties, on the one hand, and the Debtor and the DIP Guarantor, on the other hand, including, without limitation, (a) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to Section 105 or Chapter 5 or otherwise of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Pre-Petition Indebtedness or any payments made on account of the Pre-Petition Indebtedness, or the amount, validity, enforceability, priority, or non-avoidability of the Pre-Petition Liens securing the Pre-Petition Indebtedness.

### **Proofs of Claim**

73.    The Pre-Petition Agents, the Pre-Petition Lenders and the DIP Secured Parties are not required to file proofs of claim in the Case or Successor Case for any claim allowed herein.  The Debtor's stipulations shall be deemed to constitute timely filed proofs of claim for the Pre-Petition Agents and the Pre-Petition Lenders.  Notwithstanding any order entered by this Court in relation to the establishment of a proof of claim deadline or bar date in the Case or Successor Case to the contrary, the Pre-Petition Agents (on behalf of the Pre-Petition Lenders) and the DIP Secured Parties are each hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in the Case or Successor Case for any claim allowed or asserted herein.

### **No Waiver**

74.    Neither the failure of the Pre-Petition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the Pre-Petition Loan Documents, or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Secured

Parties to seek relief or otherwise exercise their respective rights and remedies under this Final Order, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise. Nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Pre-Petition Secured Party or any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of set off or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the Pre-Petition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (a) request conversion of the Case to a case under chapter 7, dismissal of the Case, or the appointment of a Chapter 11 Trustee in the Case, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtor, or (c) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Pre-Petition Secured Parties, respectively. Except to the extent otherwise expressly provided in this Final Order, neither the commencement of the Case nor the entry of this Final Order shall limit or otherwise modify the rights and remedies of the Pre-Petition Secured Parties with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Pre-Petition Loan Documents, applicable law, or equity.

**Amendments**

75.     The Debtor is authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any non-material provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (a) increases the interest rate (other than as a result of the imposition of the default rate), (b) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, (c) changes the Maturity Date (as defined in the DIP Credit Agreement), or (d) adds or amends (in any respect unfavorable to the Debtor) any DIP Default Termination Event. No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of the Debtor and the DIP Secured Parties and, except as provided herein, approved by this Court. Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Final Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Pre-Petition Secured Parties, as applicable, shall be effective unless also consented to in writing by the Pre-Petition Secured Parties.

**Reservation of Rights**

76.     Nothing in this Final Order shall be deemed to constitute the consent of the DIP Secured Parties or the Pre-Petition Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale of all or substantially all of the assets of the Debtor to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Lender Party Swap Obligations, the Pre-Petition Credit

Obligations, the Pre-Petition Secured Parties' Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

### General Cooperation From Debtor; Access to Information.

77.    Within twenty-four (24) hours of entry of this Final Order, the Debtor shall (and shall continue to so) provide the DIP Secured Parties and the Pre-Petition Secured Parties and their respective advisors and representatives, with reasonable access during normal business hours to (a) the Debtor's premises, management and financial advisors, (b) any and all books, records, engineering reports, documents and information relevant to the Debtor's business operations, and (c) and other information or report regarding the Debtor or this Chapter 11 Case or in any Successor Case that the DIP Secured Parties or the Pre-Petition Secured Parties may from time to time reasonably request.

### Interim Order

78.    Except as specifically amended, supplemented or otherwise modified hereby, all of the provisions of the Interim Order shall remain in effect and are hereby ratified by this Final Order.

### Survival of Final Order

79.    The provisions of this Final Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, the Pre-Petition Secured Parties' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Pre-Petition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in this Case, converting this Case to a case under Chapter 7 of the Bankruptcy Code, dismissing the Case, withdrawing of

the reference of this Case or any Successor Case or providing for abstention from handling or

retaining of jurisdiction of this Case in this Court. The terms and provisions of this Final Order,

including all of the DIP Protections, the Pre-Petition Secured Parties' Adequate Protection, and

all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or

all of the DIP Secured Parties and the Pre-Petition Secured Parties, shall continue in full force

and effect notwithstanding the entry of any such order, and such DIP Protections and Pre-

Petition Secured Parties' Adequate Protection shall continue in this Case and in any Successor

Case, and shall maintain their respective priorities as provided by this Final Order. Subject to

the provisions of this Final Order and the DIP Loan Documents that permit the treatment of the

DIP Obligations under the DIP Facility pursuant to any Chapter 11 plan with respect to the

Debtor, the DIP Obligations shall not be discharged by the entry of an order confirming any

such Chapter 11 plan, the Debtor having waived such discharge pursuant to section 1141(d)(4)

of the Bankruptcy Code.

### **Binding Effect**

80.    Subject to Paragraph 64, the provisions of this Final Order, including all

findings herein, and the DIP Loan Documents shall be binding upon all parties-in-interest in

this Case and in any Successor Case, including, without limitation, the DIP Secured Parties, the

Pre-Petition Secured Parties, any Committee, and the Debtor and their respective successors

and assigns (including any Trustee, any examiner appointed pursuant to Section 1104 of the

Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal

representative of the Debtor or the Debtor's estate or with respect to the property of the estate

of the Debtor), whether in this Case, in any Successor Case, or upon dismissal of any such

Case or Successor Case; provided, however, that the DIP Secured Parties and the Pre-Petition

Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any

financing to any Trustee or other responsible person appointed for the estate of the Debtor in

any Case or Successor Case.

## No Third Party Rights

81.    Except as explicitly provided for herein or in any DIP Loan Document, this

Final Order does not create any rights for the benefit of any third party, creditor, equity holder,

or any direct, indirect, or incidental beneficiary. In determining to make any loan (whether

under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in

exercising any rights or remedies as and when permitted pursuant to this Final Order or the

DIP Loan Documents, the DIP Secured Parties and the Pre-Petition Secured Parties shall not

(a) be deemed to be in control of the operations of the Debtor or (b) owe any fiduciary duty to

the Debtor, its creditors, shareholders, or estate.

82.    No Marshaling. Neither the DIP Secured Parties nor the Pre-Petition Secured

Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine

with respect to any of the DIP Collateral or the Pre-Petition Collateral, as applicable.

83.    Bankruptcy Code Section 552(b).  The DIP Secured Parties and the Pre-Petition

Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the

Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the

Bankruptcy Code shall not apply to the DIP Secured Parties nor the Pre-Petition Secured

Parties with respect to the proceeds, products, offspring or profits of any of the DIP Collateral

or the Pre-Petition Collateral, as applicable.

## **Controlling Person**

84.    Neither the DIP Secured Parties nor the Pre-Petition Secured Parties shall (a) have liability to any third party, nor be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal of state statute), or owe any fiduciary duty to the Debtor, their creditors or their bankruptcy estate, and (b) have a relationship with the Debtor which shall be deemed to constitute a joint venture or partnership with the Debtor.

## **Inconsistency**

85.    In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Final Order, the provisions of this Final Order shall govern and control.

## **Enforceability**

86.    This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of the Interim Order.

87.    <u>Headings</u>. Paragraph headings used herein are for convenience only and are not

to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

## **Retention of Jurisdiction**

88.    The Bankruptcy Court has and will retain jurisdiction to enforce this Final

Order according to its terms.


###

# Exhibit 3

*Petition Date Draft*

---

# POST-PETITION SUPERPRIORITY CREDIT AGREEMENT

### DATED AS OF
### AUGUST [___], 2016

#### AMONG

### III EXPLORATION II LP,
#### AS BORROWER,

### WILMINGTON TRUST, NATIONAL ASSOCIATION
### AS ADMINISTRATIVE AGENT,

#### AND

### THE LENDERS PARTY HERETO

---

# TABLE OF CONTENTS

Page

ARTICLE I           DEFINITIONS AND ACCOUNTING MATTERS ................................. 2

    Section 1.01  Terms Defined Above ............................................................... 2

    Section 1.02  Certain Defined Terms .............................................................. 2

    Section 1.03  Terms Generally; Rules of Construction .................................. 22

    Section 1.04  Accounting Terms and Determinations; GAAP ..................... 23

ARTICLE II          THE CREDITS ............................................................. 23

    Section 2.01  Commitments ......................................................................... 23

    Section 2.02  Loans and Borrowings .......................................................... 23

    Section 2.03  Requests for Borrowings ....................................................... 24

    Section 2.04  Funding of Borrowings .......................................................... 25

    Section 2.05  Termination and Reduction of Aggregate Commitments ....................... 26

ARTICLE III         PAYMENTS OF PRINCIPAL AND INTEREST;
                    PREPAYMENTS; FEES ................................................. 26

    Section 3.01  Repayment of Loans ............................................................. 26

    Section 3.02  Interest ................................................................................... 26

    Section 3.03  Prepayments ......................................................................... 27

    Section 3.04  Fees ...................................................................................... 28

ARTICLE IV          PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-
                    OFFS ............................................................................... 28

    Section 4.01  Payments Generally; Pro Rata Treatment; Sharing of Set-offs .............. 28

    Section 4.02  Presumption of Payment by the Borrower ............................. 29

    Section 4.03  Payments and Deductions by the Administrative Agent; Defaulting
                    Lenders .................................................................................. 30

    Section 4.04  Disposition of Proceeds ....................................................... 31

ARTICLE V           INCREASED COSTS; BREAK FUNDING PAYMENTS;
                    TAXES; ILLEGALITY ................................................... 31

    Section 5.01  Increased Costs ..................................................................... 31

    Section 5.02  Taxes ..................................................................................... 32

    Section 5.03  Mitigation Obligations; Replacement of Lenders ................... 36

ARTICLE VI          CONDITIONS PRECEDENT ....................................... 37

    Section 6.01  Effective Date ...................................................................... 37

TABLE OF CONTENTS (Continued)

Page

| | | |
|---|---|---|
| Section 6.02 | Each Credit Event | 39 |
| ARTICLE VII | REPRESENTATIONS AND WARRANTIES | 40 |
| Section 7.01 | Organization; Powers | 40 |
| Section 7.02 | Authority; Enforceability | 41 |
| Section 7.03 | Approvals; No Conflicts | 41 |
| Section 7.04 | Financial Condition; No Material Adverse Change | 41 |
| Section 7.05 | Litigation | 42 |
| Section 7.06 | Environmental Matters | 42 |
| Section 7.07 | Compliance with the Laws and Agreements; No Defaults | 43 |
| Section 7.08 | Investment Company Act | 43 |
| Section 7.09 | Taxes | 43 |
| Section 7.10 | ERISA | 44 |
| Section 7.11 | Disclosure; No Material Misstatements | 44 |
| Section 7.12 | Insurance | 45 |
| Section 7.13 | Restriction on Liens | 45 |
| Section 7.14 | Subsidiaries | 45 |
| Section 7.15 | Location of Business and Offices | 45 |
| Section 7.16 | Properties; Titles, Etc | 45 |
| Section 7.17 | Maintenance of Properties | 46 |
| Section 7.18 | Gas Imbalances, Prepayments | 47 |
| Section 7.19 | Marketing of Production | 47 |
| Section 7.20 | Swap Agreements | 47 |
| Section 7.21 | Use of Loans and Letters of Credit | 47 |
| Section 7.22 | International Operations | 48 |
| Section 7.23 | Anti-Corruption | 48 |
| Section 7.24 | Bankruptcy Representations | 48 |
| Section 7.25 | Anti-Corruption Laws and Sanctions | 49 |
| Section 7.26 | EEA Financial Institutions | 49 |
| ARTICLE VIII | AFFIRMATIVE COVENANTS | 49 |
| Section 8.01 | Financial Statements; Other Information | 49 |
| Section 8.02 | Notices of Material Events | 52 |
| Section 8.03 | Existence; Conduct of Business | 52 |

520934 000003 17688986.3

**TABLE OF CONTENTS** (Continued)

Section 8.04   Payment of Obligations...............................................................52

Section 8.05   Performance of Obligations under Loan Documents..............................53

Section 8.06   Operation and Maintenance of Properties...............................................53

Section 8.07   Insurance .......................................................................................53

Section 8.08   Books and Records; Inspection Rights ...................................................54

Section 8.09   Compliance with Laws ......................................................................54

Section 8.10   Environmental Matters......................................................................54

Section 8.11   Further Assurances...........................................................................55

Section 8.12   Operation of Accounts ......................................................................56

Section 8.13   Weekly Cash Flow Projections ............................................................56

Section 8.14   Variance Reports .............................................................................57

Section 8.15   Lender Calls ...................................................................................57

Section 8.16   Opposition to Certain Pleadings ..........................................................58

Section 8.17   Compliance with 363 Sale Milestones...................................................58

Section 8.18   Title Information..............................................................................58

Section 8.19   Additional Collateral; Additional Guarantors ..........................................59

Section 8.20   ERISA Compliance ..........................................................................59

Section 8.21   Marketing Activities .........................................................................60

Section 8.22   Swap Agreements ............................................................................60

ARTICLE IX          NEGATIVE COVENANTS .................................................60

Section 9.01   Financial Covenants..........................................................................60

Section 9.02   Debt.............................................................................................60

Section 9.03   Liens.............................................................................................61

Section 9.04   Restricted Payments; Payments on Affiliate Debt....................................61

Section 9.05   Investments, Loans and Advances ........................................................62

Section 9.06   Nature of Business; International Operations ..........................................62

Section 9.07   Limitation on Leases .........................................................................63

Section 9.08   Proceeds of Loans ...........................................................................63

Section 9.09   ERISA Compliance ..........................................................................63

Section 9.10   Sale or Discount of Receivables ..........................................................64

Section 9.11   Mergers, Etc ..................................................................................64

Section 9.12   Sale of Properties ............................................................................64

TABLE OF CONTENTS (Continued)

Section 9.13    Environmental Matters ....................................................................... 64

Section 9.14    Transactions with Affiliates ............................................................... 64

Section 9.15    Subsidiaries ......................................................................................... 65

Section 9.16    Negative Pledge Agreements; Dividend Restrictions ........................... 65

Section 9.17    Gas Imbalances, Take-or-Pay or Other Prepayments .......................... 65

Section 9.18    Swap Agreements ................................................................................. 65

Section 9.19    Bankruptcy Provisions ......................................................................... 65

Section 9.20    Compliance with Budget ...................................................................... 66

ARTICLE X            EVENTS OF DEFAULT; REMEDIES ............................................... 66

Section 10.01    Events of Default ............................................................................... 66

Section 10.02    Remedies ........................................................................................... 69

ARTICLE XI            THE ADMINISTRATIVE AGENT .................................................. 71

Section 11.01    Appointment; Powers ......................................................................... 71

Section 11.02    Duties and Obligations of Administrative Agent .................................. 71

Section 11.03    Action by Administrative Agent .......................................................... 72

Section 11.04    Reliance by Administrative Agent ....................................................... 72

Section 11.05    Subagents .......................................................................................... 73

Section 11.06    Resignation or Removal of Administrative Agent ................................. 73

Section 11.07    Administrative Agent as Lender .......................................................... 73

Section 11.08    No Reliance ........................................................................................ 74

Section 11.09    Administrative Agent May File Proofs of Claim .................................... 74

Section 11.11    Authority of Administrative Agent to Release Collateral and Liens ....... 75

ARTICLE XII            MISCELLANEOUS ........................................................................ 75

Section 12.01    Notices ............................................................................................... 75

Section 12.02    Waivers; Amendments ........................................................................ 76

Section 12.03    Expenses, Indemnity; Damage Waiver ................................................ 77

Section 12.04    Successors and Assigns ...................................................................... 80

Section 12.05    Survival; Revival; Reinstatement ........................................................ 83

Section 12.06    Counterparts; Integration; Effectiveness ............................................. 83

Section 12.07    Severability ........................................................................................ 84

Section 12.08    Right of Setoff .................................................................................... 84

Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE
OF PROCESS ...................................................................................... 84

TABLE OF CONTENTS (Continued)

Page

Section 12.10  Headings ......................................................................................... 86

Section 12.11  Confidentiality ............................................................................... 86

Section 12.12  Interest Rate Limitation ............................................................... 86

Section 12.13  EXCULPATION PROVISIONS .................................................. 87

Section 12.14  Collateral Matters; Swap Agreements ...................................... 88

Section 12.15  No Third Party Beneficiaries ..................................................... 88

Section 12.16  USA Patriot Act Notice ................................................................ 88

Section 12.17  Holdback ........................................................................................ 88

Section 12.18  Release of Claims .......................................................................... 88

Section 12.19  Acknowledgment and Consent to Bail-In of EEA Financial
Institutions................................................................................... 89


### ANNEXES, EXHIBITS AND SCHEDULES

Annex I              List of Commitments

Exhibit A            Form of Note
Exhibit B            Form of Borrowing Request
Exhibit C            Reserved
Exhibit D            Form of Compliance Certificate
Exhibit E            Security Instruments
Exhibit F            Form of Assignment and Assumption

Schedule 7.06        Environmental Matters
Schedule 7.14        Subsidiaries and Partnerships
Schedule 7.18        Gas Imbalances
Schedule 7.19        Marketing Contracts
Schedule 7.20        Swap Agreements
Schedule 9.05        Investments

## POST-PETITION SUPERPRIORITY CREDIT AGREEMENT

**THIS POST-PETITION SUPERPRIORITY CREDIT AGREEMENT** dated as of August [___], 2016 is among: III Exploration II LP, an Idaho limited partnership (the "<u>Borrower</u>"); each of the Lenders from time to time party hereto; and Wilmington Trust, National Association, as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "<u>Administrative Agent</u>").

### R E C I T A L S

A.      On July 26, 2016 (the "<u>Petition Date</u>"), the Borrower voluntarily commenced a chapter 11 case (the "<u>Case</u>") under the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the District of Utah (the "<u>Bankruptcy Court</u>");

B.      Prior to the Petition Date, the Borrower received financing pursuant to (i) that certain Credit Agreement dated as of February 19, 2013, by and among the Borrower, Wilmington Trust, National Association, successor Administrative Agent (as defined therein) to KeyBank National Association, as Administrative Agent (the "<u>Prepetition Agent</u>"), and the Lenders (as defined therein) from time to time party thereto (collectively, the "<u>Prepetition Lenders</u>") (as amended, supplemented, restated or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition Credit Agreement</u>") and (ii) that certain Second Lien Term Loan Agreement dated as of February 19, 2013 among the Borrower, KeyBank National Association, as Administrative Agent (as defined therein), and the Lenders (as defined therein) from time to time party thereto (as amended, supplemented, restated or otherwise modified from time to time prior to the date hereof, the "<u>Prepetition Second Lien Term Loan Agreement</u>");

C.      Prior to the Petition Date, the Borrower entered into the Transition Services Agreement (as defined below);

D.      At this time, the Borrower continues to operate its businesses and to manage its properties as debtor and debtor-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

E.      The Borrower has requested that the Lenders extend credit in the form of a senior secured priming and superpriority debtor-in-possession backstop revolving credit facility to finance Budget (as defined below) expenses not covered by the Borrower's cash flow, in an aggregate principal amount (subject to entry of the DIP Order (as defined below)) of up to $4,000,000, with the proceeds of such credit facility to be used by the Borrower to pay certain fees and expenses (including fees and expenses of the Administrative Agent and its professionals, consultants, advisors and representatives) related to the Transactions and for working capital and other general corporate purposes, in each case in accordance with the Budget as provided herein;

F.      The Borrower and Guarantors (as defined below) desire to secure all of the Obligations by granting to the Administrative Agent, for the benefit of the Credit Parties and the Secured Swap Parties, a security interest in and Lien (as defined below) upon substantially all of the property and assets of the Borrower and the Guarantors, subject to the limitations described herein and in the Security Instruments (as defined below);

G.    The Lenders have agreed to make such loans and extensions of credit subject to the terms and conditions of this Agreement.

H.    In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## Definitions and Accounting Matters

Section 1.01    Terms Defined Above.    As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms.    As used in this Agreement, the following terms have the meanings specified below:

"363 Asset Purchase Agreement" means an asset purchase agreement pursuant to which a buyer will consummate the 363 Sale.

"363 Sale" means the sale of all or substantially all of the assets of the Borrower under section 363 of the Bankruptcy Code.

"Administrative Agent" shall have the meaning set forth in the introductory paragraph hereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliate Debt" has the meaning given such term in Section 9.02(c).

"Agreement" means this Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage of the total Commitments represented by such Lender's Commitment; *provided that* if the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect.

2

"Applicable Rate" means, on any date, the rate per annum equal to (i) the LIBO Rate for such date plus eight percent (8%) per annum, or (ii) if the LIBO Rate is unavailable for any reason as determined by the Administrative Agent as provided in the definition thereof, the Prime Rate for such date plus eight percent (8%) per annum.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender; and (b) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Avoidance Actions" means any and all actual or potential avoidance, recovery, subordination, or other related claims and causes of action that may be brought by or on behalf of the Borrower or its estate to avoid a transfer of property or an obligation incurred by the Borrower pursuant to any applicable section of the Bankruptcy Code, including sections 506(c), 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or applicable non-bankruptcy law."

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Practice and Procedure.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof,

3

provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" shall have the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans made on the same date.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Budget" means that certain weekly line item budget approved by the Majority Lenders (initially as filed with the Bankruptcy Court covering the period of 13 calendar weeks following the Petition Date) covering the period of 24 calendar weeks following the Petition Date, which shall be tied to the Borrower's long term sale process (together with all updates thereto), as updated weekly and approved by the Majority Lenders in their sole discretion as provided in Section 8.13. The Budget shall contain reasonably detailed line items and may include approved hedging strategy.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve-Out" has the meaning specified in the DIP Order.

"Case" shall have the meaning set forth in the recitals hereto.

"Cash Collateral Order" means any interim or final order of the Bankruptcy Court approving the Motion of the Borrower for Order Approving Use of Cash Collateral in a form acceptable to the Administrative Agent and the Required Lenders in their respective sole discretion.

"Cash Management Order" means any interim or final order of the Bankruptcy Court approving the Motion of the Borrower for Order Approving (A) Maintenance of Pre-Petition Bank Accounts and Cash Management Services and (B) Continued Use of Existing Checks and Business Forms in a form acceptable to the Administrative Agent and the Required Lenders in their respective sole discretion.

"Cash Flow Report" has the meaning set forth in Section 8.01(a)(i).

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower, General Partner or any Subsidiary.

"Change in Control" means (a) the Permitted Holder does not own, directly or indirectly, beneficially or of record, Equity Interests representing 80% of (i) the aggregate issued and outstanding Equity Interests of each of the Borrower and the General Partner, (ii) the economic interest of each of the General Partner and the Borrower and (iii) the voting power of all Equity Interests of each of the General Partner and the Borrower entitled (without regard to the occurrence of any contingency) to vote for the election of members of the board of directors (or equivalent governing body) of the General Partner and the Borrower; (b) the Permitted Holder does not Control, directly or indirectly the Borrower and the General Partner; or (c) the Permitted Holder ceases to be the sole holder of the Affiliate Debt.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided that* notwithstanding anything herein to the contrary (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, or in implementation thereof and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor similar authority) or the United States financial regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, promulgated, issued or implemented.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" shall mean all Property of the Borrower or any Guarantor, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Instrument or the DIP Order, including, without limitation, to the extent set forth in the DIP Order, any Avoidance Actions and proceeds thereof and causes of action under Section 549 of the Bankruptcy Code and proceeds thereof.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder, in an aggregate outstanding principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Annex I as such commitment may be (a) modified from time to time pursuant to Section 2.05 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b). The aggregate principal amount of the Commitments of all Lenders is $4,000,000.

"Commitment Fee Rate" means one-half percent (0.5%) per annum.

520934 000003 17688986.3

"Concentration Account" means Borrower's deposit account No. _____ at Wells Fargo Bank, National Association, to be used solely to (i) receive proceeds of Loans and payments from purchasers of production from the Borrower's or Guarantors' Oil and Gas Properties (whether directly with respect to non-operated properties or indirectly from POCI's depository account with respect to operated properties) and (ii) make disbursements to the POCI Impress Account and POCI Management Fee Account to pay Budget Costs and Management Fees respectively.

"Concentration Account DACA" means a deposit account control agreement, in form and substance satisfactory to the Administrative Agent, covering the Concentration Account.

"Consolidated Subsidiaries" means each Subsidiary of the Borrower (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of the Borrower in accordance with GAAP.

"Contingent Budget Item" means any line item so designated in an approved Budget. For the avoidance of doubt, the Borrower may not make any payment or disbursement for any portion of any Contingent Budget Items without review and written approval in advance by the Majority Lenders.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Costs and Management Fees" means costs, expenses and management fees payable in accordance with the Budget (and any variance therefrom permitted hereunder) and related court order.

"Credit Party" means the Administrative Agent or any Lender.

"Debt" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety bonds, bankers' acceptances and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person; (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to

6

purchase the Debt or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person; (k) any Debt of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment and (n) all obligations of such Person under Swap Agreements.  The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) reserved or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) (i) has become the subject of a Bankruptcy Event or (ii) has become the subject of a Bail-In Action.

"DIP Order" means the final order of the Bankruptcy Court authorizing and approving this Agreement pursuant to Section 364(c) and (d), among others, of the Bankruptcy Code and Bankruptcy Rule 4001 and providing other relief, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, among other things, finding that the Lenders are extending credit to the Borrower in good faith pursuant to Section 364(e) of the Bankruptcy Code and, with respect to the final DIP Order, waiving the provisions of Section 506(c) of the Bankruptcy Code, which order shall not have been (a) vacated, reversed, or stayed, or (b) amended or modified, except as otherwise agreed to in writing by the Administrative Agent and the Required Lenders in their respective sole discretion.

520934 000003 17688986.3

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans or other obligations hereunder outstanding and all of the Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Eligible Contract Participant" means, with respect to any Swap Obligation, a Person that is an "eligible contract participant", as defined in the Commodity Exchange Act, with respect to such Swap Obligation.

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety, the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower, General Partner or any Subsidiary is conducting, or at any time has conducted business, or where any Property of the Borrower, General Partner or any Subsidiary is located, including, without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund

8

Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Law, as amended, the state law counterparts of all of the foregoing, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower, General Partner or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning assigned such term in Section 10.01.

"Excepted Liens" means:  (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law; (d) contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business; provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower, General Partner or any Subsidiary or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's

9

liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by the Borrower, General Partner or any of the Subsidiaries to provide collateral to the depository institution; (f) easements, restrictions, zoning restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower, General Partner or any Subsidiary that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower, General Partner or any Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (h) judgment and attachment Liens not giving rise to an Event of Default, provided that no action to enforce such Lien has been commenced; and (i) any interest or title of a lessor under any leases or subleases entered into by the Borrower, General Partner or any Subsidiary in the ordinary course of business and covering only the assets leased; *provided*, *further that* (x) Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced (and not stayed), (y) no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens and (z) and the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guaranty by such Guarantor of, or the grant by such Guarantor of a security interest or lien to secure, or the provision by such Guarantor of other support of, such Swap Obligation is or becomes illegal under the Commodity Exchange Act by virtue of such party's failure for any reason to constitute an Eligible Contract Participant at the time such guaranty, grant of security interest or lien or provision of support of, such Swap Obligation becomes effective. If a Swap Obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such guaranty, grant of security interest or lien to secure or provision of other support is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America or such other jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower or any Guarantor is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 5.03(a)), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is

attributable to such Foreign Lender's failure to comply with Section 5.02(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 5.02(a) or Section 5.02(c) and (d) any United States withholding Tax that is imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement, any current or future regulations or official interpretations thereof.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain letter agreement dated August [__], 2016 among the Borrower and the Administrative Agent related to the payment of certain fees by the Borrower.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Borrower and the Consolidated Subsidiaries referred to in Section 7.04(a).

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.04.

"General Partner" means Petroglyph Energy, Inc., an Idaho corporation.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any federal, state or local law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit,

11

certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority.

"Guarantor" means the General Partner and each Subsidiary that guarantees or is required to guarantee the Obligations hereunder (including pursuant to Section 6.01 and Section 8.19(b)). On the Effective Date, there are no Subsidiaries.

"Guaranty Agreement" means an agreement executed by the Borrower and the Guarantors in form and substance satisfactory to the Administrative Agent granting a first priority lien in the personal property of such Person, and with respect to the Guarantors, unconditionally guarantying on a joint and several basis, payment of the Obligations, as the same may be amended, modified or supplemented from time to time.

"Hazardous Material" means any substance defined as such by, or regulated as such under, any Environmental Law including:  (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical waste.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Huron" means Huron Consulting Group, which has been retained to monitor cash management and cash transfers with respect to the Concentration Account, the POCI Impress Account and the POCI Management Fee Account and assist the Borrower in preparing the Budget.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.  Unless otherwise indicated herein, each reference to the term "Hydrocarbon Interests" shall mean Hydrocarbon Interests of the Borrower, General Partner and/or the Subsidiaries, as the context requires.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

12

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Information" has the meaning set forth in Section 12.11.

"Interest Payment Date" means the last day of each month; *provided*, *that* if any such day is not a Business Day, such Interest Payment Date shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Payment Date shall end on the next preceding Business Day.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Debt or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, for any date, the greater of (a) one percent (1%) per annum and (b) the rate of interest, determined by the Administrative Agent on a daily basis, appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service as may be selected by the Administrative Agent, providing rate quotations comparable to those currently provided on such page of such service) at approximately 11:00 a.m., London time, two Business Days prior to such date, as the rate for dollar deposits with a term of one month commencing on such date.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a deed of trust, mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower, General Partner and the Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a

520934 000003 17688986.3

financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" means, with respect to any Swap Agreement, the sale, assignment, novation, unwind or termination of all or any part of such Swap Agreement or the creation of an offsetting position against all or any part of such Swap Agreement.  The term "Liquidated" has a correlative meaning thereto.

"Loan Documents" means this Agreement, the Notes, the Security Instruments, the POCI Agreement, the Fee Letter, and any certificate required to be delivered under this Agreement by or on behalf of the Borrower, POCI, any Guarantor or any Subsidiary.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any time while no Loans are outstanding, Lenders having more than fifty percent (50%) of the Commitments of all Lenders; and at any time while any Loans are outstanding, Lenders holding more than fifty percent (50%) of the outstanding aggregate principal amount of the Loans of all Lenders (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided that* the Commitments and the principal amount of the Loans of the Defaulting Lenders (if any) shall be excluded from the determination of Majority Lenders.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, Property or financial condition of the Borrower, General Partner and the Subsidiaries taken as a whole, (b) the ability of the Borrower, General Partner and the Subsidiaries taken as a whole to perform their obligations under the Loan Documents, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Administrative Agent or any Lender under any Loan Document; provided that (i) the Case and (ii) the impact on the Borrower's revenues of declining hydrocarbon production (so long as such decline is consistent with the projections delivered to Lenders prior to the Petition Date), in each case, shall not constitute a Material Adverse Effect under clauses (a), (b) or (c) of this definition.

"Material Disposition" means any disposition of Property or series of related dispositions of property that yields gross proceeds to the Borrower, General Partner or any Subsidiary (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $10,000.

"Material Indebtedness" means Debt (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower, General Partner or any Subsidiary in an aggregate principal amount exceeding $50,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower, General Partner or any Subsidiary in respect of any Swap Agreement at any time shall be the Swap Termination Value of such Swap Agreement.

"Maturity Date" means the earliest to occur of (i) the date 24 weeks after the Effective Date, (ii) termination of the Transition Services Agreement (including any extended period thereunder) and the payment in full of all Costs and Management Fees required thereunder, (iii) the closing of the 363 Sale, (iv) the effective date of a Chapter 11 plan filed in the Case that is confirmed pursuant to an order entered by the Bankruptcy Court, and (v) the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise; *provided* that, if any such day is not a Business Day, the Maturity Date shall be the Business Day immediately succeeding such day.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor which is subject to the Liens existing and to exist under the terms of the Security Instruments or the DIP Order.

"Notes" means the promissory notes of the Borrower described in Section 2.02(c) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Obligations" means (a) any and all amounts owing or to be owing by the Borrower, any Guarantor or any Subsidiary (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising) to the Administrative Agent, any Lender or any Related Party of any of the foregoing under any Loan Document; (b) all Secured Swap Obligations; and (c) all renewals, extensions and/or rearrangements of any of the above.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps,

15

pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless otherwise indicated herein, each reference to the term "Oil and Gas Properties" shall mean Oil and Gas Properties of the Borrower, General Partner and/or the Subsidiaries, as the context requires.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Loan Document.

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(ii).

"Permitted Holder" means Intermountain Industries, Inc., an Idaho corporation.

"Permitted Severance Payments" means "Severance Payments" (as defined in the Transition Services Agreement), other amounts under Section 4 of the Transition Services Agreement and "Retention Payments" (as defined in the Transition Services Agreement) payable by Borrower resulting from the termination of the "Service Period" (as defined in the Transition Services Agreement) prior to the scheduled 24-week Service Period provided for in the Transition Services Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning set forth in the recitals hereto.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, General Partner or a Subsidiary or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower, General Partner or a Subsidiary.

"POCI" means Petroglyph Operating Company, Inc., a Kansas corporation.

"POCI Agreement" means an agreement between POCI, the Borrower and the Administrative Agent, in form and substance satisfactory to the Majority Lenders, pursuant to which (i) POCI and the Borrower shall agree that the POCI Impress Account shall have a zero balance (except for short-term timing differences between the date on which funds are received into the POCI Impress Account from the Concentration Account and the payment of the corresponding Budget expenses (and any variance therefrom permitted hereunder) the following week) and that any funds received by POCI shall be immediately deposited (or swept) into the Concentration Account, and (ii) POCI shall pledge the POCI Impress Account to the

520934 000003 17688986.3

Administrative Agent for the benefit of the Credit Parties and Secured Swap Parties as Collateral, and shall agree to enter into the POCI Impress Account DACA.

"POCI Impress Account" means POCI's disbursement account no. _____ at Wells Fargo Bank, National Association, to be used exclusively for the payment by POCI, on behalf of the Borrower, of Budget (and any variance therefrom permitted hereunder) costs and expenses other than management fees under the Transition Services Agreement.

"POCI Impress Account DACA" means a deposit account control agreement, in form and substance reasonably satisfactory to the Administrative Agent, covering the POCI Impress Account.

"POCI Management Fee Account" means the account in the name of POCI into which POCI shall pay Budget management fees payable by the Borrower to POCI under the Transition Services Agreement.

"Prepetition Agent" shall have the meaning set forth in the recitals hereto.

"Prepetition Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Credit Obligations" means collectively, all "Obligations" as defined in the Prepetition Credit Agreement, owed by the Borrower and Guarantors in connection with the revolving credit facility evidenced by the Prepetition Credit Agreement.

"Prepetition Lenders" shall have the meaning set forth in the recitals hereto.

"Prepetition Secured Parties" means, collectively, the Prepetition Agent and the Prepetition Lenders.

"Prepetition Second Lien Term Loan Agreement" shall have the meaning set forth in the recitals hereto.

"Prime Rate" means, for any date, the "prime rate" as published in the Wall Street Journal (or another similar publication of national standing) on such date (or if such date is not a Business Day, on the preceding Business Day).

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Budget" has the meaning assigned such term in Section 8.13.

"Purchase Money Indebtedness" means Debt, the proceeds of which are used to finance the acquisition, construction or improvement of Property in the ordinary course of business; provided that such Debt is incurred contemporaneously with the acquisition, construction or improvement of such Property and the amount of such Debt does not exceed the cost of such acquisition, construction or improvement.

520934 000003 17688986.3

"<u>Redemption</u>" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "<u>Redeem</u>" has the correlative meaning thereto.

"<u>Register</u>" has the meaning assigned such term in <u>Section 12.04(b)(iv)</u>.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"<u>Release</u>" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"<u>Released Matters</u>" has the meaning assigned such term in <u>Section 12.18(a)</u>.

"<u>Released Parties</u>" has the meaning assigned such term in <u>Section 12.18(a)</u>.

"<u>Remedial Work</u>" has the meaning assigned such term in <u>Section 8.10(a)</u>.

"<u>Required Lenders</u>" means Lenders (a) constituting at least one-half (by number) of all Lenders and (b) (i) at any time while no Loans are outstanding, Lenders having more than sixty-six and two thirds percent (66 2/3%) of the Commitments of all Lenders; and (ii) at any time while any Loans are outstanding, Lenders holding more than sixty-six and two-thirds percent (66 2/3%) of the outstanding aggregate principal amount of the Loans of all Lenders (without regard to any sale by a Lender of a participation in any Loan under <u>Section 12.04(c)</u>); *provided that* Defaulting Lenders and the Commitments and the principal amount of the Loans of the Defaulting Lenders (if any) shall be excluded from the determination of Required Lenders.

"<u>Responsible Officer</u>" means, as to any Person, the Chief Executive Officer, the President, any Financial Officer or any Vice President of such Person. Unless otherwise specified, all references to a Responsible Officer herein means a Responsible Officer of the General Partner.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower or any Guarantor, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any Guarantor or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Guarantor.

"<u>Sale Order</u>" means an order entered by the Bankruptcy Court in form and substance satisfactory to the Required Lenders in their sole discretion, among other things, approving the 363 Sale.

"Sale Procedures Order" means an order entered by the Bankruptcy Court approving the bidding procedures to be applicable to the 363 Sale and the 363 Asset Purchase Agreement with a purchaser, which shall be acceptable to the Required Lenders, and any provisions therein in respect to any "credit bid", including any amount to be "credit bid", pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code shall be acceptable to the Administrative Agent and each Lender, in each case in its or their sole discretion.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan, Syria and Crimea).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or, any European Union member state, Her Majesty's Treasury of the United Kingdom, or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or, Her Majesty's Treasury of the United Kingdom, or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Swap Agreement" means any Swap Agreement between the Borrower, General Partner or any Subsidiary and any Person that is entered into prior to the time, or during the time, that such Person was a Lender or an Affiliate of a Lender (including any such Swap Agreement in existence prior to the date hereof) (any such Person, a "Secured Swap Party"); provided that, such Person shall cease to be a Secured Swap Party if such Person ceases to be a Lender or an Affiliate of a Lender.

"Secured Swap Obligations" means all amounts and other obligations owing to any Secured Swap Party under any Secured Swap Agreement; provided, when used with reference to any Guarantor, the term "Secured Swap Obligations" excludes any Excluded Swap Obligations with respect to such Guarantor.

"Secured Swap Party" shall have the meaning given such term in the definition of "Secured Swap Agreement".

"Security Instruments" means the Guaranty Agreement, mortgages, deeds of trust and other agreements, instruments or certificates described or referred to in Exhibit E, and any and all other agreements, instruments, consents or certificates now or hereafter executed and

19

delivered by the Borrower or any other Person (other than Secured Swap Agreements or participation or similar agreements between any Lender and any other lender or creditor with respect to any Obligations pursuant to this Agreement) in connection with, or as security for the payment or performance of the Obligations, the Notes or this Agreement, as such agreements may be amended, modified, supplemented or restated from time to time.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing more than 50% of the equity or more than 50% of the ordinary voting power (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) or, in the case of a partnership, any general partnership interests are, as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.  For the avoidance of doubt, POCI is not a Subsidiary and, except as expressly provided herein or in the POCI Agreement, is not intended to be bound by the Loan Documents.

"Subsidiary Guarantor" means any Subsidiary that is a Guarantor.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; *provided that* no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means any obligation to pay or perform under any Swap Agreement, whether as a party to such Swap Agreement or by providing any guarantee of or provision of support for such Swap Agreement (and whether or not such obligation is a Secured Swap Obligation hereunder).

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments.

"TPH" means Tudor Pickering & Holt, which has been retained by the Borrower pursuant to the TPH Engagement Letter.

"TPH Engagement Letter" means that certain Engagement Letter dated July 26, 2016 between the Borrower and TPH pursuant to which the Borrower has engaged TPH to market and sell all of the Oil and Gas Properties.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and the DIP Order, (b) the Borrower and General Partner, the filing by the Borrower of a voluntary petition under Chapter 11 of the Bankruptcy Code commencing the Case, and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Obligations and the other obligations under the Guaranty Agreement by such Guarantor, and the grant of Liens by such Guarantor on Mortgaged Properties pursuant to the Security Instruments and the DIP Order.

"Transition Services Agreement" means that certain Transition Services Agreement dated as of July 26, 2016 between the Borrower and POCI, as from time to time amended, supplemented or restated, approved by the Bankruptcy Court and pursuant to which POCI will (i) provide certain management and operational services for the Borrower and its assets as described therein and (ii) support and assist TPH with respect to the 363 Sale, and expressly naming Administrative Agent and Lenders as third party beneficiaries thereunder.

"U.S. Person" means any Person that is a "United States Person" as defined in section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned such term in Section 5.02(e)(i)(B)(3).

"U.S. Trustee" means the Office of the Unites States Trustee.

"<u>Variance Report</u>" means a variance report, in form and substance satisfactory to Majority Lenders, showing actual cash receipts and actual expenditures for each line item in the Budget covering each of the previous calendar week and the previous four calendar weeks, and comparing the foregoing amounts with the budgeted cash receipts and budgeted expenditures, respectively, set forth in the Budget for such line item during such one week period and such four week period. The Variance Report shall include an explanation as to any variance from the Budget of (i) 10% or more with respect to any particular line item expenditure for such previous calendar week, (ii) 5% or more with respect to aggregate Budget expenditures for such previous calendar week, or (iii) 5% or more with respect to aggregate Budget expenditures for such previous four calendar weeks (excluding in each case (x) any Contingent Budget Item approved by Majority Lenders and (y) any variance caused by any Budget expenditure budgeted for a week prior to such previous calendar week (or prior to such previous four calendar weeks), not paid in such prior week (or prior four week period), and paid in such previous week (or such previous four week period)).  Such explanation shall include, among other things, whether such variance is permanent or relates solely to timing and, to the extent related to timing, when such variance is expected to be corrected.

"<u>Variance Testing Date</u>" has the meaning set forth in <u>Section 8.14</u>.

"<u>Wholly-Owned Subsidiary</u>" means any Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or are owned by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03   <u>Terms Generally; Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to

Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.04   Accounting Terms and Determinations; GAAP.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the financial statements of the Borrower and its Consolidated Subsidiaries previously provided to the Lenders, except for changes in which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); *provided that*, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

**ARTICLE II**
**The Credits**

Section 2.01   Commitments.   Subject to the terms and conditions set forth herein, including without limitation Sections 2.03 and 8.13 hereof, each Lender agrees to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (a) the outstanding principal amount of such Lender's Loans exceeding such Lender's Commitment or (b) the total outstanding principal amount of all Loans exceeding the total Commitments.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02   Loans and Borrowings.

(a)   Borrowings; Several Obligations.   Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Applicable Percentages of the total Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided that* the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)   Minimum Amounts; Limitation on Number of Borrowings.   At the time that each Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $50,000 and not less than $50,000; *provided that* a Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments.

(c)   Notes.   Any Lender may request that Loans made by it be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement, or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of

23

the effective date of the Assignment and Assumption, payable to such Lender in a principal amount equal to its Commitment as in effect on such date, and otherwise duly completed.  In the event that any Lender's Commitment increases or decreases for any reason (whether pursuant to Section 2.05, Section 12.04(b) or otherwise), upon the request of such Lender, the Borrower shall deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Commitment after giving effect to such increase or decrease, and otherwise duly completed.  The date and amount of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03   Requests for Borrowings.  Contemporaneous with the weekly delivery of each Proposed Budget as provided in Section 8.13, in the event any such Proposed Budget shows that the Borrower's projected cash flow for the second following week shall be less than the Borrower's projected Budget expenses for such second following week, the Borrower may on the date of such delivery of such Proposed Budget submit to the Administrative Agent, by hand delivery, telecopy or electronic communication, a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower requesting a Borrowing in the amount of such projected shortfall.  Each such Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)   the aggregate amount of the requested Borrowing, which shall be (A) the difference (rounded up to the next multiple of $50,000) between (x) the Borrower's estimated cash flow for the second following week (after allowing for a minimum of $200,000 to be held as cash on hand in the Concentration Account) minus (y) the Borrower's projected Budget expenses for such second following week, plus (B) the amount of any Permitted Severance Payments to be made by the Borrower;

(ii)   the proposed date of such Borrowing, which shall be the first Business Day of the week following submission of such Borrowing Request; and

(iii)   the current total outstanding principal amount of all Loans (without regard to the requested Borrowing) and the *pro forma* total outstanding principal amount of all Loans (giving effect to the requested Borrowing).

Each Borrowing Request shall constitute the Borrower's representation that the amount of the requested Borrowing shall not cause the total outstanding principal amount of all Loans to exceed the total Commitments.  No Lender shall have any obligation to fund any requested Borrowing unless the Proposed Budget with such projected shortfall necessitating such Borrowing shall have been reviewed and approved by Huron and approved by Majority Lenders pursuant to Section 8.13.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such

Lender's Loan to be made as part of the requested Borrowing and each Lender shall within 24 hours after receipt of such Borrowing Request advise Administrative Agent if any conditions precedent to such requested Borrowing have not been satisfied.

In the event any Lender shall notify the Administrative Agent that any condition precedent hereunder to any requested Borrowing has not been satisfied, the Administrative Agent shall promptly notify the Borrower and Lenders, and the Borrower, Administrative Agent and Lenders agree that the Borrower shall request and each party shall attend an immediate hearing (to be held not more than three Business Days after such notice) before the Bankruptcy Court to determine whether or not all such conditions precedent to such requested Borrowing have been satisfied, and in the event the Bankruptcy Court shall determine that all such conditions precedent to such requested Borrowing have been satisfied, Lenders agree that they shall make such requested Borrowing available to the Borrower subject to the terms and conditions provided for herein.

Section 2.04   Funding of Borrowings.

(a)   Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof (or (1) if Majority Lenders shall not have approved the Proposed Budget submitted with such Borrowing Request prior to the Business Day immediately prior to such proposed date, on the Business Day following the date on which Majority Lenders approve a revised Proposed Budget or (2) if pursuant to a hearing before the Bankruptcy Court as described in Section 2.03, the Bankruptcy Court shall have determined that all conditions precedent to such requested Borrowing have been satisfied, on the first Business Day following such determination) by wire transfer of immediately available funds by 1:00 p.m., New York, New York time on such date of funding, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans received by it available to the Borrower by promptly transferring the amounts so received, in like funds, to the Concentration Account.  The Borrower shall immediately transfer required funds from the Concentration Account into the POCI Impress Account and POCI Management Fee Account and shall cause POCI to use such funds to promptly pay costs and expenses payable in accordance with the Budget (and any variance therefrom permitted hereunder) and related court order for the following week.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)   Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.04(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of

25

payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.05    Termination and Reduction of Aggregate Commitments.

(a)    Scheduled Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the Termination Date.

(b)    Optional Termination and Reduction of Commitments.

(i)    The Borrower may at any time terminate, or from time to time reduce, the total Commitments; *provided that* (A) each reduction of the total Commitments shall be in an amount that is an integral multiple of $50,000 and not less than $50,000 and (B) the Borrower shall not terminate or reduce the total Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.03(c)(i), the total outstanding principal amount of all Loans would exceed the total Commitments.

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the total Commitments under Section 2.05(b)(i) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.05(b)(ii) shall be irrevocable.  Any termination or reduction of the total Commitments shall be permanent and may not be reinstated.  Each reduction of the total Commitments shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

**ARTICLE III**
**Payments of Principal and Interest; Prepayments; Fees**

Section 3.01    Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02    Interest.

(a)    Loans.  The Loans shall bear interest at the Applicable Rate, but in no event to exceed the Highest Lawful Rate.

(b)    Post-Default Rate.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding, in the case of an Event of Default, and such overdue amount, in the case of a failure

26

to pay amounts when due, shall bear interest, after as well as before judgment, at the Applicable Rate <u>plus</u> an additional five percent (5%) per annum, but in no event to exceed the Highest Lawful Rate.

(c)     <u>Interest Payment Dates</u>.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; *provided that* (i) interest accrued pursuant to <u>Section 3.02(b)</u> shall be payable on demand, and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     <u>Interest Rate Computations</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year).  The applicable LIBO Rate, Prime Rate and Applicable Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties.

Section 3.03   <u>Prepayments</u>.

(a)     <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with <u>Section 3.03(b)</u>.

(b)     <u>Notice and Terms of Optional Prepayment</u>.  The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy or electronic communication) of any prepayment hereunder not later than 2:00 p.m., New York, New York time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing as provided in <u>Section 2.02</u>.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 3.02(c)(ii)</u>.

(c)     <u>Mandatory Prepayments</u>.

(i)     If, after giving effect to any termination or reduction of the total Commitments pursuant to <u>Section 2.05(b)</u>, the total outstanding principal amount of the Loans exceeds the total Commitments, then the Borrower shall prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess.

(ii)     Immediately upon consummation of any Material Disposition, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the net proceeds thereof and such net proceeds together with any other consideration therefor shall be delivered to the Administrative Agent for the benefit of the Lenders.

(iii)   Immediately upon receipt by the Borrower or any Guarantor or by the Administrative Agent as loss payee, of any proceeds of any insurance policies covering any of the Borrower's or any Guarantor's Property, the Borrower or such Guarantor shall prepay the Loans in an aggregate amount equal to 100% of such proceeds.

(iv)   At any time that the collected funds balance in the Concentration Account (other than funds specifically identified to be used to pay Budget Costs and Management Fees in the current or following week) exceeds $200,000, the Borrower shall prepay the Loans in an aggregate amount equal to such excess.

(v)   Each prepayment of Borrowings pursuant to this Section 3.03(c) shall be applied ratably to the Loans included in the prepaid Borrowings.   Prepayments pursuant to this Section 3.03(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)   No Premium or Penalty.   Prepayments permitted or required under this Section 3.03 shall be without premium or penalty.

Section 3.04   Fees.

(a)   Commitment Fees.   The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.   Accrued commitment fees shall be payable in arrears on each Interest Payment Date and on the Termination Date, commencing on the first such date to occur after the date hereof.   All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case such commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)   Administrative Agent Fees.   The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

## ARTICLE IV
## Payments; Pro Rata Treatment; Sharing of Set-offs

Section 4.01   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)   Payments by the Borrower.   The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees or of amounts payable under Section 5.01, Section 5.02 or otherwise) prior to 12:00 noon, New York, New York time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.   Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.   Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business

Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except that payments pursuant to Section 5.01, Section 5.02 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided that* (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02   Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand

520934 000003 17688986.3

the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Payments and Deductions by the Administrative Agent; Defaulting Lenders.

(a)    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(b), Section 4.02, Section 5.02(f) or Section 12.03(c), then the Administrative Agent may, in its sole discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its sole discretion.

(b)    Payments to Defaulting Lenders.  If a Defaulting Lender (or a Lender who would be a Defaulting Lender but for the expiration of the relevant grace period) as a result of the exercise of a set-off shall have received a payment in respect of the outstanding principal amount of its Loans which results in the outstanding principal amount of its Loans being less than its Applicable Percentage of the aggregate outstanding principal amount of all Loans, then no payments will be made to such Defaulting Lender until such time as such Defaulting Lender shall have complied with Section 4.03(c) and all amounts due and owing to the Lenders have been equalized in accordance with each Lender's respective pro rata share of the Obligations. Further, if at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its pro rata share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.  After acceleration or maturity of the Loans, subject to the first sentence of this Section 4.03(b), all principal will be paid ratably as provided in Section 10.02(c).

(c)    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)    Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.04(a).

(ii)    The Commitment and outstanding principal amount of Loans of such Defaulting Lender shall not be included in determining whether the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or

waiver pursuant to Section 12.02), provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender shall require the consent of such Defaulting Lender; but the Commitment of a Defaulting Lender may not be increased without the consent of such Defaulting Lender.

In the event that the Administrative Agent and the Borrower each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender and such Lender is no longer a Defaulting Lender, then on such date, if necessary, such Lender shall purchase at par such of the Loans of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

Section 4.04   Disposition of Proceeds.  The Security Instruments and/or the DIP Order may contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Lenders of all of the Borrower's and/or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments and/or the DIP Order may further provide in general for the application of such proceeds to the satisfaction of the Obligations and other obligations described therein and secured thereby.  Notwithstanding any such assignment contained in the Security Instruments and/or the DIP Order, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

## ARTICLE V
## Increased Costs; Break Funding Payments; Taxes; Illegality

Section 5.01   Increased Costs.

(a)     Changes in Law.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(ii)    impose on any Lender any other condition affecting this Agreement;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

31

(b)    Capital Requirements.  If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 5.01(a) or (b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 5.01 for any increased costs or reductions incurred more than 365 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 365-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law; provided that if the Borrower or any Guarantor shall be required to deduct any Taxes from such payments, then (i) in the case of Indemnified Taxes or Other Taxes, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.02(a)), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or such Guarantor shall make such deductions and (iii) the Borrower or such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation

of the Borrower or any Guarantor hereunder or in connection with any Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.02) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent or a Lender as to the amount of such payment or liability under this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d)     Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Foreign Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement or any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate. In addition, any Lender, if reasonably requested by a Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by such Borrower or the Administrative Agent as will enable such Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.02(e)(i)(A), (i)(B) and (i)(D) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

33

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Foreign Lender or are effectively connected but are not includible in the Foreign Lender's gross income for U.S. federal income tax purposes under an income tax treaty (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership), executed originals of IRS Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, U.S. Tax Compliance Certificate, Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided that* if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such beneficial owner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code)

34

and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA or to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)      Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)      Treatment of Certain Refunds.  If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.02 (including by the payment of additional amounts pursuant to this Section 5.02), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be

520934 000003 17688986.3

construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

Section 5.03   Mitigation Obligations; Replacement of Lenders.

(a)   If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.02, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.02, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)   Replacement of Lenders.  If (i) any Lender requests compensation under Section 5.01, (ii) the Borrower or any Guarantor is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender or indemnify any Lender pursuant to Section 5.02, or (iii) any Lender becomes a Defaulting Lender, then the Borrower, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require, in the case of clauses (i) through (ii) above, such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(b)), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (x) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (y) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (z) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.02, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Notwithstanding the foregoing, a Lender shall not be required to make any such assignment and delegation if such Lender is a Secured Swap Party with any outstanding Secured Swap Agreement, unless on or prior thereto, all such Swap Agreements have been terminated or novated to another Person and such Lender (or its Affiliate) shall have received payment of all amounts, if any, payable to it in connection with such termination or novation.

## ARTICLE VI
## Conditions Precedent

Section 6.01   <u>Effective Date</u>.  The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 12.02</u>):

(a)     The Administrative Agent and the Lenders shall have received all commitment, arrangement, upfront and agency fees and all other fees and amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder (including, without limitation, the fees and expenses of counsel and other consultants and advisors engaged by Administrative Agent or other counsel engaged by any Lender) required to be reimbursed or paid by the Borrower hereunder.

(b)     The Bankruptcy Court shall have entered the Cash Collateral Order, the Cash Management Order and the DIP Order and each shall be in full force and effect and shall not have been appealed, reversed, modified, stayed or amended unless such appeal, reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their sole discretion.

(c)     No pleading or application seeking relief affecting the provision of the revolving credit facility herein shall have been filed in the Bankruptcy Court.

(d)     The Administrative Agent or its counsel shall have received a certificate of the Secretary or an Assistant Secretary of the General Partner and each Guarantor each setting forth resolutions of its board of directors, board of managers or other appropriate governing body with respect to the authorization of the Borrower or such Guarantor to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, the officers of the General Partner (on behalf of the Borrower) or such Guarantor (i) who are authorized to sign the Loan Documents to which the Borrower or such Guarantor is a party and (ii) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, specimen signatures of such authorized officers, and the articles or certificate of incorporation and by-laws, the limited liability company agreement, operating agreement, partnership agreement, certificate of formation or other applicable organizational documents of the Borrower, the General Partner and such Guarantor, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(e)     The Administrative Agent or its counsel shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of the Borrower, the General Partner and each other Guarantor.

(f)        The Administrative Agent or its counsel shall have received a compliance certificate which shall be substantially in the form of Exhibit D, duly and properly executed by a Responsible Officer and dated as of the Effective Date.

(g)        The Administrative Agent or its counsel shall have received from the Borrower and each Lender counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(h)        The Administrative Agent or its counsel shall have received duly executed Notes payable to each Lender requesting a Note in a principal amount equal to its Commitment dated as of the date hereof.

(i)        The Administrative Agent or its counsel shall have received from each party thereto duly executed counterparts (in such number as may be requested by the Administrative Agent or such counsel) of the Security Instruments, including the Guaranty Agreement, described on Exhibit E.   In connection with the execution and delivery of the Security Instruments, the Administrative Agent's counsel shall

(i)        be reasonably satisfied that the Security Instruments and the DIP Order create first priority, perfected Liens (subject only to Excepted Liens identified in clauses (a) to (f) of the definition thereof, but subject to the provisos at the end of such definition); and

(ii)        have received certificates, together with undated, blank stock powers for such certificates, representing all of the issued and outstanding certificated Equity Interests in each Subsidiary.

(j)        The Administrative Agent or its counsel shall have received a certificate of insurance coverage of the Borrower evidencing that the Borrower is carrying insurance in accordance with Section 7.12.

(k)        The Administrative Agent or its counsel shall have received title information as such counsel may reasonably require satisfactory to the Majority Lenders setting forth the status of title to the Borrower's or any Guarantor's proved Oil and Gas Properties and the results thereof shall be acceptable to Majority Lenders in their reasonable discretion.

(l)        The Majority Lenders shall be reasonably satisfied with the environmental condition of the Oil and Gas Properties of the Borrower, General Partner and its Subsidiaries.

(m)        The Administrative Agent or its counsel shall have received a certificate of a Responsible Officer of the Borrower certifying that the Borrower has received all consents and approvals required by Section 7.03.

(n)        The Administrative Agent and the Lenders shall have received from the Borrower the Budget and such other information as may be requested by the Lenders.

(o)        The Borrower shall have entered into the Transition Services Agreement and the TPH Engagement Letter, each in form and substance acceptable to the Lenders, and the Administrative Agent or its counsel shall have received executed copies thereof.

(p)     The Administrative Agent and the Lenders shall have received, and be reasonably satisfied in form and substance with, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including but not restricted to the USA Patriot Act.

(q)     The Administrative Agent shall have received evidence that (i) the Borrower shall have entered into such Swap Agreements as Majority Lenders may require, covering up to 80% of projected Hydrocarbon production from Borrower's proved developed producing Oil and Gas Properties for the period from the Effective Date through the Maturity Date and (ii) all funds in any deposit account of the General Partner have been transferred into the Concentration Account (and all such General Partner deposit accounts closed thereafter) and all other Property of General Partner (other than (i) its general partner interests in Borrower or POCI, (ii) the abandoned Spanish Peak Pipeline Gathering System, (iii) section 29 partnership interest (holding tailend interests in various oil and gas wells) valued at less than $50,000, and (iv) field office titled in predecessor to General Partner but owned by POCI, tax assessment value less than $370,000) has been conveyed by the General Partner to the Borrower.

(r)     The Administrative Agent, Lenders or counsel for Administrative Agent shall have received such other documents as may be reasonably requested.

Counsel for the Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 2:00 p.m., New York, New York time, on the Business Day following entry of the DIP Order by the Bankruptcy Court (and, in the event such conditions are not so satisfied, extended or waived, the Commitments shall terminate at such time).

Section 6.02   Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding) is subject to the satisfaction of the following conditions:

(a)     At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(b)     At the time of and immediately after giving effect to such Borrowing, no event, development or circumstance has occurred since the Petition Date or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(c)     The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except to the extent any such representations and warranties are limited by materiality, in which case, they shall be true and correct in all respects (subject to materiality qualifications set forth in such representation or warranty, if any)) on and as of the date of such Borrowing, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing, such representations and warranties shall continue to be true and correct in all material respects as of such specified earlier date.

39

(d)    The DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been reversed, modified, stayed or amended unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Majority Lenders in their sole discretion.

(e)    Subject to Section 8.14, the Borrower shall be in compliance in all respects with the Budget (and any variance therefrom permitted hereunder) and any Loans (i) shall be in accordance with the Budget (and any variance permitted hereunder), (ii) the relevant Borrowing Request shall contain a certification by the Borrower that the withdrawal request pursuant thereto complies, and the application of the funds so withdrawn will comply, with the terms of this Agreement in all respects, and the Administrative Agent shall be entitled to conclusively rely on such certification, absent manifest error.

(f)    The Transition Services Agreement and the TPH Engagement Letter shall each be in full force and effect and shall not have been terminated without the consent of the Administrative Agent and Majority Lenders.

(g)    The making of such Loan would not conflict with, or cause any Lender to violate or exceed, any applicable Governmental Requirement, and no Change in Law shall have occurred, and no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(h)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 and Section 6.02(e)(ii).

Each Borrowing Request presented to the Administrative Agent shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.02(a) through (g).

## ARTICLE VII
## Representations and Warranties

Each of the General Partner and the Borrower represents and warrants to the Lenders that:

Section 7.01    Organization; Powers.  Each of the Borrower and the Guarantors is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02   Authority; Enforceability.   The Transactions are within the Borrower's and each Guarantor's corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).   After giving effect to the DIP Order, each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03   Approvals; No Conflicts.   Except as a result of the Case, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including holders of its Equity Interests or any class of directors, managers or supervisors, as applicable, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than the recording and filing of the Security Instruments as required by this Agreement, (b) will not violate any applicable law or regulation or the charter, bylaws or other organizational documents of the Borrower or any Guarantor or any order of any Governmental Authority, and (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any Guarantor or any of their respective Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or any Guarantor and will not result in the creation or imposition of any Lien on any Property of the Borrower or any Guarantor (other than the Liens created by the Loan Documents).

Section 7.04   Financial Condition; No Material Adverse Change.

(a)      The Borrower has heretofore furnished to the Lenders the Budget.   The Budget has been prepared in good faith by the Borrower based upon (i) the assumptions stated therein (which assumptions are believed by the Borrower on the date of delivery thereof, and on the Effective Date to be reasonable), and (ii) the best information available to the Borrower and the Guarantors as of the date of delivery and the Effective Date.

(b)      Since the Petition Date, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Borrower and each Guarantor has been conducted only in the ordinary course of business.

(c)      Other than as disclosed on the Borrower's schedules filed in the Case with the Bankruptcy Court, neither the Borrower nor any Guarantor has on the date hereof any material Debt (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments.

41

Section 7.05   <u>Litigation</u>.  Except for the Case, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any Guarantor (a) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (b) that involve any Loan Document or the Transactions.

Section 7.06   <u>Environmental Matters</u>.   Except for such matters as set forth on <u>Schedule 7.06</u> or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)      the Borrower and each Guarantor and each of their respective Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws;

(b)      the Borrower and each Guarantor have obtained all Environmental Permits required for their respective operations and each of their Properties, with all such Environmental Permits being currently in full force and effect, and none of the Borrower or the Guarantors has received any written notice or otherwise has knowledge that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied;

(c)      there are no claims, demands, suits, orders, inquiries, or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that is pending or, to the Borrower's knowledge, threatened against the Borrower or any Guarantor or any of their respective Properties or as a result of any operations at such Properties;

(d)      to the Borrower's knowledge, none of the Properties of the Borrower or any Guarantor contain or have contained any:  (i) underground storage tanks; (ii) asbestos-containing materials; (iii) landfills or dumps; (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law; or (v) sites on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law;

(e)      there has been no Release or, to the Borrower's knowledge, threatened Release, of Hazardous Materials at, on, under or from any of the Borrower's or any Guarantor's Properties, there are no investigations, remediations, abatements, removals, or monitorings of Hazardous Materials required under applicable Environmental Laws at such Properties and, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property at concentrations currently requiring remedial action by the Borrower or any Guarantor under Environmental Laws;

(f)      neither the Borrower nor any Guarantor has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials

42

at, under, or Released or threatened to be Released from any real properties offsite the Borrower's or any Guarantor's Properties and, to the Borrower's knowledge, there are no conditions or circumstances that could reasonably be expected to result in the receipt of such written notice;

(g)     to the Borrower's knowledge, there has been no exposure of any Person or Property to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Borrower's or the Guarantors' Properties that could reasonably be expected to form the basis for a claim for damages or compensation; and

(h)     the Borrower and the Guarantors have provided to the Lenders complete and correct copies of all material environmental site assessment reports, investigations, studies, analyses, and correspondence on environmental matters (including matters relating to any alleged non-compliance with or liability under Environmental Laws) that are in the Borrower's or any Guarantor's possession or control and relating to their respective Properties or operations thereon.

Section 7.07   Compliance with the Laws and Agreements; No Defaults.

(a)     Each of the Borrower and the Guarantors is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Neither the Borrower nor any Guarantor is in default (that is enforceable in spite of the commencement of the Case) nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default (that is enforceable in spite of the commencement of the Case), or would require the Borrower or any Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Indebtedness incurred after the Petition Date is outstanding or by which the Borrower or any Guarantor or any of their Properties is bound.

(c)     No Default has occurred and is continuing.

Section 7.08   Investment Company Act.   Neither the Borrower nor any Guarantor is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09   Taxes.   Each of the Borrower and the Guarantors has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings (including the Case) or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.   The charges and accruals on the books of the Borrower and the Guarantors in respect of Taxes and other

43

governmental charges are, in the reasonable opinion of the Borrower, adequate.  No Tax Lien has been filed and, to the knowledge of the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge, other than Liens after the Petition Date, the enforcement of which is stayed by the pendency of the Case.

Section 7.10   ERISA.

(a)   Except for such matters that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and the Guarantors have complied in all respects with ERISA and, where applicable, the Code regarding each Plan; (ii) each Plan is, and has been, established and maintained in compliance with its terms, ERISA and, where applicable, the Code; (iii) no act, omission or transaction has occurred which could result in imposition on the Borrower or any Guarantor (whether directly or indirectly) of either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or a breach of fiduciary duty liability damages under section 409 of ERISA; and (iv) full payment when due has been made of all amounts which the Borrower or any Guarantor is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof.

(b)   Neither the Borrower nor any Guarantor sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower or the Guarantor, as applicable in its sole discretion at any time without any material liability.

(c)   Neither the Borrower, any of the Guarantors nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 7.11   Disclosure; No Material Misstatements.  The Borrower has disclosed or made available to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of the Guarantors is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the other reports, financial statements, certificates or other information furnished by or on behalf of the Borrower or any Guarantor to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided that*, with respect to the Budget and other projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  There is no fact peculiar to the Borrower or any Guarantor which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this

Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Guarantor prior to, or on, the date hereof in connection with the transactions contemplated hereby.

Section 7.12   Insurance.  The Borrower and the General Partner have, and have caused all of the Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and the Guarantors. The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as loss payee with respect to Property loss insurance.

Section 7.13   Restriction on Liens.  Neither the Borrower nor any of the Guarantors is a party to any material agreement or arrangement (other than (a) the Prepetition Credit Agreement and the Prepetition Second Lien Term Loan Agreement and (b) Capital Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such Capital Leases), or subject to any order, judgment, writ or decree (other than the DIP Order), which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or in respect of their Properties to secure the Obligations and the Loan Documents.

Section 7.14   Subsidiaries.  Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to Schedule 7.14, the Borrower has no Subsidiaries.  The Borrower has no Foreign Subsidiaries.  Each Subsidiary is a Wholly-Owned Subsidiary.

Section 7.15   Location of Business and Offices.   The Borrower's jurisdiction of organization is Idaho; the name of the Borrower as listed in the public records of its jurisdiction of organization is III Exploration II LP; and the organizational identification number of the Borrower in its jurisdiction of organization is L4721 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(l) in accordance with Section 12.01).  The Borrower's principal place of business and chief executive office is located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(l) and Section 12.01(c)).  Each Guarantor's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(l)).

Section 7.16   Properties; Titles, Etc.

(a)      Each of the Borrower and the Guarantors has good and defensible title to their respective Oil and Gas Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03.  Subject to the Excepted Liens, the Borrower or the Guarantor specified as the owner owns the net interests in production attributable to its Hydrocarbon Interests, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Guarantor to bear the costs and expenses relating to the maintenance,

development and operations of each such Property in an amount in excess of its working interest therein that is not offset by a corresponding proportionate increase in the Borrower's or such Guarantor's net revenue interest in such Property.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and the Guarantors are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and the Guarantors including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Guarantors to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, all of the Properties of the Borrower and the Guarantors which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with customary industry standards.

(e)     Each of the Borrower and the Guarantors owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Guarantor does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. The Borrower and the Guarantors either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17   Maintenance of Properties.   Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and the Guarantors have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and the Guarantors. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Borrower or any Guarantor is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Guarantor is deviated

from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Guarantor.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of the Guarantors that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of the Guarantors, in a manner consistent with the Borrower's or the Guarantors' past practices (other than those the failure of which to maintain in accordance with this <u>Section 7.17</u> could not reasonably be expected to have a Material Adverse Effect).

Section 7.18   <u>Gas Imbalances, Prepayments</u>.  Except as set forth on <u>Schedule 7.18</u>, on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of the Guarantors to deliver Hydrocarbons produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding one half bcf of gas (on an mcf equivalent basis) in the aggregate.

Section 7.19   <u>Marketing of Production</u>.  Except for contracts listed and in effect on the date hereof on <u>Schedule 7.19</u>, and thereafter disclosed in writing to the Administrative Agent (with respect to all of which contracts the Borrower and General Partner represents that it or the other Guarantors are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days notice or less without penalty or detriment for the sale of production from the Borrower's or the Guarantors' Hydrocarbons (including, without limitation, calls on or other rights to purchase production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20   <u>Swap Agreements</u>.  <u>Schedule 7.20</u>, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to <u>Section 8.01(e)</u>, sets forth, a true and complete list of all Swap Agreements of the Borrower and each Guarantor, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.21   <u>Use of Loans</u>.  The proceeds of the Loans shall be used solely to (a) fund post-petition operating expenses and working capital needs of Borrower; (b) fund fees and expenses (including professional fees) incurred in connection with this Agreement and the Case; (c) pay adequate protection payments to the extent approved by the Bankruptcy Court; (d) fund the Carve-Out to the extent approved by the Bankruptcy Court and in accordance with the DIP Order; and (e) pay certain other costs and expenses of the Case, in each case in accordance with the Budget (subject to any variance permitted by <u>Section 8.14</u>) and the DIP Order and to make Permitted Severance Payments; provided, upon any early termination of the Transition Services Agreement as provided therein (including the payment of Permitted Severance Payments required in connection therewith), no further Loans may be used to fund payments owing POCI

under the Transition Services Agreement, except to the extent of outstanding Costs and Management Fees accrued prior to the appointment of such replacement operator. The Borrower, General Partner and the Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of any Loan will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22    International Operations. None of the Borrower and the Guarantors own, and have not acquired or made any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties located outside of the geographical boundaries of the United States.

Section 7.23    Anti-Corruption. The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that General Partner, the Subsidiaries, Affiliates and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or in a European Union member state, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 7.24    Bankruptcy Representations.

(a)    The Case was commenced in accordance with the Bankruptcy Code and other applicable law and proper notice thereof and of the hearings for the approval of the DIP Order shall have been given. The Borrower has given, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(b)    After giving effect to the DIP Order, the provisions of the Loan Documents and the DIP Order: (i) are effective to create in favor of the Administrative Agent, for the benefit of the Credit Parties and the Secured Swap Parties, legal, valid and perfected first priming and senior Liens on and security interests in all rights, title and interests in the Collateral subject and subordinate only to the Carve-Out (subject to the limitations set forth herein and in the DIP Order) and (ii) are enforceable against the Borrower and Guarantors.

(c)    Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations hereunder and all other obligations of the Borrower under the Loan Documents: (i) constitute allowed superpriority administrative expense claims in the Case having priority, subject only to the payment of the Carve-Out in accordance with the DIP Order, over all administrative expense claims, adequate protection and other diminution claims, and unsecured claims of any kind whatsoever against the Borrower, whether now existing or hereafter arising, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the DIP Order), 507(a), 507(b), 546, 552, 726, 1113, 1114 or any other provision of the Bankruptcy Code, whether or

48

not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (ii) are senior to the rights of the Borrower and any successor trustee or estate representative in the Case or any subsequent proceeding or case under the Bankruptcy Code.

(d)     The DIP Order: (i) is in full force and effect and (ii) has not been reversed, stayed, modified, amended, vacated, or subjected to a stay pending appeal without the prior written consent of the Administrative Agent and the Required Lenders in their respective sole discretion.

(e)     The Liens securing the Obligations shall not be junior to, or pari passu with, any Lien avoided and preserved for the benefit of the Borrower and its estate pursuant to Section 551 of the Bankruptcy Code.

Section 7.25   <u>Anti-Corruption Laws and Sanctions</u>.  The Borrower and General Partner have implemented and maintain in effect policies and procedures designed to ensure compliance by the Borrower, General Partner, the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, General Partner, the Subsidiaries and their respective officers and directors and to the knowledge of the Borrower, General Partner and the Subsidiaries, its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower, General Partner or the Subsidiaries  being designated as a Sanctioned Person.  None of (a) the Borrower, General Partner, any Subsidiary or to the knowledge of the Borrower, General Partner or such Subsidiary any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower, General Partner or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.   No Borrowing, use of proceeds or other transaction contemplated by this Agreement  will violate any Anti-Corruption Law or applicable Sanctions.

Section 7.26   <u>EEA Financial Institutions</u>.  Neither the Borrower nor any Guarantor is an EEA Financial Institution.


**ARTICLE VIII**
**Affirmative Covenants**

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full, the Borrower and General Partner covenants and agrees with the Lenders that:

Section 8.01   <u>Financial Statements; Other Information</u>.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)     <u>Cash Flow Report</u>.  Beginning on the first Wednesday following the Petition Date, and each Wednesday thereafter, by no later than 2:00 p.m. (prevailing Eastern time) on each such Wednesday, deliver or cause Huron to be able to deliver to the Administrative Agent and the Lenders:

(i)     a written report summarizing the Borrower's and each Guarantor's actual cash flow ending on Friday of the prior week, as compared to the cash flow for such week as set forth in the Budget (the "<u>Cash Flow Report</u>"), each such report to be in a form and with such level of detail as shall be satisfactory to Huron and Majority Lenders; and

(ii)     a written report setting forth the Borrower's and each Guarantor's working capital position (including a summary of priority payables) ending on Friday of the prior week, such report to include all supporting ledgers, analysis and other information (including a transaction report from the Concentration Account, the POCI Impress Account and the POCI Management Fee Account), each such report to be in form and with such level of detail as shall be satisfactory to Majority Lenders.

(b)     <u>Monthly Statement of Accounts</u>.  As soon as available but in no event later than 2:00 p.m. (prevailing Eastern time) on the 25th day of each month following the Petition Date, deliver or cause to be delivered to the Administrative Agent and the Lenders, in form and detail reasonably acceptable to Majority Lenders, (i) an accounts payable aging and an accounts receivable aging and (ii) all written demands or claims related to or asserting any Liens in respect of Borrower's Property.

(c)     <u>Intentionally Omitted</u>.

(d)     <u>Case Filings</u>.  A reasonable period of time prior to filing with the Bankruptcy Court (or prior to the distribution to any committee, creditor or equity holder of the Borrower, as applicable), copies of all pleadings, motions, applications, judicial, or financial information and other documents to be filed by or on behalf of the Borrower with the Bankruptcy Court or distributed to any Committee or any creditors or equity holders of the Borrower with respect to (i) cash collateral, the Cash Collateral Order or the Cash Management Order, (ii) the DIP Order or the credit facility provided for herein, Obligations hereunder or the Collateral, (iii) the Sale Procedures Order, the Sale Order, any 363 Sale or any other disposition of Borrower's Property, (iv) any challenge to the validity or enforceability of any obligation or Debt of Borrower under the Prepetition Credit Agreement or any Lien securing any such obligation or Debt, or (v) any plan of reorganization or liquidation and/or any disclosure statement related to any such plan.

(e)     <u>Certificate of Financial Officer – Swap Agreements</u>.  From time to time as may be requested by Majority Lenders, a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Majority Lenders, setting forth as of a recent date, a true and complete list of all Swap Agreements of the Borrower, General Partner and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on <u>Schedule 7.20</u>, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

50

(f)    Certificate of Insurer -- Insurance Coverage.  From time to time as may be requested by the Administrative Agent or any Lender, a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07 in customary form and, if requested, all copies of the applicable policies.

(g)    Other Accounting Reports.  Promptly upon receipt thereof, a copy of each other report or letter submitted to the Borrower, General Partner or any Subsidiary by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower, General Partner or any such Subsidiary, and a copy of any response by the Borrower, General Partner or any such Subsidiary or the board of directors of the Borrower, General Partner or any such Subsidiary, to such letter or report.

(h)    Intentionally Omitted.

(i)    Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any notices furnished to or by any Person pursuant to the terms of the Transition Services Agreement or the TPH Engagement Letter not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(j)    Lists of Purchasers.  Upon the request of the Administrative Agent (at the request of Majority Lenders), a list of all Persons purchasing Hydrocarbons from the Borrower, General Partner or any Subsidiary and, if requested by the Administrative Agent, cause such Persons to remit all payments therefor to the Concentration Account.

(k)    Notice of Casualty Events.  Prompt written notice, and in any event within five Business Days after receiving notice of the occurrence of any Casualty Event in excess of $50,000 or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event in excess of $50,000.

(l)    Information Regarding the Borrower and Guarantors.  Prompt written notice (and in any event within twenty (20) days prior thereto) of any change (i) in the Borrower's or any Guarantor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower's or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower's or Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Borrower's or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower's or any Guarantor's federal taxpayer identification number.

(m)    Production Report and Lease Operating Statements.  Within 45 days following each calendar month, a report setting forth, for each calendar month during the then current fiscal year to date through and including the last day of the fiscal quarter for which financial statements are being delivered, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related

51

ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(n)     Notices of Certain Changes.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, bylaws, any preferred stock designation or any other organizational document of the Borrower, General Partner or any Subsidiary.

(o)     Other Requested Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower, General Partner or any Subsidiary (including any Plan and any reports or other information required to be filed with respect thereto under the Code or under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

Section 8.02   Notices of Material Events.   The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)     the occurrence of any Default;

(b)     the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof (other than the Case) not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(c)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03   Existence; Conduct of Business.  The Borrower and General Partner will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; *provided that* the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.11.

Section 8.04   Payment of Obligations.  The Borrower will, and will cause each of the Subsidiaries to, pay its obligations in accordance with and as contemplated by the Budget.

Section 8.05   Performance of Obligations under Loan Documents.  The Borrower will pay the Loans according to the terms hereof, and the Borrower and General Partner will, and will cause each Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06   Operation and Maintenance of Properties.  The Borrower and General Partner, at its own expense, will, and will cause each Subsidiary to (in accordance with the Budget and any variance therefrom permitted hereunder):

(a)   operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements (including timely payment of amounts due thereunder to the extent provided in the Budget), and in compliance with all Governmental Requirements, including, without limitation, Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b)   keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material Properties, including, without limitation, all equipment, machinery and facilities, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(c)   promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties in accordance with the Budget, and will otherwise do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder consistent with the Budget;

(d)   promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards and the Budget, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties;

(e)   to the extent the Borrower or any Guarantor is not the operator of any Property, the Borrower or such Guarantor shall use commercially reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07   Insurance.  The Borrower and General Partner will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the

520934 000003 17688986.3

same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will endeavor to give at least 30 days prior notice of any cancellation to the Administrative Agent.

Section 8.08    Books and Records; Inspection Rights.  The Borrower and General Partner will, and will cause each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower and General Partner will, and will cause each Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants (in the presence of a representative of the Borrower), all at such reasonable times and as often as reasonably requested (it being understood that unless an Event of Default has occurred and is continuing, the Borrower shall only be required to bear the expense of one such visit in each fiscal year).

Section 8.09    Compliance with Laws.  The Borrower and General Partner will, and will cause each Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and General Partner will maintain in effect and enforce policies and procedures designed to ensure compliance by the General Partner, Borrower, the Subsidiaries and their respective directors, officers, employees and agents with  Anti-Corruption Laws and applicable Sanctions.

Section 8.10    Environmental Matters.  (a) The Borrower and General Partner shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not Release or threaten to Release, and shall cause each Subsidiary not to Release or threaten to Release, any Hazardous Material on, under, about or from any of the Borrower's or Guarantors' Properties or any other property offsite the Property to the extent caused by the Borrower's or any of Guarantors' operations except in compliance with applicable Environmental Laws, the Release or threatened Release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or Guarantors' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in

520934 000003 17688986.3

connection with the actual or suspected past, present or future Release or threatened Release of any Hazardous Material on, under, about or from any of the Borrower's or Guarantors' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; (v) conduct, and cause the Subsidiaries to conduct, their respective operations and businesses in a manner that will not expose any Property or Person to Hazardous Materials that could reasonably be expected to form the basis for a claim for damages or compensation; and (vi) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be reasonably necessary to continuously determine and assure that the Borrower's and the Guarantors' obligations under this <u>Section 8.10(a)</u> are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)     The Borrower will promptly, but in no event later than five days of the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any Person against the Borrower or any Guarantor or their respective Properties of which the Borrower has knowledge in connection with any Environmental Laws if the Borrower could reasonably anticipate that such action will result in liability (whether individually or in the aggregate) in excess of $1,000,000, not fully covered by insurance, subject to normal deductibles.

(c)     The Borrower and General Partner will, and will cause each Subsidiary to, provide environmental assessments, audits and tests in accordance with the most current version of the American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11   <u>Further Assurances</u>.   (a) The Borrower and General Partner at its sole expense will, and will cause each Subsidiary to promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower, General Partner or any Subsidiary, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the Collateral or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.

(b)     The Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or

55

any financing statement covering the Mortgaged Property or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 8.12   Operation of Accounts.

(a)   Concentration Account.   The Borrower shall use the Concentration Account solely to (i) receive proceeds of Loans and payments from purchasers of production from Borrower's and each Guarantors' non-operated Oil and Gas Properties and (ii) make disbursements to the POCI Impress Account and POCI Management Fee Account to pay Budget Costs and Management Fees respectively (and any Contingent Budget Items approved by the Majority Lenders, and Permitted Severance Payments, if any). The Concentration Account shall (i) be pledged to the Administrative Agent for the benefit of the Credit Parties and Secured Swap Parties to secure the Obligations and shall be subject to terms, conditions and restrictions satisfactory to the Administrative Agent, and (ii) shall at all times be subject to (i) the perfected lien in favor of the Administrative Agent for the benefit of the Credit Parties and the Secured Swap Parties created by the DIP Order and (ii) the Concentration Account DACA. Any cash deposits received by POCI shall be immediately deposited in or swept into the Concentration Account.

(b)   POCI Impress Account.   The POCI Impress Account shall be used solely to pay Budget (and any variance therefrom permitted hereunder) costs and expenses other than management fees pursuant to the POCI Agreement and the Transition Services Agreement. The POCI Impress Account shall at all times be subject to (i) the terms of the POCI Agreement, (ii) a first priority perfected lien in favor of the Administrative Agent for the benefit of the Credit Parties and Secured Swap Parties securing the Obligations, and (iii) the POCI Impress Account DACA.

(c)   POCI Management Fee Account.   The POCI Management Fee Account shall be used solely to (x) receive Budget management fees payable by the Borrower to POCI pursuant to the POCI Agreement and the Transition Services Agreement and (y) pay amounts permitted under the Transition Services Agreement.

(d)   Huron.   Huron will monitor cash management and all cash transfers and have full access rights to and on-site monitoring of (i) the Concentration Account, the POCI Impress Account and the POCI Management Fee Account and (ii) all supporting documentation of the Borrower, any Guarantor or POCI with respect to any report required under this Agreement, including but not limited to bank statements, contracts, invoices, copies of checks and general ledgers. The Borrower shall fully cooperate on a commercially reasonable basis with Huron with respect to the Budget.

Section 8.13   Weekly Cash Flow Projections.   On each Wednesday (or if such Wednesday is not a Business Day, the following Business Day) by 6:00 p.m., New York, New York time, commencing on the Petition Date, deliver an updated, "rolling" 13-week cash flow projection for the period  commencing from the end of the previous week through and including thirteen weeks thereafter  (each, a "Proposed Budget"), which shall reflect the Borrower's good faith projections, reflect  reversal of any timing variances set forth in any Variance Report,  include  a  description of changes from the previously approved Budget and be

56

in form and detail consistent with the initial Budget and subject to the approval of the Majority Lenders. The Proposed Budget shall also be delivered to the Administrative Agent and the Lenders hereunder by the Borrower; provided that unless and until the Majority Lenders have approved of such Proposed Budget, the Borrower shall still be subject to and be governed by the terms of the Budget then in effect and the Lenders shall have no obligation to fund any Loans pursuant to any Proposed Budget not constituting the approved Budget. The Majority Lenders shall have two (2) Business Days following receipt of each Proposed Budget to notify the Administrative Agent (either orally or in writing) of approval or rejection of such Proposed Budget (and any Lender failing to notify the Administrative Agent within such period shall be deemed to have approved such Proposed Budget), and the Administrative Agent shall promptly deliver to the Borrower written notice of such approval or rejection; provided that any portion of a Proposed Budget that relates to periods covered by a previously approved Budget shall automatically be deemed approved to the extent that no changes have been made to the Proposed Budget for such periods; provided, further, that, for the avoidance of doubt, the Borrower and the Majority Lenders may nonetheless mutually agree to modify line items in a Proposed Budget for weeks that have been previously approved by the Majority Lenders. Upon receipt of a notice of rejection, the Borrower shall, within 24 hours of receipt of such notice, engage in good faith negotiations with the Majority Lenders in order to develop a Proposed Budget that is acceptable to the Majority Lenders in their respective sole discretion (such revised Proposed Budget to be submitted within two (2) Business Days of the Borrower's receipt of a notice of rejection).  Any Proposed Budget shall, upon approval by Majority Lenders pursuant to this <u>Section 8.13</u>, become the effective Budget and, except to the extent provided in this <u>Section 8.13</u>, shall replace and supersede the then effective Budget.

Section 8.14   <u>Variance Reports</u>.   On each Wednesday (or if such Wednesday is not a Business Day, the following Business Day) following the Petition Date, the Borrower shall deliver to the Administrative Agent and the Lenders a Variance Report (such date, the "<u>Variance Testing Date</u>").   As of each Variance Testing Date, the Borrower shall not permit: (A) any particular line item expenditure for the previous calendar week to exceed 10% of such Budget line item for such week, (B) aggregate expenditures for the previous calendar week to exceed 5% of aggregate Budget expenditures for such week, (C) aggregate expenditures for the previous four calendar weeks to exceed 5% of aggregate Budget expenditures for such four week period (excluding in each case (x) any Contingent Budget Items approved by Majority Lenders, and (y) any variance caused by any Budget expenditure budgeted for a week prior to such previous calendar week (or prior to such previous four calendar week period), not paid in such week (or prior four week period), and paid in such previous week (or previous four week period)), or (D) the Borrower's net cash receipts (equal to gross revenue less production tax, royalties, processing costs, oxygen removal fee and NGPL transportation costs), on an aggregate basis, for the previous four calendar weeks to be less than 90% of the aggregate amount of cash receipts included in the Budget for such four week period (other than as a result of fluctuations in Hydrocarbon commodity prices or production volumes).

Section 8.15   <u>Lender Calls</u>.   The Borrower, its officers and its advisors (including any investment banker and any financial advisor retained by the Borrower) shall make themselves available to participate in conference calls to be held on a weekly basis (or more frequently as the Majority Lenders may request) with the Lenders to discuss the Budget (and all updates and

Variance Reports related thereto), the sales and marketing process related to the 363 Sale or any other issues as may be requested by the Lenders.

Section 8.16  Opposition to Certain Pleadings.  The Borrower shall promptly and diligently oppose all pleadings filed by Persons in the Bankruptcy Court to terminate the automatic stay on the Collateral (other than pleadings filed by the Administrative Agent and/or the Majority Lenders), all pleadings filed by Persons in the Bankruptcy Court to terminate the exclusive right of the Borrower to file a plan of reorganization, and all other pleadings filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Administrative Agent or any Lender or any Collateral.

Section 8.17  Compliance with 363 Sale Milestones.  The Borrower shall actively and diligently work with TPH to promptly establish sale procedures with respect to the 363 Sale and market its Properties and conduct the 363 Sale pursuant to the Sale Procedures Order and the Sale Order, including timely response to any requests by, and prompt implementation of  any recommendations made by, TPH with respect thereto, and shall achieve the following milestones, unless the Administrative Agent and the Required Lenders in their respective discretion shall otherwise consent in writing:

(a)  On or before the Petition Date, TPH and the Borrower shall have entered into the TPH Engagement Letter and initiated the 363 Sale process;

(b)  On or before August 15, 2016, the Borrower shall have delivered to the Administrative Agent and Lenders a copy of the draft confidential sales memorandum which will be disseminated to potential purchasers;

(c)  On or before August 23, 2016, the Bankruptcy Court shall have entered the Sale Procedures Order.

(d)  On or before August 15, 2016, TPH shall have commenced actively marketing the Borrower's and Guarantors' Property to third parties.

(e)  The final bid deadline with respect to the 363 Sale shall be not later than October 24, 2016.

(f)  On or before November 7, 2016, the 363 Asset Purchase Agreement shall have been executed.

(g)  On or before December 13, 2016, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale.

(h)  On the date not later than three Business Days after the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale, the 363 Sale shall close pursuant to the terms of the 363 Asset Purchase Agreement(s).

Section 8.18  Title Information.  Upon request of the Administrative Agent (at the request of Majority Lenders), the Borrower will deliver title information in form and substance

acceptable to the Majority Lenders covering the Oil and Gas Properties of the Borrower and each Guarantor.

Section 8.19  <u>Additional Collateral; Additional Guarantors</u>.  (a) The Borrower and General Partner shall, and shall cause the Subsidiaries to, grant, within twenty (20) days after any request by the Administrative Agent (acting at the direction of the Majority Lenders), to the Administrative Agent as security for the Obligations a first-priority Lien (provided that Excepted Liens of the type described in clauses (a) to (d) and (f) of the definition thereof may exist, but subject to the provisos at the end of such definition) on additional Oil and Gas Properties not already subject to a Lien of the Security Instruments or the DIP Order; provided, however, that notwithstanding anything in this Agreement or any Security Instrument to the contrary, no Guarantor shall grant a Lien to support any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of such Guarantor.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, mortgages, security agreements and financing statements or other Security Instruments, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.  In order to comply with the foregoing, if any Subsidiary places a Lien on its Oil and Gas Properties and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with <u>Section 8.19(b)</u>.

(b)    The Borrower shall promptly cause each Subsidiary to guarantee the Obligations pursuant to the Guaranty Agreement; provided, however, that notwithstanding anything in this Agreement or any Security Instrument to the contrary, no Guarantor shall guarantee (or grant a Lien to support, as applicable) any Excluded Swap Obligations of such Guarantor for purposes of determining any obligations of such Guarantor.  In connection with any such guaranty, the Borrower shall, or shall cause such Subsidiary to, promptly, but in any event no later than 10 days after the formation or acquisition (or other similar event) of such Subsidiary to, (i) execute and deliver a supplement to the Guaranty Agreement executed by such Subsidiary, (ii) pledge all of the Equity Interests of such new Subsidiary (including, without limitation, delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock power for each certificate duly executed in blank by the registered owner thereof, if applicable) and (iii) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

Section 8.20  <u>ERISA Compliance</u>.  The Borrower and General Partner will promptly furnish and will cause the Subsidiaries to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan or any trust created thereunder, (ii) immediately upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan or any trust created thereunder, a written notice signed by the President or the principal Financial Officer of the Borrower, General Partner or the Subsidiary, as the case may be, specifying the nature thereof, what action the Borrower, General Partner or the Subsidiary is

taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto.

Section 8.21   <u>Marketing Activities</u>.   The Borrower and General Partner will not, and will not permit any of the Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and the Guarantors that the Borrower or any Guarantor has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business, (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto or (iv) in connection with the 363 Sale.

Section 8.22   <u>Swap Agreements</u>..   The Borrower shall maintain the hedge position established by the Swap Agreements required under <u>Section 6.01q)</u> during the period specified therein and shall neither assign, terminate or unwind any such Swap Agreements nor sell any Swap Agreements if the effect of such action (when taken together with any other Swap Agreements executed contemporaneously with the taking of such action) would have the effect of canceling its positions under such Swap Agreements required hereby, unless, in each event, an event of default has occurred thereunder, and it is the non-defaulting party, or a termination event has occurred thereunder, and it is the non-affected party, and it has notified the Administrative Agent of any such occurrence.

## ARTICLE IX
## Negative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 9.01   <u>Financial Covenants</u>.   Reserved.

Section 9.02   <u>Debt</u>.   The Borrower and General Partner will not, and will not permit any Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

      (a)   the Obligations arising under the Loan Documents or any guaranty of or suretyship arrangement for the Obligations arising under the Loan Documents or any Excluded Swap Obligations;

      (b)   Debt in respect of the Prepetition Credit Agreement, the Prepetition Second Lien Term Loan Agreement and other Debt outstanding on the Petition Date incurred in

compliance with the Prepetition Credit Agreement and Prepetition Second Lien Term Loan Agreement.

(c)     Debt of the Borrower owing to the Permitted Holder incurred prior to the Petition Date ("Affiliate Debt").

(d)     accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than ninety (90) days past the date of invoice or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(e)     Debt under Capital Leases or Purchase Money Indebtedness incurred prior to the Petition Date;

(f)     Debt associated with bonds or surety obligations required by Governmental Requirements in connection with the operation of the Oil and Gas Properties;

(g)     endorsements of negotiable instruments for collection in the ordinary course of business; and

(h)     Debt in respect of netting services, overdraft protections and similar arrangements, in each case in connection with deposit accounts in the ordinary course of business and discharged within two Business Days of the incurrence thereof.

Section 9.03    Liens.  The Borrower and General Partner will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)     Liens securing the payment of any Obligations;

(b)     Excepted Liens;

(c)     Liens granted and properly perfected prior to the Petition Date (i) permitted by the Prepetition Credit Agreement or (ii) securing Capital Leases and Purchase Money Indebtedness permitted by Section 9.02(e), but only on the Property under lease or the Property being financed pursuant to such Purchase Money Indebtedness; and

(d)     Liens on Property granted and properly perfected prior to the Petition Date in respect of (i) the Prepetition Credit Obligations pursuant to the Prepetition Credit Agreement and (ii) loans under the Prepetition Second Lien Term Loan Agreement pursuant thereto, and in each case adequate protection liens granted in respect thereof.

Section 9.04    Restricted Payments; Payments on Affiliate Debt.   The Borrower and General Partner will not, and will not permit any of the Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, or call, make or offer to make any Redemption of, or otherwise Redeem (whether optionally, voluntarily or

61

mandatorily), any Affiliate Debt, or make any payment of, whether in whole or in part, any principal, interest, fees, costs, expenses or any other amounts payable in respect of any Affiliate Debt, except that to the extent in accordance with the Budget, Subsidiaries may declare and pay dividends ratably with respect to their Equity Interests.

Section 9.05   Investments, Loans and Advances.  The Borrower and General Partner will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that to the extent in accordance with the Budget the foregoing restriction shall not apply to:

(a)     Investments existing on the Petition Date in compliance with the Prepetition Credit Agreement and Prepetition Second Lien Term Loan Agreement

(b)     accounts receivable arising in the ordinary course of business;

(c)     direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)     commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's;

(e)     deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively;

(f)     deposits in money market funds investing exclusively in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e);

(g)     Investments (i) made by the Borrower in or to the Subsidiary Guarantors, or (ii) made by any Subsidiary in or to the Borrower or any Subsidiary Guarantor; and

(h)     Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Borrower or any Subsidiary as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any of the Subsidiaries; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(h) exceeds $250,000.

Section 9.06   Nature of Business; International Operations.  The Borrower and General Partner will not, and will not permit any Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company.

The Borrower, General Partner and the Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States of America, and the Borrower will not have any Foreign Subsidiaries.  The Borrower will not amend or modify the Transition Services Agreement or the TPH Engagement Letter without the written consent of the Administrative Agent and the Majority Lenders.

Section 9.07   Limitation on Leases.  Other than with respect to transactions entered into prior to the commencement of the Case, the Borrower and General Partner will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any obligation for the payment of rent or hire of Property of any kind whatsoever (real or personal excluding, to the extent in each case in accordance with the Budget, Capital Leases, leases of Hydrocarbon Interests, leases of drilling rigs, leases of drilling and completion related equipment, leases of workover and related equipment and leases of field system gas compressors), under leases or lease agreements which would cause the aggregate amount of all payments made by the Borrower and the Subsidiaries pursuant to all such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $1,500,000 in any period of twelve consecutive calendar months during the life of such leases.

Section 9.08   Proceeds of Loans.  The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

Section 9.09   ERISA Compliance.  The Borrower and General Partner will not, and will not permit any Subsidiary to, at any time:

(a)     engage in any transaction in connection with which the Borrower, General Partner or a Subsidiary could be subjected to either a material civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a material tax imposed by Chapter 43 of Subtitle D of the Code;

(b)     fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, General Partner or a Subsidiary is required to pay as contributions thereto;

(c)     contribute to or assume an obligation to contribute to any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability; or

63

(d)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any employee pension benefit plan, as defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.10   Sale or Discount of Receivables.   Except for receivables obtained by the Borrower, General Partner or any Subsidiary out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Borrower and General Partner will not, and will not permit any Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.11   Mergers, Etc.   The Borrower and General Partner will not, and will not permit any Subsidiary to, merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; *provided that* (a) any Wholly-Owned Subsidiary may participate in a consolidation with any other Wholly-Owned Subsidiary and (b) any Wholly-Owned Subsidiary may participate in a consolidation with the Borrower so long as the Borrower is the continuing or surviving corporation.

Section 9.12   Sale of Properties.   The Borrower and General Partner will not, and will not permit any Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property except for (a) the sale of Hydrocarbons in the ordinary course of business; (b) the sale or transfer of equipment that is no longer necessary for the business of the Borrower, General Partner or such Subsidiary or is replaced by equipment of at least comparable value and use; and (c) the 363 Sale.

Section 9.13   Environmental Matters.   The Borrower and General Partner will not, and will not permit any Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations, Release or threatened Release, exposure, or Remedial Work could reasonably be expected to have a Material Adverse Effect.

Section 9.14   Transactions with Affiliates.   The Borrower and General Partner will not, and will not permit any Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors), other than the Affiliated Debt, transaction permitted under the Transition Services Agreement. Payments made in accordance with the Budget (and any variance therefrom permitted hereunder), or transactions in the ordinary course of business consistent with past practices with the General Partner, unless such transactions are otherwise

64

permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

Section 9.15   Subsidiaries.   The Borrower and General Partner will not, and will not permit any Subsidiary to, create or acquire any additional Subsidiary, unless the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.19(b).   The Borrower and General Partner shall not, and shall not permit any Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in the Borrower or any Subsidiary except in compliance with Section 9.12(c).   The Borrower and the Subsidiaries shall have no Foreign Subsidiaries and each Subsidiary shall be a Wholly-Owned Subsidiary.

Section 9.16   Negative Pledge Agreements; Dividend Restrictions.   The Borrower and General Partner will not, and will not permit any Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Agreement, the Security Instruments, or Capital Leases creating Liens permitted by Section 9.03(c)) which in any way prohibits or restricts (or which requires the consent of or notice to other Persons in connection therewith): (a) the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Lenders, (b) any Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, (c) paying any Debt owed to, the Borrower or any other Subsidiary, (d) making loans or advances to, or other Investments in, the Borrower or any other Subsidiary, or (e) transferring any of its assets to the Borrower or any other Subsidiary.

Section 9.17   Gas Imbalances, Take-or-Pay or Other Prepayments.   The Borrower and General Partner will not, and will not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Guarantor that would require the Borrower or such Guarantor to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed a value of $1,000,000 in the aggregate.

Section 9.18   Swap Agreements.   The Borrower and General Partner will not, and will not permit any Subsidiary to, enter into any Swap Agreements with any Person other than Swap Agreements required pursuant to Section 6.01(q) or as may otherwise be approved by the Majority Lenders.

Section 9.19   Bankruptcy Provisions.

(a)   The Borrower shall not: (i) file or approve a plan of reorganization or liquidation (unless such plan contains provisions providing that the Obligations and the Prepetition Credit Obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization or liquidation) without the written consent of the Administrative Agent and the Required Lenders; (ii) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise (other than the 363 Sale) without the written consent of the Administrative Agent and the Required Lenders; (iii) seek to dismiss the Case or convert the Case to a Chapter 7 case without the written consent of the Administrative Agent and the Required Lenders; (iv) incur any superpriority or other administrative expense claims pari passu with or senior to the Obligations; (v) seek or

65

consent to any modification, stay, vacatur or amendment with respect to (I) any motion made on the Petition Date and any order entered in connection therewith (which motions and orders in respect thereof shall be acceptable in form and substance to the Administrative Agent and the Required Lenders in their respective sole discretion), (II) the DIP Order, except as agreed to in writing by the Administrative Agent and Required Lenders in their sole discretion, or (III) the Loan Documents, except as agreed to in writing by the Administrative Agent and Majority Lenders in their respective sole discretion; (vi) create any Lien that ranks senior to, or pari passu with, the Liens securing the Obligations or the Prepetition Credit Obligations; (vii) make cash expenditures on account of claims incurred (I) by critical vendors prior to the Petition Date or (II) pursuant to Section 503(b)(9) of the Bankruptcy Code, except in each case as agreed to in writing by the Administrative Agent and the Majority Lenders or as permitted by the Budget; (viii) make any payment, by way of adequate protection or otherwise, in respect of any prepetition debt or other obligations, other than as approved by the Bankruptcy Court and in accordance with the Budget and the DIP Order, or (ix) seek or consent to any order seeking authority to take any action prohibited by the DIP Order without the written consent of the Administrative Agent and the Required Lenders or otherwise required by any Governmental Requirement.

(b)      The Borrower agrees that (i) the Obligations shall not be discharged by the entry of an order confirming a chapter 11 plan (and the Borrower pursuant to Section 1141(d) of the Bankruptcy Code hereby waives any such discharge), (ii) the superpriority claim granted to the Administrative Agent and the Lenders pursuant to the DIP Order and the Liens granted to the Administrative Agent, the Lenders and the Secured Swap Parties pursuant to such orders and the Security Instruments shall not be affected in any manner by the entry of an order confirming a chapter 11 plan, and (iii) the Borrower shall not propose or support any chapter 11 plan without the written consent of the  Administrative Agent and the Majority Lenders in their respective sole discretion.

Section 9.20   Compliance with Budget .   Neither the Borrower nor General Partner shall make, nor shall the Borrower permit POCI or any Subsidiary to make, any cash disbursement that is not contemplated by the Budget (and any variance therefrom permitted hereunder).

## ARTICLE X
## Events of Default; Remedies

Section 10.01   Events of Default.   One or more of the following events shall constitute an "Event of Default":

(a)      the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)      any representation or warranty made or deemed made by or on behalf of the General Partner, the Borrower or any Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect when made or deemed made;

(d)      the General Partner, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.01(l), Section 8.02, Section 8.03, Section 8.18, Section 8.19, Section 8.20 or in Article IX;

(e)      the General Partner, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of 10 days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (B) a Responsible Officer of the General Partner, the Borrower or such Subsidiary otherwise becoming aware of such default;

(f)      the General Partner, the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness incurred after the Petition Date (except for any failure to pay any principal or interest not permitted to be paid under the DIP Order), when and as the same shall become due and payable;

(g)      any event or condition (other than as a result of any failure to observe or perform any term, covenant, agreement or condition not permitted to be observed or performed under the DIP Order) occurs that results in any Material Indebtedness incurred after the commencement of the Case becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness incurred after the commencement of the Case or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the General Partner, the Borrower or any Subsidiary to make an offer in respect thereof;

(h)      the Bankruptcy Court shall enter, or the General Partner, Borrower or any Subsidiary shall seek, fail to oppose or support the entry of, any order providing for any of the following: (i) dismissal of the Case or conversion of the Case to a Chapter 7 case without the prior written consent of the Administrative Agent and the Majority Lenders; (ii) appointment of a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of the Borrower in the Case; (iii) other than the Carve-Out, the granting of any superpriority claim or lien which is pari passu with or senior to the claims or Liens of the Administrative Agent and the Lenders in the Case, or the invalidation, subordination, reduction or other impairment, in whole or in part, of the Liens or superpriority claims granted the Administrative Agent and the Lenders with respect to the Obligations; (iv) the entry of any order

in the Case charging any of the Collateral under Section 552(b) of the Bankruptcy Code or, subject to the DIP Order, Section 506(c) of the Bankruptcy Code, or the commencement of other actions by the Borrower, or the entry of any order, allowing any action that would violate any covenant or condition contained in the Loan Documents or otherwise adverse to the rights and remedies of the Credit Parties and the Secured Swap Parties under the Loan Documents, in their sole discretion without the consent of the Administrative Agent and the Required Lenders; (v) the Borrower's failure to comply with the Cash Collateral Order, Cash Management Order, DIP Order, Sale Order, Sale Procedures Order, or the entry of an order by the Bankruptcy Court terminating the use of cash collateral; (vi) the entry of an order or orders granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party or third parties to proceed against any assets of the Borrower or to permit other actions that individually or in the aggregate would have a material adverse effect on the Borrower or its estate; or (vii) termination of the Borrower's exclusive period to file and/or solicit acceptances to a plan of reorganization;

(i)      Intentionally Omitted;

(j)      (i) one or more judgments for the payment of money in an aggregate amount in excess of $50,000 (to the extent not covered by independent third party insurance provided by insurers of the highest claims paying rating or financial strength as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the General Partner, the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed (including as a result of the pendency of the Case), or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the General Partner, the Borrower or any Subsidiary to enforce any such judgment;

(k)      the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the Collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the General Partner, the Borrower, any Subsidiary or any of their Affiliates shall so state in writing;

(l)      a Change in Control shall occur;

(m)      failure of the DIP Order to be in full force and effect, including by the entry of an order reversing, amending, supplementing, staying for any period, vacating or otherwise modifying, in a manner that is adverse to the Credit Parties and the Secured Swap Parties in their sole discretion, without the prior consent of the Administrative Agent and the Majority Lenders, in their respective sole discretion;

(n)      failure of the Borrower to comply with the terms of the DIP Order, or the Borrower or any Guarantor shall file a motion for reconsideration with respect to the DIP Order,

520934 000003 17688986.3

or the right of the Borrower to borrow hereunder is terminated by an order entered by the Bankruptcy Court;

(o)     failure of the Bankruptcy Court to enter (i) a Sale Procedures Order by August 23, 2016 or (ii) a Sale Order by December 13, 2016;

(p)     the payment by the Borrower (by way of adequate protection or otherwise) of any principal or interest or other amount on account of any pre-petition indebtedness or payables (other than as provided in the Budget);

(q)     the assertion (or support) by the Borrower of any investigation, claim or action against (x) the Administrative Agent or any other Credit Party or any Secured Swap Party or (y) the Prepetition Lenders (other than in the case of clause (y) only, a customary claim and lien investigation conducted by an official statutory committee for a period of no longer than 60 days from the date of such committee's formation or, if no such committee is appointed, by a party in interest granted standing for a period of no longer than 75 days from the Petition Date);

(r)     a sale of all or any substantial portion of the Borrower's assets except as approved by the Majority Lenders in their respective sole discretion;

(s)     cessation of work otherwise contemplated by the Budget adversely affecting material current or planned business operations;

(t)     actual, or assertion by the Borrower of, lack of legality, validity, enforceability or perfection of guarantees or liens in favor of Credit Parties or Secured Swap Parties;

(u)     the filing of a chapter 11 plan of reorganization or liquidation without the written consent of the Majority Lenders, in their respective sole discretion;

(v)     the Borrower or any Guarantor shall suffer to exist any Lien on any asset of the Borrower or any Guarantor (other than Liens permitted under Section 9.03) that constitutes Collateral unless such Lien shall be expunged promptly; or

(w)     either POCI or the Borrower shall default on any of their obligations under the Transition Services Agreement, including without limitation, any failure by POCI to support and assist TPH with respect to the 363 Sale, or the Transition Services Agreement or the TPH Engagement Letter is terminated without the prior written consent of the Administrative Agent and the Lenders thereof.

Section 10.02 Remedies.  (a) At any time during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, notify the Borrower in writing of such Event of Default and take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) unless cured within five days after such notice, declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be

declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; provided, in the event Borrower disputes the occurrence and continuance of such Event of Default, Borrower, Administrative Agent and Lenders agree that Borrower shall request and such parties shall attend an immediate hearing (not more than three Business Days after such notice) before the Bankruptcy Court to determine whether or not an Event of Default has occurred, and in the event the Bankruptcy Court shall determine that no Event of Default shall have occurred or be continuing, Lenders agree that such notice of Event of Default shall be of no force or effect and any termination of the Commitments or acceleration of the Loans shall be rescinded.

(b)     In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will be automatically granted relief from the automatic stay in order to exercise, and shall have, all other rights and remedies available at law and equity, and may enforce any and all Liens and security interests created pursuant to the Loan Documents and the DIP Order and to enforce all of its other rights and remedies under the Loan Documents, the DIP Order and applicable law, including, without limitation, posting the Collateral for foreclosure, foreclosing on the Collateral, and seeking the appointment of a receiver over the Collateral, without requiring specific relief from the automatic stay or prior authorization of the Bankruptcy Court.

(c)     All proceeds realized from the liquidation or other disposition of Collateral or otherwise received after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)     *first*, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)     *second*, pro rata to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Lenders;

(iii)     *third*, pro rata to payment of accrued interest on the Loans;

(iv)     *fourth*, pro rata to payment of (A) principal outstanding on the Loans, (B) reserved and (C) Secured Swap Obligations owing to Secured Swap Parties;

(v)     *fifth*, pro rata to any other Obligations;

(vi)     *sixth*, reserved; and

(vii)     *seventh*, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement;

provided that, to the extent that any Excluded Swap Obligations exist with respect to any Guarantor, monies or property received from such Guarantor or from the proceeds of any Collateral provided by such Guarantor may not be shared with the Credit Parties to the extent that doing so would violate the Commodity Exchange Act (but to the maximum extent allowed under applicable law the amounts received or recovered from the Borrower and other Guarantors will instead be allocated to the Credit Parties as necessary to achieve the overall ratable applications of monies and property intended by this Section but for this proviso).

## ARTICLE XI
## The Administrative Agent

Section 11.01 <u>Appointment; Powers</u>.  Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any Guarantor shall have rights as a third party beneficiary of any of such provisions.

Section 11.02 <u>Duties and Obligations of Administrative Agent</u>.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in <u>Section 11.03</u>, including for the avoidance of doubt any action that may be in violation of the automatic stay in the Case, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in <u>Article VI</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the

71

existence, value, perfection or priority of any Collateral security or the financial or other condition of the Borrower and the Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03  Action by Administrative Agent.  The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02), and otherwise the Administrative Agent shall not be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper

Person, and shall not incur any liability for relying thereon and each of the Borrower and the Lenders hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05 <u>Subagents</u>. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this <u>Article XI</u> shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06 <u>Resignation or Removal of Administrative Agent</u>. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this <u>Section 11.06</u>, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower, and the Administrative Agent may be removed at any time with or without cause by the Majority Lenders. Upon any such resignation or removal, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or removal as the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this <u>Article XI</u> and <u>Section 12.03</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Section 11.07 <u>Administrative Agent as Lender</u>. Any bank serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

Section 11.08 <u>No Reliance</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower or any Guarantor of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or any Guarantor.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of the Administrative Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Thompson & Knight LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09 <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower, General Partner or any of the Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 12.03</u>) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent

74

and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10 Withholding Tax.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  Without limiting the provisions of Section 5.02(a) or Section 5.02(c), each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 11.10.  The agreements in this Section 11.10 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 11.11 Authority of Administrative Agent to Release Collateral and Liens.  Each Lender hereby authorizes the Administrative Agent to release any Collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents and to release any Guarantor from the Guaranty Agreement pursuant to the terms thereof. Each Lender hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 9.12 or is otherwise authorized by the terms of the Loan Documents.

# ARTICLE XII
## Miscellaneous

Section 12.01 Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or electronic communication, as follows:

(i)     if to the Borrower, to it at 960 Broadway Ave., P. O. Box 70019, Boise, ID 83706, Attention of Michael Rich (Telecopy No. 208-685-7605) and Marshall Murrin, with a copy to: Cohne Kinghorn, P.C., 111 East Broadway, 11th Floor, Salt Lake City, UT 84111, Attention George Hofmann (Telecopy No. 801-363-4378);

(ii)     if such notice is not a payment, to the Administrative Agent, to it at 50 South Sixth Street, Suite 1290, Minneapolis, MN 55402, Attention Josh James, Vice President  (Telecopy No. 612-217- 5651), with a copy to: Thompson & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201, Attention Shad Sumrow (Facsimile: 214-880-3170);

(iii)     if such notice is a payment, to the Administrative Agent, to it at 1100 North Market Street, Wilmington, DE 19801, ABA #031100092. Account No. 117046-000, Account Name: III Exploration II DIP, Reference: ICS, Attention Josh James; or to such wire transfer number as the Administrative Agent may provide; Wilmington Trust, National Association;

(iv)     if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided that* the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided that* approval of such procedures may be limited to particular notices or communications.

(c)     Any party hereto may change its address, telecopy number or email address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02  Waivers; Amendments.  (a) No failure on the part of the Administrative Agent or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be

construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; *provided that* no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reserved, (iii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Obligations hereunder or under any other Loan Document, without the written consent of each Lender affected thereby, (iv) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or any interest thereon, or any fees payable hereunder, or any other Obligations hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date without the written consent of each Lender affected thereby, (v) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (vi) waive or amend Section 3.03(b), Section 6.01, Section 8.19, Section 10.02(c) or Section 12.14 or change the definition of the terms "Domestic Subsidiary", "Foreign Subsidiary" or "Subsidiary", without the written consent of each Lender, (vii) release any Guarantor (except as set forth in the Guaranty Agreement), release all or substantially all of the Collateral (other than as provided in Section 11.11), without the written consent of each Lender, or (viii) change any of the provisions of this Section 12.02(b), the definitions of "Majority Lenders" or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender; *provided further that* no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.   Notwithstanding the foregoing, (a) any supplement to Schedule 7.14 (Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders, and (b) any Security Instrument may be supplemented to add additional Collateral with the consent of the Administrative Agent.

Section 12.03  Expenses, Indemnity; Damage Waiver.  (a) The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including, without limitation, the reasonable fees, charges and disbursements of counsel, financial advisors and other outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental invasive and non-invasive assessments and audits and surveys and appraisals, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the

provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all reasonable and documented out-of-pocket expenses (including, without limitation, the reasonable fees, charges and disbursements of counsel and other outside consultants) incurred by any Lender in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to any Lender as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (iv) all out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (ii) THE FAILURE OF THE BORROWER, GENERAL PARTNER OR ANY SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ANY GUARANTOR BY THE BORROWER AND ANY GUARANTORS, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS OR THE DIP ORDER, (viii) ANY

ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY GUARANTOR OR ANY OF THEIR PROPERTIES OR OPERATIONS, INCLUDING THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON OR AT ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY GUARANTOR WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY GUARANTOR, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY GUARANTOR OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY GUARANTOR OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER, GENERAL PARTNER OR ANY OF THE SUBSIDIARIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY GUARANTOR, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; *PROVIDED THAT* SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) RESULT FROM A CLAIM BROUGHT BY THE BORROWER OR ANY GUARANTOR AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF THE BORROWER OR SUCH GUARANTOR HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.  THIS SECTION 12.03(B) SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under Section 12.03(a) or (b), each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided that* the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section 12.03 shall be payable not later than three days after written demand therefor.

Section 12.04  Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04 and (iii) no Lender may assign to the Borrower, an Affiliate of the Borrower, a Defaulting Lender or an Affiliate of a Defaulting Lender all or any portion of such Lender's rights and obligations under this Agreement or all or any portion of its Commitments or the Loans owing to it hereunder.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's

Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $100,000 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(iii)   Subject to <u>Section 12.04(b)(iv)</u> and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Section 5.01</u>, <u>Section 5.03</u> and <u>Section 12.03</u>).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 12.04(c)</u>.

(iv)   The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").   The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower and each Lender.

(v)   Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and

81

recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)    (i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided that* (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided that* such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 12.02 that affects such Participant.  In addition such agreement must provide that the Participant shall be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01 and Section 5.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender.

(ii)   A Participant shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 5.03 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 5.02(e) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register").  Any such Participant Register shall be available for inspection by the Administrative Agent at any reasonable time and from time to time upon reasonable prior notice; *provided that* the applicable Lender shall have no obligation to show such Participant Register to the Borrower except to the extent such disclosure is necessary to establish that such Loan, commitment or other obligation is in registered form under Section 5f.103-1(c) of the Treasury regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the

82

Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 12.04(d) shall not apply to any such pledge or assignment of a security interest; *provided that* no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05  Survival; Revival; Reinstatement.   (a) All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 5.01, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06  Counterparts; Integration; Effectiveness.   (a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which

shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c)     Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.   Delivery of an executed counterpart of a signature page of this Agreement by telecopy, facsimile or other electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07 Severability.   Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08 Right of Setoff.   If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitation, obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower, General Partner or any Subsidiary against any of and all the obligations of the Borrower, General Partner or any Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have.

Section 12.09 GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)     THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW

YORK EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.   EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)     EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN Section 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO Section 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)     EACH     PARTY     HEREBY     (i)     IRREVOCABLY     AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED

HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS Section 12.09.

Section 12.10 Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11 Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Borrower and its obligations, (g) with the written consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section 12.11, "Information" means all information received from the General Partner, the Borrower or any Subsidiary relating to the General Partner's, the Borrower's or any Subsidiary's businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the General Partner, the Borrower or any Subsidiary; provided that, in the case of information received from the General Partner, the Borrower or any Subsidiary after the date hereof, such information is hereby deemed at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 12.12 Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the

Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Notes is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.

Section 12.13 EXCULPATION PROVISIONS.  EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT

AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 <u>Collateral Matters; Swap Agreements</u>.   The benefit of the Security Instruments and of the provisions of this Agreement relating to any Collateral shall also extend to and be available to Secured Swap Parties on a pro rata basis (but subject to the terms of the Loan Documents, including, without limitation, provisions thereof relating to the application and priority of payments to the Persons entitled thereto) in respect of Secured Swap Obligations.  No Secured Swap Party shall have any voting rights under any Loan Document as a result of the existence of Secured Swap Obligations.

Section 12.15 <u>No Third Party Beneficiaries</u>.   This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent or any Lender for any reason whatsoever.   There are no third party beneficiaries other than to the extent contemplated by the last sentence of Section 12.04(a).

Section 12.16 <u>USA Patriot Act Notice</u>.   The Administrative Agent and each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and other information that will allow the Administrative Agent and each such Lender to identify the Borrower and the Guarantors in accordance with the Act.

Section 12.17 <u>Holdback</u>.   The Lenders hereby agree that the Borrower may deposit proceeds of the Collateral, solely in accordance with the DIP Order and the applicable provisions of the Loan Documents, into a segregated account (the "Wind Down Account"), solely in an amount necessary to fund the wind-down of the Borrower's estate and the closure of the Case, in accordance with a wind-down budget prepared by the Borrower and acceptable to the Majority Lenders in their respective sole discretion.

Section 12.18 <u>Release of Claims</u>.

(a)    To induce the Administrative Agent and each Lender to enter into this Agreement and extend credit as provided herein, Borrower (and by executing the Guaranty Agreement, General Partner and each other Guarantor) hereby (i) represents and warrants that as of the date of this Agreement there are no claims or offsets against or defenses or counterclaims to its obligations under the Prepetition Credit Agreement and Prepetition Second Lien Term Loan Agreement, or the "Loan Documents" (as such term is respectively defined in the Prepetition Credit Agreement and Prepetition Second Lien Term Loan Agreement), and waives any and all such claims, offsets, defenses, or counterclaims, whether known or unknown, arising prior to the date hereof and (ii) releases and forever discharges the Administrative Agent, each Lender, together with its employees, agents, attorneys, officers, and directors (all of the

520934 000003 17688986.3

foregoing hereinafter called the "Released Parties"), from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter accruing, for or because of any matter or things done, omitted or suffered to be done by any of the Released Parties prior to and including the date hereof, and in any way directly or indirectly arising out of or in any way connected to the Prepetition Credit Agreement and Prepetition Second Lien Term Loan Agreement, including but not limited to claims of usury (although no such claims are known to exist) (all of the foregoing hereinafter called the "Released Matters").  The Borrower (and by executing the Guaranty Agreement, General Partner, and each other Guarantor) acknowledges that the agreements in this Section 12.18 are intended to cover and be in full satisfaction for all or any alleged injuries or damages arising in connection with the Released Matters herein compromised and settled.

(b)    The Borrower (and by executing the Guaranty Agreement, General Partner and each other Guarantor) understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    The Borrower (and by executing the Guaranty Agreement, General Partner and each other Guarantor) agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(d)    The Borrower (and, by executing the Guaranty Agreement, General Partner and each other Guarantor) on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Released Party that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any Released Matter released, remised and discharged by the Borrower pursuant to this Section 12.18.  If the Borrower or any of its successors, assigns or other legal representations violates the foregoing covenant, the Borrower (and, by executing the Guaranty Agreement, General Partner and each other Guarantor) for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

Section 12.19 Acknowledgment and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**[SIGNATURES BEGIN NEXT PAGE]**

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                          III EXPLORATION II LP

                                   By: Petroglyph Energy, Inc.,
                                       its general partner


                                   By: _____
                                   Name:
                                   Title:


GENERAL PARTNER:                   PETROGLYPH ENERGY, INC.


                                   By: _____
                                   Name:
                                   Title:

520934 000003 17688986.3

ADMINISTRATIVE AGENT:                 WILMINGTON TRUST, NATIONAL
                                      ASSOCIATION, as Administrative Agent


                                      By: _____
                                      Name:
                                      Title:

520934 000003 17688986.3

LENDERS:

KEYBANK NATIONAL ASSOCIATION,
as a Lender


By: _____
Name:  Dale Conder
Title:    Senior Vice President


CITIBANK, N.A.,
as a Lender


By: _____
Name:
Title:


ONEWESTBANK, N.A.,
as a Lender


By: _____
Name:
Title:


U.S. BANK NATIONAL ASSOCIATION,
as a Lender


By: _____
Name:
Title:


BOKF, NA dba Bank of Oklahoma,
as a Lender


By: _____
Name:
Title:

ANNEX I

## LIST OF COMMITMENTS

| Name of Lender | Applicable Percentage | Commitment |
|---|---|---|
| KeyBank National Association | 30.00% | $1,200,000.00 |
| Citibank, N.A. | 30.00% | $1,200,000.00 |
| OneWestBank, N.A. | 14.54% | $581,600.00 |
| U.S. Bank National Association | 12.73% | $509,200.00 |
| BOKF, NA dba Bank of Oklahoma | 12.73% | $509,200.00 |
| TOTAL | 100.00% | $4,000,000.00 |

520934 000003 17688986.3

# EXHIBIT A
# FORM OF NOTE

$[_____]                                          [_____], 201[__]

      FOR VALUE RECEIVED, III EXPLORATION II LP, an Idaho limited partnership (the "Borrower"), hereby promises to pay to [_____] (the "Lender"), at the principal office of WILMINGTON TRUST, NATIONAL ASSOCIATION (the "Administrative Agent"), the principal sum of [_____] Dollars ($[_____]) (or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement, as hereinafter defined), in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

      The date and amount of each Loan made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, may be endorsed by the Lender on the schedules attached hereto or any continuation thereof or on any separate record maintained by the Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of this Note.

      This Note is one of the Notes referred to in the Credit Agreement dated as of August [__], 2016 among the Borrower, the Administrative Agent, and the lenders signatory thereto (including the Lender), and evidences Loans made by the Lender thereunder (such Credit Agreement as the same may be amended, supplemented or restated from time to time, the "Credit Agreement").  Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

      This Note is issued pursuant to, and is subject to the terms and conditions set forth in, the Credit Agreement and is entitled to the benefits provided for in the Credit Agreement and the other Loan Documents.  The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of Loans upon the terms and conditions specified therein and other provisions relevant to this Note.

      THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

III EXPLORATION II LP

By: Petroglyph Energy, Inc.,
    its general partner


By: _____
Name:
Title:

520934 000003 17688986.3

**EXHIBIT B**
**FORM OF BORROWING REQUEST**

[_____], 201[__]

III Exploration II LP, an Idaho limited partnership, as the Borrower, pursuant to <u>Section 2.03</u> of the Credit Agreement dated as of August __, 2016 (together with all amendments, restatements, supplements or other modifications thereto, the "<u>Credit Agreement</u>") among the Borrower, Wilmington Trust, National Association, as Administrative Agent and the lenders (the "<u>Lenders</u>") which are or become parties thereto (unless otherwise defined herein, each capitalized term used herein is defined in the Credit Agreement), hereby requests a Borrowing as follows:

     (i)     Aggregate amount of the requested Borrowing is $[_____] [,which includes Permitted Severance Payments in an amount equal to $_____];

     (ii)     Date of such Borrowing is [_____], 201[__];

     (iii)     Total outstanding principal amount of Loans on the date hereof is $[_____]; and

     (iv)     *Pro forma* total outstanding principal amount of Loans (giving effect to the requested Borrowing) is $[_____]; and

     (v)     Location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.04</u> of the Credit Agreement, is as follows:

[_____]
[_____]
[_____]
[_____]
[_____]

The undersigned further certifies, represents and warrants on behalf of the Borrower that:

1)     The requested Borrowing complies with (A) the Budget as approved by Majority Lenders pursuant to the terms of the Credit Agreement and in effect as of the date hereof and (B) the DIP Order;

2)     [The "Service Period" (as defined in the Transition Services Agreement) has terminated prior to the scheduled 24-week Service Period provided for in the Transition Services Agreement, and the amount of Permitted Severance Payments included in the requested Borrowing are now due and payable pursuant to the terms of the Transition Services Agreement];

520934 000003 17688986.3

3)      The undersigned certifies that he is the [_____] of Petroglyph Energy, Inc., an Idaho corporation, the general partner of the Borrower, and that as such he is authorized to execute this Borrowing Request on behalf of the Borrower; and

4)      The Borrower is entitled to receive the requested Borrowing under the terms and conditions of the Credit Agreement.

III EXPLORATION II LP

By: Petroglyph Energy, Inc.,
       its general partner

By: _____
Name:
Title:

**EXHIBIT C**
**RESERVED**

EXHIBIT C-1

**EXHIBIT D**
**FORM OF**
**COMPLIANCE CERTIFICATE**

The undersigned hereby certifies that he is the [                    ] of Petroglyph Energy, Inc., an Idaho corporation, the general partner of III Exploration II LP, an Idaho limited partnership (the "Borrower"), and that as such he is authorized to execute this certificate on behalf of the Borrower.  With reference to the Credit Agreement dated as of August __, 2016 (together with all amendments, restatements, supplements or other modifications thereto being the "Agreement") among the Borrower, Wilmington Trust, National Association, as Administrative Agent, and the lenders (the "Lenders") which are or become a party thereto, and such Lenders, the undersigned represents and warrants as follows (each capitalized term used herein having the same meaning given to it in the Agreement unless otherwise specified):

(a)     The representations and warranties of the Borrower contained in Article VII of the Agreement and in the Loan Documents and otherwise made in writing by or on behalf of the Borrower or any Guarantor pursuant to the Agreement and the Loan Documents were true and correct when made, and are repeated at and as of the time of delivery hereof and are true and correct at and as of the time of delivery hereof, except to the extent such representations and warranties are expressly limited to an earlier date or the Majority Lenders have expressly consented in writing to the contrary.

(b)     Each of the Borrower, General Partner and the Subsidiaries has performed and complied with all agreements and conditions contained in the Agreement and in the Loan Documents required to be performed or complied with by it prior to or at the time of delivery hereof [or specify default and describe].

(c)     Since September 30, 2015, no change has occurred which could reasonably be expected to have a Material Adverse Effect [or specify event].

(d)     There exists no Default or Event of Default [or specify Default and describe].

(e)     Attached hereto are the detailed computations necessary to determine whether the Borrower is in compliance with Section 8.19(a) and Section 9.01 as of the end of the [fiscal quarter][fiscal year] ending [_____].

EXECUTED AND DELIVERED this [____] day of [_____].

III EXPLORATION II LP

By: Petroglyph Energy, Inc.,
     its general partner

By: _____
Name:
Title:

EXHIBIT D-1

## EXHIBIT E
## SECURITY INSTRUMENTS

1.      Guarantee and Collateral Agreement dated as of August __, 2016 made by Petroglyph Energy, Inc., III Exploration II LP and certain of its Subsidiaries in favor of Wilmington Trust, National Association, as Administrative Agent.

2.      Financing Statements related to item 1.

3.      POCI Agreement.

520934 000003 17688986.3

# EXHIBIT F
## FORM OF ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit and guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.   Assignor:          _____

2.   Assignee:          _____
                        [and is an Affiliate of [identify Lender]

3.   Borrower:          III Exploration II LP

4.   Administrative Agent:   Wilmington Trust, National Association, as the administrative agent under the Credit Agreement

5.   Credit Agreement:   The Credit Agreement dated as of August __, 2016, as from time to time supplemented, amended, or restated, among III Exploration II LP, the Lenders parties thereto, and Wilmington Trust, National Association, as Administrative Agent

520934 000003 17688986.3

6.    Assigned Interest:

| Commitment Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[1] |
|---|---|---|---|
|  | $ | $ | % |
|  | $ | $ | % |
|  | $ | $ | % |

Effective Date: _____ ___, 201___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]


By:_____
Name:
Title:


ASSIGNEE

[NAME OF ASSIGNEE]


By:_____
Name:
Title:

---

[1] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

520934 000003 17688986.3

[Consented to and]<sup>2</sup> Accepted:


Wilmington Trust, National Association, as Administrative Agent


By_____
  Name:
  Title:


[Consented to:]<sup>3</sup>


III Exploration II LP

By: Petroglyph Energy, Inc.,
       its general partner

By: _____
Name:
Title:

---

[2] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[3] To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any Collateral thereunder, (iii) the financial condition of the Borrower, General Partner, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, General Partner, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 8.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

EXHIBIT F-4

3.      General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

EXHIBIT F-5

## SCHEDULE 7.06
## ENVIRONMENTAL MATTERS

None.

520934 000003 17688986.3

**SCHEDULE 7.14**
**SUBSIDIARIES AND PARTNERSHIPS**

None.

520934 000003 17688986.3

**SCHEDULE 7.18**
**GAS IMBALANCES**

None.

520934 000003 17688986.3

# SCHEDULE 7.19
# MARKETING CONTRACTS

None.

# SCHEDULE 7.20
# SWAP AGREEMENTS

CRUDE OIL

| | | | Nominal Volume | III Exploration II LP Pays: | Receives: | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Effective Date | Termination Date | (Bbls/Month) | Floating Index | Fixed Price | MTM @ 01/08/13 | Trade Date | Counterparty |
| Fixed for Floating Swap | January 1, 2013 | December 31, 2013 | 15,000 | Oil-WTI-Nymex | $ 100.00 | $1,037,100 | April 7, 2011 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2013 | December 31, 2013 | 5,000 | Oil-WTI-Nymex | $ 101.10 | $ 411,700 | February 14, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2014 | December 31, 2014 | 5,000 | Oil-WTI-Nymex | $ 100.00 | $ 429,500 | March 19, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2014 | December 31, 2014 | 5,000 | Oil-WTI-Nymex | $ 100.00 | $ 429,500 | March 20, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2014 | December 31, 2014 | 5,000 | Oil-WTI-Nymex | $ 100.07 | $ 433,700 | March 21, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2013 | December 31, 2013 | 3,000 | Oil-WTI-Nymex | $ 105.75 | $ 414,420 | March 23, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2013 | December 31, 2013 | 5,000 | Oil-WTI-Nymex | $ 90.31 | $ (235,700) | August 1, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2014 | December 31, 2014 | 5,000 | Oil-WTI-Nymex | $ 90.00 | $ (170,500) | August 3, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2013 | December 31, 2013 | 5,000 | Oil-WTI-Nymex | $ 90.00 | $ (254,300) | November 23, 2012 | BP Energy Company |
| Fixed for Floating Swap | January 1, 2014 | December 31, 2014 | 5,000 | Oil-WTI-Nymex | $ 90.00 | $ (170,500) | November 26, 2012 | BP Energy Company |
| | | | | | | $2,324,920 | | |

NATURAL GAS

| | | | Nominal Volume | III Exploration II LP Pays: | Receives: | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Effective Date | Termination Date | (MMBtu/Mont | Floating Index | Fixed Price | MTM @ 01/08/13 | Trade Date | Counterparty |
| Fixed for Floating Swap | April 1, 2012 | March 31, 2013 | 150,000 | Inside FERC-Rocky Mountains (NWP) | $ 2.830 | $ (99,000) | January 18, 2012 | BP Energy Company |
| Fixed for Floating Swap | November 1, 2011 | October 31, 2013 | 50,000 | Inside FERC-Rocky Mountains (NWP) | $ 4.170 | $ 416,300 | September 28, 2011 | BP Energy Company |
| Fixed for Floating Swap | April 1, 2012 | March 31, 2013 | 30,000 | Inside FERC-Rocky Mountains (NWP) | $ 4.480 | $ 79,200 | September 30, 2010 | BP Energy Company |
| Fixed for Floating Swap | April 1, 2013 | October 31, 2013 | 50,000 | Inside FERC-Rocky Mountains (NWP) | $ 2.830 | $ (153,700) | January 18, 2012 | BP Energy Company |
| Fixed for Floating Swap | April 1, 2013 | October 31, 2013 | 100,000 | Inside FERC-Rocky Mountains (NWP) | $ 3.575 | $ 214,100 | September 28, 2012 | BP Energy Company |
| Fixed for Floating Swap | April 1, 2014 | October 31, 2014 | 100,000 | Inside FERC-Rocky Mountains (NWP) | $ 3.870 | $ 51,100 | September 28, 2012 | BP Energy Company |
| Fixed for Floating Swap | November 1, 2013 | October 31, 2014 | 50,000 | Inside FERC-Rocky Mountains (NWP) | $ 4.000 | $ 115,700 | October 17, 2012 | BP Energy Company |
| | | | | | | $ 623,700 | | |

**SCHEDULE 9.05**
**INVESTMENTS**

None.

520934 000003 17688986.3

# Exhibit 4

**III Exploration II LP**
**DIP LOAN BUDGET**
DRAFT - as of 7/25/2016

(in 000's)

| | RESERVE BUDGET 1 Week Ending 29-Jul | RESERVE BUDGET 2 Week Ending 5-Aug | BUDGET 3 Week Ending 12-Aug | BUDGET 4 Week Ending 19-Aug | BUDGET 5 Week Ending 26-Aug | BUDGET 6 Week Ending 2-Sep | BUDGET 7 Week Ending 9-Sep | BUDGET 8 Week Ending 16-Sep | BUDGET 9 Week Ending 23-Sep | BUDGET 10 Week Ending 30-Sep | BUDGET 11 Week Ending 7-Oct | BUDGET 12 Week Ending 14-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joint Venture Cash Flow | | | | | | | | | | | | |
| 1 Energy Revenue - Net Receipts | 405 | - | - | - | 462 | - | - | - | - | 479 | - | - |
| 2 JIB Disbursements - Net Use | - | (515) | - | (187) | - | (510) | - | (125) | - | - | (510) | - |
| 3 Total Joint Venture Cash Flow | 405 | (515) | - | (187) | 462 | (510) | - | (125) | - | 479 | (510) | - |
| 4 Professional Fees | - | - | (208) | (45) | - | - | (895) | - | - | - | (511) | - |
| 5 DIP Interest Expense | - | - | - | - | - | - | (2) | - | - | - | (2) | - |
| 6 Operating Company Cash Flow | | | | | | | | | | | | |
| 7 Energy Revenue - Gross | - | - | - | - | 2,031 | - | - | - | 2,018 | - | - | - |
| 8 Royalty Payments | (462) | - | - | - | - | (452) | - | - | (449) | - | - | - |
| 9 Production Taxes | - | - | - | - | - | (375) | - | - | - | - | - | - |
| 10 Accounts Payable | (321) | (215) | (221) | (221) | (221) | - | (222) | (222) | (222) | (222) | (221) | (221) |
| 11 Payroll | (182) | - | (182) | - | (182) | - | (182) | - | (182) | - | (182) | - |
| 12 Management Fee | (10) | (10) | (10) | (10) | (10) | (8) | (8) | (8) | (8) | (8) | (10) | (10) |
| 13 Wind Down Reserve | - | - | - | - | - | - | - | - | - | - | - | - |
| 14 Other | - | - | - | - | - | - | - | - | - | - | - | - |
| 15 Total Operating Company Cash Flow | (975) | (225) | (413) | (231) | 1,619 | (835) | (412) | (230) | 1,606 | (679) | (413) | (231) |
| 16 Net Cash Surplus (Uses) | (570) | (740) | (621) | (463) | 2,080 | (1,345) | (1,309) | (355) | 1,606 | (200) | (1,436) | (231) |
| 17 DIP Financing | - | - | - | - | - | - | - | - | - | - | - | - |
| 18 Beginning, Cash Surplus | 4,030 | 3,460 | 2,720 | 2,099 | 1,636 | 3,716 | 2,371 | 1,062 | 707 | 2,313 | 2,114 | 678 |
| 19 Net Cash (Use) | (570) | (740) | (621) | (463) | 2,080 | (1,345) | (1,309) | (355) | 1,606 | (200) | (1,436) | (231) |
| 20 Ending, Cash Surplus | 3,460 | 2,720 | 2,099 | 1,636 | 3,716 | 2,371 | 1,062 | 707 | 2,313 | 2,114 | 678 | 447 |
| **21 Cumulative DIP Loan Balance** | - | - | - | - | - | - | - | - | - | - | - | - |
| Contingent Budget Expenses | | | | | | | | | | | | |
| QEP P&A AFE's (Joint Venture Cash Flow) | - | - | - | - | - | (423) | - | - | - | - | - | - |
| QEP Audit Adj. - Company Demand | - | 43 | - | - | - | 265 | - | - | - | - | - | - |
| QEP Audit Adj. - QEP Demand | - | - | - | - | - | (1,071) | - | - | - | - | - | - |
| EP Revenue Return | - | - | - | (312) | - | - | - | - | - | - | - | - |
| Severance Avoidance | - | - | - | - | - | - | - | - | - | - | - | - |
| Ad Valorem Taxes | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Contingent Budget Expenses** | - | 43 | - | (312) | - | (1,229) | - | - | - | - | - | - |

Note: The accompanying cash flow forecast has been prepared by the Debtors' management team in collaboration with Huron. This work product remains subject to material change. The Debtors expect to make ongoing revisions to this and other forecasts. The DIP Loan Budget assumes a sale closes on or before October 31, 2016. The DIP Loan Budget also assumes investment banker fees will be paid from the sale proceeds

**III Exploration II LP**
**DIP LOAN BUDGET**
**DRAFT - as of 7/25/2016**

(in 000's)

| | BUDGET 13 Week Ending 21-Oct | BUDGET 14 Week Ending 28-Oct | BUDGET 15 Week Ending 4-Nov | BUDGET 16 Week Ending 11-Nov | BUDGET 17 Week Ending 18-Nov | BUDGET 18 Week Ending 25-Nov | BUDGET 19 Week Ending 2-Dec | BUDGET 20 Week Ending 9-Dec | BUDGET 21 Week Ending 16-Dec | BUDGET 22 Week Ending 23-Dec | BUDGET 23 Week Ending 30-Dec | BUDGET 24 Week Ending 6-Jan | 24-WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Joint Venture Cash Flow | | | | | | | | | | | | | |
| 1 Energy Revenue - Net Receipts | - | 482 | - | - | - | 481 | - | - | - | - | 488 | - | 2,796 |
| 2 JIB Disbursements - Net Use | (125) | - | (510) | - | (125) | - | (510) | - | (125) | - | - | - | (3,242) |
| 3 Total Joint Venture Cash Flow | (125) | 482 | (510) | - | (125) | 481 | (510) | - | (125) | - | 488 | - | (445) |
| 4 Professional Fees | - | - | - | (500) | - | - | - | (480) | - | - | - | - | (2,639) |
| 5 DIP Interest Expense | - | - | - | (2) | - | - | - | (2) | - | - | (8) | - | (16) |
| 6 Operating Company Cash Flow | | | | | | | | | | | | | |
| 7 Energy Revenue - Gross | 1,937 | - | - | - | - | 1,992 | - | - | - | - | - | - | 7,978 |
| 8 Royalty Payments | - | - | (431) | - | - | - | (443) | - | - | - | - | - | (2,237) |
| 9 Production Taxes | - | - | - | - | - | - | (401) | - | - | - | - | - | (777) |
| 10 Accounts Payable | (221) | (221) | (209) | (209) | (209) | (209) | - | - | - | - | - | - | (3,806) |
| 11 Payroll | (182) | (1,015) | (172) | - | - | - | - | - | - | - | - | - | (2,462) |
| 12 Management Fee | (10) | (10) | (9) | (9) | (9) | (9) | (9) | - | - | - | - | - | (175) |
| 13 Wind Down Reserve | - | - | - | - | (150) | - | - | (150) | - | - | - | - | (300) |
| 14 Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 15 Total Operating Company Cash Flow | 1,524 | (1,246) | (821) | (218) | (368) | 1,774 | (854) | (150) | - | - | - | - | (1,779) |
| 16 Net Cash Surplus (Uses) | 1,399 | (765) | (1,331) | (720) | (493) | 2,254 | (1,364) | (632) | (125) | - | 480 | - | (4,879) |
| 17 DIP Financing | - | - | 500 | 700 | 500 | (1,700) | 800 | 600 | 150 | - | (438) | - | 1,112 |
| 18 Beginning, Cash Surplus | 447 | 1,846 | 1,082 | 250 | 230 | 237 | 791 | 228 | 196 | 221 | 221 | 262 | 4,030 |
| 19 Net Cash (Use) | 1,399 | (765) | (831) | (20) | 7 | 554 | (564) | (32) | 25 | - | 42 | - | (3,767) |
| 20 Ending, Cash Surplus | 1,846 | 1,082 | 250 | 230 | 237 | 791 | 228 | 196 | 221 | 221 | 262 | 262 | 262 |
| **21 Cumulative DIP Loan Balance** | **-** | **-** | **500** | **1,200** | **1,700** | **-** | **800** | **1,400** | **1,550** | **1,550** | **1,112** | **1,112** | |
| Contingent Budget Expenses | | | | | | | | | | | | | |
| QEP P&A AFE's (Joint Venture Cash Flow) | - | - | - | - | - | - | - | - | - | - | - | - | (423) |
| QEP Audit Adj. - Company Demand | - | - | - | - | - | - | - | - | - | - | - | - | 308 |
| QEP Audit Adj. - QEP Demand | - | - | - | - | - | - | - | - | - | - | - | - | (1,071) |
| EP Revenue Return | - | - | - | - | - | - | - | - | - | - | - | - | (312) |
| Severance Avoidance | - | (818) | - | - | - | - | - | - | - | - | - | - | (818) |
| Ad Valorem Taxes | - | - | - | - | - | (450) | - | - | - | - | - | - | (450) |
| **Total Contingent Budget Expenses** | **-** | **(818)** | **-** | **-** | **-** | **(450)** | **-** | **-** | **-** | **-** | **-** | **-** | **(2,766)** |